# FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT, <br><br> Complainant, <br><br> v. <br><br> PINNACLE PARTNERS FINANCIAL CORPORATION <br> (CRD No. 145523), <br><br> and <br><br> BRIAN K. ALFARO <br> (CRD No. 4049120), <br><br> Respondents. | Disciplinary Proceeding <br> No. 2010021324501 <br><br> Hearing Officer – LBB <br><br><br> **DEFAULT DECISION** <br><br><br> Dated: April 25, 2012 |

Respondent Pinnacle Partners Financial Corporation is expelled from FINRA membership, and Respondent Brian K. Alfaro is barred from associating with any member firm in any capacity, for making material misrepresentations in connection with the sale of securities, in willful violation of Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5, NASD Rules 2120 and 2110, and FINRA Rules 2020 and 2010.

Alfaro is also barred for misusing customer funds, in violation of NASD Rules 2330 and 2110, and FINRA Rules 2150 and 2010.

Alfaro is additionally barred, and Pinnacle is expelled, for unregistered sales of securities, in violation of Section 5 of the Securities Act of 1933, NASD Rule 2110, and FINRA Rule 2010.

In light of the bars, no additional sanctions are imposed for Respondents' failure to document and determine suitability, in violation of NASD Rule 2310 and FINRA Rule 2010; failure to report, accurately report, and maintain Rule 3070 filings, and failure to update and late updating of Forms U4, in violation of FINRA's By-Laws, NASD Rule 3070, and FINRA Rule 2010; failure to supervise, establish and maintain supervisory controls, in violation of NASD Rules 3012 and 3010, and FINRA Rule 2010; willful failure to maintain books and records, in violation of Section 17 of the Securities Act of 1933, SEC Rule 17a-4, and FINRA Rule 2010 (by Pinnacle); and causing Pinnacle to fail to maintain books and records (by Alfaro).

As restitution, Respondents are ordered to offer rescission to the customers who were the victims of the fraudulent securities sales. For those customers who do not elect to rescind their securities purchases, Respondents are ordered to refund all sales commissions received from Pinnacle's customers who were the victims of the fraudulent securities sales.

*Appearances*

For the Department of Enforcement, Mark P. Dauer, Esq., Deputy Chief Litigation Counsel, New Orleans, Louisiana, and Robert Long, Esq., Senior Regional Counsel, Dallas, Texas.

For Respondents, Alan Wolper, Esq. and Christopher Seps, Esq., Chicago, Illinois, and Patton Zárate, San Antonio, Texas.

## DECISION

A three-week hearing was scheduled to begin in this disciplinary proceeding on February 27, 2012. Although the hearing location was moved from Dallas to San Antonio to accommodate Respondent Brian K. Alfaro ("Alfaro"), when the Extended Hearing Panel, the Department of Enforcement ("Enforcement"), and counsel for Respondents convened for the hearing, Respondents' counsel stated he had just been informed that his clients had decided not to attend the hearing, and they were defaulting. Accordingly, pursuant to FINRA Rule 9269, the Hearing Officer held that Respondents defaulted. Pursuant to Rule 9269, the allegations of the Complaint are deemed admitted for purposes of this default decision.[1]

## I.     Summary

This case involves fraudulent sales of unregistered securities in 11 private placement offerings by Respondent Alfaro and his wholly-owned firm, Respondent Pinnacle Partners Financial Corporation ("Pinnacle") (collectively "Respondents"). Alfaro and Pinnacle operated a boiler room where Pinnacle's registered representatives placed thousands of cold calls each week to solicit investments in Alfaro's captive oil and gas drilling joint ventures. The operators of the ventures are entities owned or controlled by Alfaro. Alfaro and Pinnacle raised more than $10 million from more than 100 investors for offerings that misrepresented or omitted material facts. From August 2008 to Respondents' March 2011 suspension from FINRA registration and

---

[1] References to the Second Amended Complaint are cited herein as "Complaint ¶ __." Enforcement submitted exhibits for the planned hearing, and the Hearing Officer has relied on some of those exhibits in this default decision. The exhibits are cited herein as "CX-__." A FINRA examiner, who was scheduled to testify at the hearing, testified briefly at a conference that was held at the hearing site when Respondents' counsel informed the Extended Hearing Panel and Enforcement that Respondents were defaulting. The testimony was offered primarily in support of Enforcement's request for restitution. References to the transcript of that conference, including the examiner's testimony, are cited at "Tr. __."

membership, Alfaro and Pinnacle offered and sold fraudulent offerings to investors throughout the United States. These fraudulent sales have caused significant harm to Pinnacle's customers. By engaging in the foregoing conduct, Respondents willfully violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), SEC Rule 10b-5, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020.[2] Complaint ¶ 1.

From August 2008 to March 2011, Pinnacle and Alfaro misrepresented or omitted material facts related to the South Bayou Crook Chene, Pangaea, Normanna Deep, Normanna North, Victoria Secret, French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali offerings they sold to investors. Pinnacle and Alfaro provided investment summaries to all of the investors in these offerings. The investment summaries included numerous misrepresentations and omissions. Specifically, Alfaro received reports about prospects from well operators and deleted material information that was unfavorable before forwarding information contained in the reports to the investors. Pinnacle and Alfaro never informed investors of Alfaro's alteration of the reports or of the deleted material information. Pinnacle and Alfaro also provided investors with maps that omitted numerous dry, plugged, and abandoned wells near their projected drilling sites. In the investment summaries, Pinnacle and Alfaro grossly inflated natural gas prices, projected natural gas reserves, estimated gross returns, and estimated monthly cash flows. In addition, Pinnacle and Alfaro distributed an offering document claiming that a previous venture had distributed $14,287,436.46 to its investors when the actual distribution was less than $1.5 million. As a result of the foregoing conduct, Respondents Pinnacle and Alfaro willfully violated Section 10(b) of the Exchange Act,

---

[2] As of July 30, 2007, NASD consolidated with the member regulation and enforcement functions of NYSE Regulation and began operating under a new corporate name, the Financial Industry Regulatory Authority (FINRA). References in this decision to FINRA include, where appropriate, NASD. Following consolidation, FINRA began developing a new FINRA Consolidated Rulebook. The first phase of the new consolidated rules became effective on December 15, 2008, including certain conduct rules and procedural rules. *See* Regulatory Notice 08-57 (Oct. 2008). This decision refers to and relies on the NASD and FINRA Rules that were in effect at the time of each violation.

SEC Rule 10b-5, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020. Complaint ¶ 2.

From January 2009 to March 2011, Alfaro misused customer funds to: (1) meet obligations for previous offerings; (2) cover Alfaro's personal expenses; and (3) make cash payments to Alfaro personally. The only way non-party Alfaro Oil and Gas, LLC ("Alfaro Oil and Gas") could meet its financial obligations to drill the investors' wells and meet obligations to previous investors, after spending investor funds in this fashion, was to raise additional funds from investors or tap Alfaro's personal resources. As a result of the foregoing conduct, Alfaro violated NASD Rule 2330 and FINRA Rules 2150 and 2010. Complaint ¶ 3.

From August 23, 2008, to September 24, 2010, Pinnacle and Alfaro offered and sold unregistered securities. Pinnacle engaged in general solicitations by offering Alfaro's joint ventures to investors through the boiler room operated by Pinnacle and Alfaro. Specifically, Pinnacle and Alfaro pitched offerings on the initial cold call and sent out offering materials immediately following the initial cold call. By engaging in the foregoing conduct, Pinnacle and Alfaro acted in contravention of Section 5 of the Securities Act of 1933 ("Securities Act"), and thereby violated FINRA Rule 2010 and NASD Rule 2110. Complaint ¶ 4.

Pinnacle and Alfaro systematically destroyed documents, maintained inaccurate books and records, failed to report numerous written investor complaints related to the allegations in the Complaint, and failed to amend Forms U4 for settlements related to customer grievances in excess of $15,000. By engaging in the foregoing conduct, Respondents Pinnacle and Alfaro violated Article V, Section 2, of FINRA's By-Laws, NASD Rules 3070 and 2110, and FINRA Rule 2010. Complaint ¶ 5.

Pinnacle willfully violated Section 17 of the Exchange Act, SEC Rule 17a-4, and NASD Rule 3110, by failing to maintain firm records, including correspondence and e-mails. By

4

causing Pinnacle's violations of Section 17 of the Exchange Act, SEC Rule 17a-4, and NASD Rule 3110, Alfaro violated NASD Rule 2110 and FINRA Rule 2010. Complaint ¶¶ 5, 139-142.

From August 2008 through March 2011, Pinnacle's supervisory system and written procedures were not reasonably designed to ensure compliance with e-mail retention requirements. Among other things, the firm's procedures did not provide for any reasonable follow-up and review to ensure that copies of all e-mail communications were captured and maintained. As a result of the foregoing conduct, Pinnacle and Alfaro violated NASD Rules 3012, 3010, and 2110 and FINRA Rule 2010. Complaint ¶ 6.

## II.    Procedural Background and Respondents' Default

Enforcement filed the Complaint in this disciplinary proceeding on November 23, 2010, and an Amended Complaint on December 3, 2010, asserting four causes of action against Respondents Pinnacle and Alfaro, and a fifth cause of action against Alfaro. Enforcement filed a Second Amended Complaint on June 23, 2011, adding a cause of action against both Respondents for supervisory violations.

The First Cause of Action of the Second Amended Complaint charges both Pinnacle and Alfaro with violating Section 10(b) of the Exchange Act, SEC Rule 10b-5, NASD Rules 2120 and 2110, and FINRA Rules 2020 and 2010, in connection with the sale of 11 investments in oil and gas joint ventures. The Second Cause of Action charges Alfaro with misuse of customer funds, in violation of NASD Conduct Rule 2330, and FINRA Rules 2150 and 2010. The Third Cause of Action charges Respondents with violating of Section 5 of the Securities Act, and therefore NASD Rule 2110 and FINRA Rule 2010, by unregistered securities sales. The Fourth Cause of Action charges Respondents with violating NASD Rule 2310 and FINRA Rule 2010 by failing to document and determine suitability. The Fifth Cause of Action charges Respondents with violating NASD Rule 3070 and FINRA Rule 2010 by failing to report, accurately report, and maintain Rule 3070 filings; and with violating Article V, Section 2 of FINRA's By-Laws,

and FINRA Rule 2010, by failing to update and filing late updates of Forms U4. The Sixth Cause of Action charges Respondents with failing to supervise, failure to maintain supervisory controls, and failing to maintain accurate books and records, in violation of the Exchange Act, SEC Rule 17a-4, and FINRA's Rules.

On December 3, 2010, Enforcement filed its First Amended Complaint and initiated a Temporary Cease and Desist proceeding alleging that Respondents were continuing to commit fraud and misuse customer funds. Respondents entered into Temporary Cease and Desist Consent Orders on December 10, 2010 (the "December TCDO") and January 21, 2011 (the "January TCDO").

On February 10, 2011, Enforcement served a Notice of Suspension on Respondents based on Respondents' violations of the January TCDO. Specifically, Enforcement alleged that Respondents had made a number of fraudulent misrepresentations and omissions related to their offering and sale of the Montague Legacy project, an oil and gas venture that that is one of the ventures that are the subject of this proceeding. Respondents requested a hearing, but later withdrew that request. As a result, Respondents were suspended from FINRA membership effective March 8, 2011.

By Order of August 26, 2011, a hearing was scheduled for Dallas, Texas for February 27, 2012. On February 6, 2012, Respondents filed a motion for an indefinite continuance, based on Alfaro's alleged inability to travel due to a chronic medical condition. The Hearing Officer moved the hearing location to San Antonio to enable Alfaro to attend the hearing without traveling, and a Notice of Hearing was served on the parties on February 9, 2012, formally notifying them of the new hearing location. On February 27, 2012, the Extended Hearing Panel, Enforcement, and counsel for Respondents convened for the hearing in San Antonio, but Alfaro did not attend. Instead, Respondents' counsel stated that his

clients had decided not to attend the hearing, and they were defaulting. Accordingly, the Hearing Officer ruled that Respondents had defaulted. Tr. 3, 16.

## III. Respondents, Related Entities, and Jurisdiction

Pinnacle was a member of FINRA from March 7, 2008, until May 24, 2011, the effective date of its Form BDW withdrawing from FINRA membership. Alfaro was the firm's president and chief compliance officer. Pinnacle is 100% owned by Silver Star Resources, LLC, ("Silver Star"), which is wholly-owned by Alfaro. Pinnacle operated pursuant to the (k)(2)(i) exemptive provisions of SEC Rule 15c3-3, and only conducted a securities business selling oil and gas private placements, purportedly pursuant to SEC Regulation D. Complaint ¶ 19 (admitted); CX-2. Although Pinnacle has not been a FINRA member firm since May 24, 2011, it remains subject to FINRA's jurisdiction for purposes of this proceeding, because the Complaint was filed while it was a member firm.

Alfaro entered the securities industry in October 1999 through registered firm The Champion Group, Inc. ("Champion"). Alfaro's employment was terminated by Champion in June 2006. He was employed by Pinnacle from September 2006 until March 3, 2011. Alfaro was suspended from FINRA registration on March 8, 2011. During his career in the securities industry, Alfaro obtained Series 7, 39, and 63 licenses. Complaint ¶ 21 (admitted); CX-1. Although Alfaro has not been associated with a FINRA member firm since March 3, 2011, he remains subject to FINRA's jurisdiction for purposes of this proceeding, because the Complaint was filed while he was associated with a FINRA member firm.

Non-party Silver Star is the sole owner of Pinnacle. Silver Star was used by Alfaro to increase the cost to investors for leases originally acquired by Alfaro. Silver Star charged exorbitant fees to investors without providing any identifiable services. Complaint ¶ 23.

Non-party Alfaro Oil and Gas is wholly-owned by Alfaro and acts as the managing venturer for almost all offerings sold by Pinnacle and Alfaro. Alfaro Oil and Gas charged

7

exorbitant additional fees to all investors that are not typically incurred by other interest holders in similar oil and gas drilling projects. Complaint ¶ 24.

## IV. First Cause of Action: Respondents Violated Section 10(b) of the Exchange Act, SEC Rule 10b-5, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020

The Second Amended Complaint charges Respondents with making misrepresentations and omissions of material facts in connection with the sale of investments in 11 oil and gas drilling joint ventures, in violation of Section 10(b) of the Exchange Act, SEC Rule 10b-5, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020.

### A. Misrepresentations and Omissions Under the Exchange Act, SEC Rule 10b-5, and FINRA's Rules

Section 10(b) of the Exchange Act provides that it is "unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[3]

SEC Rule 10b-5 makes it unlawful "[t]o employ any device, scheme, or artifice to defraud; to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."[4] To establish a violation of Rule 10b-5, Enforcement must prove by a preponderance of the evidence that Respondents: (1) made misrepresentations or omissions of material facts; (2) acted with scienter; (3) made such misrepresentations or omissions in connection with the purchase or sale of a security; and (4)

---

[3] 15 U.S.C. § 78j(b).

[4] 17 C.F.R. § 240.10b-5.

8

used "any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange."[5]

Liability for material omissions is "'premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction.'"[6] A registered representative owes a duty to his clients to disclose material information fully and completely, including material adverse facts, when recommending a transaction.[7]

FINRA's antifraud rule, FINRA Rule 2020, and its predecessor, NASD Rule 2120, are similar to Rule 10b-5.[8] A violation of FINRA's antifraud rule or SEC Rule 10b-5 is also a violation of FINRA Rule 2010, and its predecessor, NASD Rule 2110. "It is well established that a violation of a Commission or NASD rule or regulation is inconsistent with just and equitable principles of trade, and is therefore also a violation of Rule 2110."[9]

## B. Respondents Made Material Misrepresentations and Omissions in Securities Sales to All Investors

Pinnacle and Alfaro offered and sold securities to investors located throughout the United States from their boiler room in San Antonio, Texas. The 11 securities at issue in the First Cause of Action were marketed as joint venture interests (general partnerships) for participation in the acquisition of working interests and net revenue interests in oil and gas wells. The 11 offerings were South Bayou Crook Chene, Victoria Secret, Normanna North, Normanna Deep, Pangaea,

---

[5] *Dep't of Enforcement v. Kaweske*, No. C07040042, 2007 NASD Discip. LEXIS 5, at *25-26 (N.A.C. Feb. 12, 2007); *Dep't of Enforcement v. Frankfort*, No. C02040032, 2007 NASD Discip. LEXIS 16, at *21 (N.A.C. May 24, 2007); 17 C.F.R. § 240.10b-5; *see SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865 (S.D.N.Y. 1997) (finding that the jurisdictional requirements of the federal antifraud provisions are broadly construed), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).

[6] *Dep't of Enforcement v. Kesner*, No. 2005001729501, 2010 FINRA Discip. LEXIS 2, at *19 (N.A.C. Feb. 26, 2010), quoting *Chiarella v. United States*, 445 U.S. 222, 230 (1980).

[7] *Dep't of Enforcement v. Frankfort*, No. C02040032, 2007 NASD Discip. LEXIS 16, at *20 (N.A.C. May 24, 2007); *Dep't of Enforcement v. Kesner*, 2010 FINRA Discip. LEXIS 2, at *19.

[8] *Dep't of Enforcement v. Kirlin Sec.*, No. EAF0400300001, 2009 FINRA Discip. LEXIS 2, at *39 (N.A.C. Feb. 25, 2009), *aff'd*, Exchange Act Rel. No. 61135, 2009 SEC LEXIS 4168, at *42 (Dec. 10, 2009).

[9] *Kirlin Sec.*, 2009 SEC LEXIS 4168, at *59-60, n.81 (Dec. 10, 2009).

French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali. Complaint ¶ 26.

Pinnacle and Alfaro failed to disclose to all investors that none of the joint ventures offered through Pinnacle and Alfaro had ever been profitable for anyone other than Pinnacle, Alfaro, and entities that Alfaro owned and controlled. Alfaro used two non-registered entities that charged fees to investors, making each of the offerings less likely to be profitable. Alfaro Oil and Gas acts as the managing venturer for almost all offerings sold by Pinnacle and Alfaro. Silver Star and Alfaro Oil and Gas charged exorbitant additional fees to all investors that are not typically incurred by other interest holders in similar oil and gas drilling projects. Complaint ¶ 27. Silver Star charged all investors for purported lease acquisition costs. The extent of Silver Star's exorbitant fees was never disclosed to investors. Complaint ¶ 28.

Pinnacle and Alfaro's solicitations created the false impression that Alfaro Oil and Gas was an oil and gas operator. Alfaro Oil and Gas entered into "turnkey agreements" with all investors in the 11 offerings at issue offered and sold by Pinnacle and Alfaro. Turnkey agreements are drilling contracts under which the drilling contractor agrees to perform stated functions for an agreed-upon price. This typically limits the liability exposure for a contractor's actions. The turnkey agreement stated that Alfaro Oil and Gas would be paid to "... acquire the Prospect and drill and complete the Prospect well, including, but not limited to, the setting of production casing or, if necessary, the plugging and abandoning of a dry hole...." The turnkey agreement also stated that: "Alfaro shall conduct all of its efforts in a good and workmanlike manner and with reasonable due diligence." Alfaro Oil and Gas has never acted as an operator or actually drilled an oil and gas well. In the offerings sold by Pinnacle and Alfaro, Alfaro Oil and Gas served solely as an interest holder in prospects that were run by actual operators. Complaint ¶ 29.

Despite the limited role of Alfaro Oil and Gas in the development of the wells, Pinnacle and Alfaro sold the 11 joint venture interests to all investors at prices that were as much as 100% to 200% more than the cost estimates Alfaro received from the operators to drill the wells. As a result, investors received minority interests in oil and gas prospects at prices that included substantial additional costs: 1) to cover overhead; 2) to compensate the boiler room employees; and 3) to fund Alfaro's lifestyle. Neither Pinnacle nor Alfaro disclosed the drilling cost estimates to investors. Thus, investors were not aware that they paid 100% to 200% more than the drilling cost estimate totals for the interests they acquired. Complaint ¶ 30.

### C. Respondents Made Material Misrepresentations and Omissions in the Sales of Securities that were Specific to the Joint Venture Being Marketed

Pinnacle and Alfaro routinely materially misrepresented or omitted facts that were provided to them by the wells' actual operators. As discussed more specifically below, Pinnacle and Alfaro misrepresented or omitted material facts related to the South Bayou Crook Chene, Victoria Secret, Normanna North, Normanna Deep, Pangaea, French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali offerings. Complaint ¶ 31.

### The South Bayou Crook Chene Offering

The South Bayou Crook Chene offering was dated July 10, 2008. From at least August 2008 until January 2009, Pinnacle and Alfaro offered and sold the South Bayou Crook Chene offering to investors. Alfaro prepared an investment summary and provided it to all investors with the South Bayou Crook Chene offering materials. The investment summary was copied verbatim from a report Alfaro received from the operator, with the exception of one sentence. The first page of Alfaro's executive summary and the report provided by the operator stated: "Cumulative production ... has been in excess of 12.5MMBO - 49 BCFG. At least two wells are still producing from this field, the Kerr McGee B-3 and the Hilcorp 4-B. The B-1 may also be

producing." However, Alfaro deleted the next sentence stating: "All currently producing wells are very marginal." This would have been material information to investors. Pinnacle and Alfaro never informed investors of Alfaro's alteration of the report or of the deleted information. Complaint ¶ 32.

Respondents collected $2,475,386.71 from South Bayou Crook Chene investors. The well was drilled and abandoned, and no money was ever distributed to the investors. CX-40; Tr. 6.

### The Pangaea Offering

The Pangaea offering was dated March 8, 2010. Pinnacle and Alfaro offered and sold the Pangaea offering to investors from at least March 2010 to September 2010. The Pangaea offering document provided to all investors discusses Alfaro's and Alfaro Oil and Gas's management experience. The offering document states: "As of 2006 Mr. Alfaro has served as a corporate officer of Primera Energy Partners, LLC ("Primera"). In that capacity he has had success in the following prior activities: ..." The offering document then details a number of previous offerings. The first offering listed is South Brushy Creek. Alfaro misrepresented that South Brushy Creek made "cash distribution to partners" of $14,287,436.46. This number is grossly inflated from the actual figure of less than $1.5 million. This material misrepresentation made it appear as if Alfaro's previous offering had been more profitable than it really was. Complaint ¶ 33.

The first four offerings detailed in the management section of the Pangaea offering documents were sorted by their "cash distribution to partners." The South Brushy Creek offering was listed as the highest cash distribution to partners at more than $14 million which, as stated previously, was grossly inflated. The second highest cash distribution to partners was less than $450,000, and the third highest was less than $250,000. None of the other offerings listed cash distributions to partners of more than $200,000. Alfaro continued the Pangaea offering without

correcting this misrepresentation even after this error was brought to his attention. Complaint ¶ 34.

Respondents collected $967,488.15 from Pangaea investors. The well was drilled, then plugged and abandoned. No money was ever distributed to investors. CX-44; Tr. 7.

### The Victoria Secret Offering

The Victoria Secret offering was dated January 5, 2009. Pinnacle and Alfaro offered and sold Victoria Secret to investors from at least January 2009 to July 2009. Each unit offered and sold to investors represented a .41% working interest in the venture. The investment summary included with the offering materials and used extensively during sales calls with all investors contained projected natural gas reserves of $630,000,000, estimated gross returns of $1,890,000 to $2,310,000 (for each investor's .41% working interest), and estimated monthly cash flow of $6,300 to $12,600 (for each investor's .41% working interest) based on natural gas prices of $7.00 per MCF. (MCF is the abbreviation for one thousand cubic feet, one of the standard units of measurement for natural gas.) Pinnacle and Alfaro had no basis for predicting that the wellhead price for natural gas would be $7.00 per MCF when Victoria Secret was offered by Pinnacle and Alfaro to investors. According to the U.S. Energy Information Administration, the wellhead price for natural gas was $5.15/MCF in January 2009, $4.19/MCF in February 2009, $3.72/MCF in March 2009, $3.43/MCF in April 2009, $3.45/MCF in May 2009, $3.45/MCF in June 2009, and $3.43/MCF in July 2009. Complaint ¶ 35. Respondents' use of the inflated projected natural gas price caused the potential natural gas reserves, estimated gross returns, and estimated monthly cash flow to increase dramatically. The chart below illustrates the magnitude of Respondents' misrepresentations:

| Natural Gas Price per MCF | Potential Natural Gas Reserves | Estimated Gross Returns/per .41% working interest | Estimated Monthly Cash Flow/per .41% working interest |
|---|---|---|---|
| $7.00 (Alfaro's number) | $630,000,000 | $1,890,000 to $2,310,000 | $6,300 to $12,600 |
| $5.15 (January actual number) | $463,500,000 | $1,390,500 to $1,699,500 | $4,635 to $9,270 |
| $4.19 (February actual number) | $337,100,000 | $1,131,300 to $1,382,700 | $3,772 to $7,542 |
| $3.45 (May/June actual number) | $310,500,000 | $931,500 to $1,138,500 | $3,105 to $6,210 |

Notwithstanding the fact that natural gas prices may fluctuate, the projected price conveyed by Pinnacle and Alfaro was unreasonable, and materially misrepresented projected reserves, estimated gross returns, and estimated monthly cash flow. Complaint ¶ 35.

In June and July 2009, Alfaro sent correspondence to investors claiming that Victoria Secret's operator "required special equipment" and was waiting for a rig. Alfaro also stated that drilling should occur in the next 45 to 60 days. At a time when natural gas prices were below $3.50/MCF, Alfaro continued to make his projections to investors with calculations based on a price of $7.00/MCF: "We are extremely excited about this prospect which is targeting reserves in excess of $630,000,000.00 and should reach a total depth of 15,000'." At the time Alfaro sent this correspondence, targeted reserves were less than $315,000,000. Complaint ¶ 36.

Respondents collected $1,587,681 from Victoria Secret investors. Respondents refunded $192,425 for subscriptions; $322,503 of drilling and testing refunds; $216,722 of transfers of subscriptions; and $255,031 of transfers of drilling and testing. In total, $980,701.49 was either returned to investors or investors' funds were transferred to another offering. Pinnacle and Alfaro retained or spent $598,979.51. The well was never drilled. CX-46; Tr. 8.

### The SW Redfish Reef Offering

The SW Redfish Reef offering was dated November 16, 2009. Pinnacle and Alfaro offered and sold the SW Redfish Reef offering from December 9, 2009, to March 2, 2010. According to their SW Redfish Reef blotter, Pinnacle and Alfaro collected $837,387 from investors, including almost $120,000 for drilling and testing and completion costs that were not owed. A total of $58,360 was returned to investors, and $779,027 was not returned. The well has never been drilled. Complaint ¶ 37; CX-157; Tr. 15-16.

On September 9, 2009, Alfaro Oil and Gas executed a participation agreement and acquired a 10% working interest in the SW Redfish Reef project. Attached to the participation agreement was an authorization for expenditure dated August 4, 2009. Alfaro approved the authorization for expenditure with his signature on September 22, 2009. The authorization for expenditure detailed Alfaro Oil and Gas's total drilling, completion, and equipment costs as $604,990. Despite receiving the authorization for expenditure and signing a contract confirming these amounts prior to the SW Redfish Reef offering, Alfaro and Pinnacle never disclosed these figures to any of their investors. Complaint ¶ 38.

The November 16, 2009, SW Redfish Reef offering offered 25 joint venture interests for $2,297,000. Alfaro Oil and Gas purchased the project for $90,000, representing its share of the prospect development costs. According to the operator, only 29.5% of the SW Redfish prospect has been sold, and the project has very little current interest or value. As a result, the operator has offered to refund participation costs to Alfaro and the other partners upon request. Alfaro has failed to inform investors that the project was never more than 30% sold, and that the operator offered a complete refund for any partner in the project. Complaint ¶ 39.

### The Normanna Deep Offering

The Normanna Deep offering was dated February 10, 2009. Pinnacle and Alfaro offered and sold the Normanna Deep offering to investors from at least February 2009 to May 2009.

The investment summary included with the offering materials and used extensively during sales calls with all investors contained projected natural gas reserves of $350,000,000, estimated gross returns of $1,050,000 to $2,100,000 (for each investor's .41% working interest), and estimated monthly cash flow of $6,300 to $9,450 (for each investor's .41% working interest) based on natural gas prices of $7.00 per MCF. Pinnacle and Alfaro had no basis for predicting that the wellhead price for natural gas would be $7.00 per MCF when Normanna Deep was offered by Pinnacle and Alfaro to investors. According to the U.S. Energy Information Administration, the wellhead price for natural gas was $4.19/MCF in February 2009, $3.72/MCF in March 2009, $3.43/MCF in April 2009, and $3.45/MCF in May 2009. Complaint ¶ 40. The chart below illustrates the magnitude of these misrepresentations:

| Natural Gas Price per MCF | Potential Natural Gas Reserves | Estimated Gross Returns/per .41% working interest | Estimated Monthly Cash Flow/per .41% working interest |
|---|---|---|---|
| $7.00 (Alfaro's number) | $350,000,000 | $1,050,000 to $2,100,000 | $6,300 to $9,450 |
| $4.19 (February actual number) | $209,500,000 | $628,500 to $1,257,000 | $3,771 to $5,656.50 |
| $3.45 (May/June actual number) | $172,500,000 | $517,500 to $1,035,000 | $3,105 to $4,657.50 |

Notwithstanding the fact that natural gas prices may fluctuate, the projected price conveyed by Pinnacle and Alfaro was unreasonable, and materially misrepresented projected reserves, estimated gross returns, and estimated monthly cash flow. Complaint ¶ 40.

Respondents collected $523,935 from Normanna Deep investors. The investors were transferred to the Normanna North offering. Alfaro required investors to contribute additional funds for "drilling and testing" in connection with the transfer, and those funds were credited to

Normanna North, creating the appearance that investors' funds had been transferred. None of the money was returned to investors. The Normanna Deep well was not drilled. CX-89; Tr. 10-11.

### The Normanna North Offering

The Normanna North offering was dated December 9, 2009. From at least December 2009 until May 2010, Pinnacle and Alfaro offered and sold the Normanna North offering to investors. The Normanna North offering sought to raise $2,302,370. According to the Normanna North blotter, Pinnacle and Alfaro offered and sold Normanna North from December 16, 2009, to April 7, 2010, when an investor was transferred from the Victoria Secret offering. Although Alfaro used a natural gas price of $5.00 per MCF – rather than the inflated $7.00/MCF he had used in the Normanna Deep and Victoria Secret offerings, for example – Alfaro prepared an investment summary provided to all investors that contained material misrepresentations and omissions. Specifically, he provided maps to all investors detailing more than ten producing wells near the proposed drilling site. The maps highlighted the producing wells and noted their production quantities; however, the maps failed to disclose that there were also more than ten wells that were dry, plugged, and abandoned near the proposed drilling site. This information was readily available to Alfaro and was not provided to investors. Complaint ¶¶ 41, 42.

Alfaro Oil and Gas entered into a joint operating agreement with Abraxas Petroleum Corporation ("Abraxas") on April 22, 2009. The terms of the joint operating agreement were "a third for a quarter." This is an industry standard that provides a participant with a 33.33% working interest to casing point, and a 25% working interest (that also provides 25% of revenue) after casing point. Casing point is the point at which a well has been drilled to the desired depth and the owners must decide whether or not to complete and prepare the well for production. A working interest is the rights to mineral interests granted in an oil and gas lease providing the right to work on the leased property to search, develop, and produce oil and gas (and the

17

obligation to pay all costs). Essentially, the terms require a participant to pay 33.33% of all costs to casing point in order to receive 25% of the project's return. Pinnacle and Alfaro never disclosed the terms of the joint operating agreement to their investors. Complaint ¶ 43.

On December 8, 2009, one day before the offering, Abraxas provided Alfaro with an authorization for expenditure showing $485,500 as Alfaro Oil and Gas's 33.33% proportionate share of drilling costs. The authorization for expenditure also detailed completion costs. Despite receiving the authorization for expenditure and signing a contract confirming these amounts prior to the Normanna North offering, Alfaro and Pinnacle never disclosed these figures to any of their investors. Complaint ¶ 44.

Respondents received $2,200,614 from Normanna North investors. The well was drilled and in production, but the operator was retaining any funds that might have been distributed as an offset against money that Alfaro Oil and Gas owed to the operator because Alfaro Oil and Gas had not paid the full $751,000 amount of the drilling contract, despite collecting more than $2 million from investors. No money has been distributed to investors. CX-98; Tr. 11.

### The French Town Offering

The offering document for French Town 2-H is dated July 23, 2010. Pinnacle and Alfaro began selling the investment in early August 2010. The participation agreement between Alfaro Oil and Gas and Gulftex/French Town Acres is dated "September ___, 2010."[10] According to Alfaro Oil and Gas's website, the French Town 2-H well was drilled to total depth on January 7, 2010. As this well was already drilled more than six months before the offering document, there was no need to drill a well; however, the offering document provided by Pinnacle and Alfaro to investors incorrectly stated that their investment would be used to acquire, drill, and complete a well. Complaint ¶ 45.

---

[10] The blank space is in the Second Amended Complaint and the referenced document. CX-130 at 2.

Pinnacle and Alfaro also failed to disclose to French Town investors that only $1.4 million of the $2.1 million raised for this project would be sent to the operator, as the costs were already known for this well that had already been drilled. Complaint ¶ 46.

Alfaro and Pinnacle provided every French Town investor with an investment summary. The investment summary included with the offering materials and used extensively during sales calls with all investors contained projected estimated gross returns of $787,500 to $967,500 (for each investor's 1.34% working interest), and estimated monthly cash flow of $4,050 to $6,750 (for each investor's 1.34% working interest) based on projected daily gas production of 3,000/MCF to 5,000/MCF. The investment summary contained grossly inflated projected daily gas production numbers. Pinnacle and Alfaro had no basis for predicting that the daily gas production would be 3,000/MCF to 5,000/MCF when French Town was offered by Pinnacle and Alfaro to investors. In fact, Alfaro Oil and Gas's lead geologist for the French Town offering had previously informed Alfaro that he expected initial production of 1,000/MCF to 1,500/MCF per day, dropping to about 500/MCF to 600/MCF per day in six to eight months, and then leveling out at 350/MCF to 450/MCF per day after a year. Pinnacle and Alfaro never provided any French Town investors with the estimates provided by the lead geologist. Complaint ¶ 47.

Despite the fact that his "geophysicist stamp" was included and he was listed as the "lead geologist" in the French Town offering materials, Alfaro Oil and Gas's lead geologist was unaware that Alfaro had unilaterally increased the daily gas production projection for the French Town offering to 3,000/MCF to 5,000/MCF per day. When confronted with the offering materials provided by Pinnacle and Alfaro to investors, the lead geologist testified under oath that he was previously unaware that these numbers had been provided to investors, and that he was upset that his name was associated with the inflated numbers provided by Alfaro and Pinnacle to investors. Complaint ¶ 48.

The French Town offering materials also included information provided by a "senior geologist" for the project. Alfaro Oil and Gas's senior geologist was also unaware that Alfaro had unilaterally increased the daily gas production projection for the French Town offering to 3,000/MCF to 5,000/MCF. The senior geologist had also previously informed Alfaro that he expected initial production of 1,000/MCF to 1,500/MCF per day. When confronted with the offering materials provided by Pinnacle and Alfaro to investors, the senior geologist testified under oath that the daily production numbers provided by Pinnacle and Alfaro to investors were not attainable. Complaint ¶ 49.

Alfaro and Pinnacle provided investors with initial production information for eight similar producing gas wells near the French Town well; however, Alfaro and Pinnacle failed to disclose that the actual production for all eight of these wells was substantially less than the projections contained in the French Town investment summary. Alfaro and Pinnacle's projected daily gas production numbers were 3,000/MCF to 5,000/MCF. If any of the eight similar wells ever had actual daily gas production that exceeded 3,000/MCF, that level of production was extremely short-lived. Within ten months, none of the eight similar wells was producing more than 1,000/MCF per day, and the daily production from all of these wells continued to decline. The lowest daily production value provided by Alfaro and Pinnacle was significantly higher than that of any of the eight similar producing wells. The actual production numbers for the eight similar wells were hundreds of percent less than the projected production numbers. As a result, Pinnacle and Alfaro materially misrepresented projected daily production, estimated gross returns, and estimated monthly cash flow for the French Town offering. Complaint ¶ 50.

Respondents collected $1,703,506 from French Town investors. The well was drilled and completed, and in production, but no money has been distributed to investors. CX-128; Tr. 12.

## The East Wharton Offering

The East Wharton offering was dated October 26, 2009. By December 8, 2009, Alfaro had reached the maximum 15 units and $1,183,200 detailed in the offering; however, Pinnacle and Alfaro continued to add investors and oversell the offering. Alfaro Oil and Gas's drilling costs for the well were $658,272 for a 16% working interest. The completion costs were estimated to be $160,000. Despite receiving the authorization for expenditure and signing a contract confirming these amounts prior to the East Wharton offering, Alfaro and Pinnacle never disclosed these figures to any of their investors. Complaint ¶¶ 51, 56.

The East Wharton well was drilled in January 2010, and the operator sent completion ballots out to all industry partners. After a review of the preliminary well tests, one partner elected not to complete the well based on data related to the well's potential production. This required the departing partner to forfeit all of the funds it had paid for drilling and testing costs as well as any future interest in the well. On February 23, 2010, Alfaro elected to complete the well and to purchase the working interest of the non-consenting partner. This allowed Alfaro to obtain an additional 5% working interest while only paying for the completion costs associated with the interest. Pinnacle and Alfaro never disclosed to any investor that the industry partner had abandoned the project because it did not like the data related to the well's potential production, or that the units being sold were acquired solely by paying completion costs because the industry partner was unwilling to pay completion costs after analyzing data related to the well's potential production. Complaint ¶ 52.

After February 23, 2010, Alfaro sold interests in the East Wharton offering to nine additional investors using the same non-amended private placement memorandum, resulting in a total of 33.0662 units being sold (rather than the 15 unit maximum listed in the offering materials) and a total investment of $1,886,764 (rather than the $1,183,200 listed in the offering materials). Complaint ¶ 53.

There are numerous material misstatements in the offering document, including the location of the well, the well's specifications, and the turnkey cost to investors. When confronted with these inaccurate items in the offering materials, Alfaro admitted to the staff that the East Wharton offering materials contained numerous false and inaccurate statements. Complaint ¶ 54.

On February 20, 2010, after the well tests were analyzed and the industry partner elected to abandon its interest in the project, the operator sent e-mails to Alfaro and all other partners regarding the "East Wharton non-consent situation." The operator's e-mail to Alfaro and all other partners contained revised reserve estimates for the project of 3 BCF of gas and 200,000 barrels of oil. Alfaro failed to provide the revised reserves estimates to current or potential East Wharton investors. Instead, he continued offering the East Wharton project to new investors and to Victoria Secret transferees until February 2011 with projected reserves of 20 BCF of gas and 1,000,000 barrels of oil. Complaint ¶ 57.

After February 20, 2010, Pinnacle and Alfaro sold interests in the East Wharton offering to numerous additional investors using the same non-amended private placement memorandum, and Respondents received a total investment of over $1.8 million (rather than the $1,183,200 listed in the offering materials). At least three of these investors were transferred by Pinnacle and Alfaro from the Victoria Secret offering to the East Wharton offering. The offering document still contained the material misrepresentations and omissions. In addition, none of Pinnacle and Alfaro's East Wharton investors was provided with the revised reserves estimates sent by the operator or information related to the non-consenting partner, which was a material omission. Complaint ¶ 58.

As recently as September 16, 2010, Alfaro sold additional units in East Wharton to two Victoria Secret investors, as a means to transfer the interests of the Victoria Secret investors from the undrilled project. Complaint ¶ 55.

On April 26, 2011, Alfaro informed investors that the East Wharton well had failed. As a result, the project was terminated. Complaint ¶ 59. Respondents collected $1,888,318.21 from East Wharton investors. The well was drilled, plugged, and abandoned. No money was ever returned to investors. CX-73; Tr. 8-9.

### The Montague Legacy Offering

The Montague Legacy offering is dated November 1, 2010, and the offering documents include misrepresentations and omissions that are similar to those made in previous offerings. It is a turnkey offering to raise $4,943,840. On November 11, 2010, Pinnacle and Alfaro sold three units ($65,000 initial subscription and $269,000 total commitment). Between November 11 and November 23, 2010, Alfaro and Pinnacle sold an additional 7.75 units to six customers resulting in an additional $146,623.50 in payments and a $696,632 total commitment. Complaint ¶ 60.

As discussed in the previous paragraph, Alfaro and Pinnacle made their first sale of the Montague Legacy offering on November 11, 2010. On November 12, 2010, the staff discovered a negative balance reflected in Alfaro Oil and Gas's general ledger cash account and discussed it with the accountant shared by Alfaro Oil and Gas, Pinnacle, and Alfaro. According to the accountant, escrow was broken in the Montague Legacy offering and investors' funds were immediately transferred by Alfaro from the offering's account to Alfaro Oil and Gas's bank account. As a result of this transfer, the negative balance in Alfaro Oil and Gas's bank account was covered by using investor funds from the Montague Legacy offering the day after they were received. Complaint ¶ 61.

As of the date of the Second Amended Complaint, Alfaro had informed FINRA staff that he was selling and intended to keep selling the Montague Legacy offering to investors, and that

the funds raised from existing and new investors would be forwarded to him and placed in the offering's operating account, which Alfaro would then be entitled to use for any business or personal expense Alfaro deemed appropriate. Complaint ¶ 62.

The maps in the Montague Legacy offering materials reference nearby wells producing over 100 BOPD (barrels of oil per day). The wells referenced are more than two miles away and some are more than nine miles away. However, nearby wells, not identified in the offering materials, have verifiable production of less than one BOPD, and within a half-mile radius of the proposed well location there are two plugged wells and one dry hole. Despite the fact that information concerning all of these nearby wells was readily available to Alfaro and Pinnacle, this material information was not disclosed to investors in the offering materials. Complaint ¶ 63.

The Montague Legacy offering documents also reference a nearby well that had been drilled but had not reported any verifiable production at the time of the offering. The offering materials list the well's initial production as 800 BOPD and averaging 600 BOPD. When FINRA staff contacted the operator regarding this well, it was informed that the numbers listed in the Montague Legacy offering documents for the well were inflated. This was confirmed by a recent Texas Railroad Commission filing related to the well. Complaint ¶ 64.

Pinnacle and Alfaro also provided offering materials and made oral representations to hundreds of investors that violate Section 10(b) of the Exchange Act, SEC Rule 10b-5, and FINRA Rule 2020. Specifically, the January 25, 2011, Montague Legacy offering materials stated:

> With the newest technology, the completion of the Montague Legacy is anticipated to be every bit as successful as the offset Barnett Shell well due east, drilled and completed by Braden Exploration in July 2010, named the Rater "A" Unit #1H. In a recent conversation between Giant Resources and Braden concerning the well, they reported that the well IP'd over 800 Bopd and was producing approximately 600 Bopd as of July 11, 2010.

24

However, the offering materials and oral representations to investors failed to disclose that the November 2010 production numbers for the Braden well showed production of less than 250 BOPD. These numbers were filed by Braden with the Texas Railroad Commission and were known by Pinnacle and Alfaro. Complaint ¶ 72.

The Montague Legacy offering materials also failed to disclose that Pinnacle and Alfaro received a Wells Notice from the Securities and Exchange Commission citing securities fraud in December 2010. Pinnacle and Alfaro also failed to disclose information related to the Securities and Exchange Commission's Wells Notice and the Texas State Securities Board's Cease and Desist Order and upcoming related hearing when relevant inquiries were posed by investors on tape-recorded conversations with Alfaro. Complaint ¶ 73.

The Montague Legacy offering materials also state: "EOG reports on their website that they have many wells that come in making up to 1800 Bopd. With time, a slow decline is anticipated to a steady production rate average of 200+ Bopd and a slight increase in gas production of upwards of 1 Mmcfpd has been reported." However, the offering materials fail to disclose that: (a) EOG only lists one well with initial production of 1800 BOPD; (b) EOG lists the well as "EOG's best well to date in the Barnett Combo;" and (c) that the "slow decline" occurred in a matter of months. Complaint ¶ 74.

Pinnacle and Alfaro have also made oral representations to investors regarding an EOG well ten miles away had an initial production of 1800 BOPD; however, the oral representations to investors fail to disclose that the well is actually more than 15 miles away, never produced 1800 BOPD, a rapid decline in production occurred in three months, and that the November 2010 production numbers for the EOG well showed production of less than 250 BOPD. These numbers were filed with the Texas Railroad Commission and were known by Pinnacle and Alfaro. Pinnacle and Alfaro have also engaged in high pressure sales tactics involving false

statements regarding the number of units sold and available in the Montague Legacy offering. The misstatements in these recorded conversations directly contradict the firm's purchase and sales blotters and the Montague Legacy offering materials. Complaint ¶ 75.

- **Failure to Disclose to Montague Legacy Investors that Alfaro Oil and Gas Was Insolvent**

The only new private placement offering sold by Pinnacle and Alfaro from late 2010 until they were suspended on March 8, 2011, was the Montague Legacy offering. The Montague Legacy offering was also Respondents' primary source of revenue to fund unrelated business expenses and Alfaro's personal expenses. Pinnacle and Alfaro failed to inform Montague Legacy investors that Alfaro Oil and Gas was insolvent. This omission was especially material given that: (1) Montague Legacy investors were purchasing a turnkey contract requiring Alfaro Oil and Gas to pay the project's drilling and completion costs; (2) Alfaro Oil and Gas's failure to pay the well's operator when the payment was due for drilling and completion costs could result in Montague Legacy investors' distributions being withheld to cover unpaid costs; and (3) Alfaro Oil and Gas's failure to pay outstanding debts could lead to rescission of Alfaro Oil and Gas's rights (that Alfaro sold to investors). Complaint ¶ 65.

Pursuant to the January TCDO, Pinnacle and Alfaro were ordered "to cause Alfaro [Oil and Gas] to file with FINRA sufficient financials supervised by a certified public accountant, not unacceptable to FINRA, that demonstrate that Alfaro [Oil and Gas] is solvent and can meet its current obligations." On February 21, 2011, Respondents provided financial statements that: (1) were not supervised by a certified public accountant; (2) were replete with inaccuracies; and (3) indicated that Alfaro Oil and Gas was insolvent and incapable of meeting its current obligations. Complaint ¶ 66.

On February 21, 2011, Respondents provided a transmittal letter from a certified public accountant that stated: "Please find enclosed a copy of the current Alfaro Oil and Gas, LLC's

unaudited financials which have been prepared by the company in accordance with Generally Accepted Accounting Principles, GAAP. These financials reflect the current financial status of Alfaro Oil and Gas, LLC and the results of their operations." On February 22, 2011, FINRA staff contacted the certified public accountant who stated that he: (1) did not supervise the financials; (2) did not have anything to do with preparing the financials; (3) never reviewed the general ledger; and (4) never reviewed any supporting documentation related to the financials. Complaint ¶ 67.

The balance sheet provided to FINRA listed accounts payable of $402,046.35 and checking/savings of $35,135.57. The largest "asset" listed was "Interco Due to From Primera," classified as a contra liability of $2,081,546. Elimination of this alleged asset would have caused Alfaro Oil and Gas to have a negative value of more than $1 million, even if everything else in the financial statements had been accurate. Complaint ¶ 68.

The certified public accountant who provided the financials informed FINRA that he never saw any supporting documentation related to the "Interco Due to From Primera" entry. Primera is owned entirely by Respondent Alfaro. When confronted with the "Interco Due to From Primera" on August 26, 2010, Respondent Alfaro testified:

Q: How much money does Primera have at this point?

A: Last time I looked, not very much. We have moved a lot out of it.

Q: You said you've been moving money out of Primera. Where have you been moving that money to?

A: Well, Alfaro assumed a lot of liability of Primera. You know, Primera has been phased out, so to speak. We're not using it. So it didn't have a lot of money to begin with. We haven't been moving money out of it aggressively or anything. We just haven't had any money. We have not raised a deal on Primera since Alfaro and Pinnacle. But it's had expenses obviously, so it's just been--

Q: Does Primera have any way to pay back that $1.9 million?

A: Let me make sure that $1.9 million is accurate. But, no, that can't be accurate.

Q: To your knowledge there are not significant assets in Primera's accounts?

A: There's not.

27

Complaint ¶ 69. Primera has no meaningful operations, revenues, or ability to pay $2 million. As a result, the "Interco" entry is improper and Alfaro Oil and Gas is insolvent. Complaint ¶ 70.

The balance sheet provided to FINRA also improperly listed two assets. The first is "Joint Venture Project Deposits" of $951,559. The only information contained in the transaction detail shows that this number was created by a journal entry on December 31, 2008. No other information was provided to substantiate this purported asset. "A/R Other" of $347,820.89 is the second largest asset listed. The transaction detail shows that the accounts receivable are largely related party loans. The firm has failed to provide any supporting documentation that indicates that these assets exist or are collectable. Without these two assets, Alfaro Oil and Gas's own financial statements indicate that it had assets of less than $83,000. Complaint ¶ 71.

Respondents collected $240,751.50 from Montague Legacy investors, as of the date of the accounting submitted to Enforcement. The well was drilled and in production, but Enforcement does not know if investors have received any money. CX-105; Tr. 8-9.

### The Denali Offering

The Denali offering was dated May 13, 2010. Pinnacle and Alfaro offered and sold Denali to investors from June 1, 2010, to October 27, 2010, including four Victoria Secret transferees. According to the Denali blotter, Pinnacle and Alfaro received more than $1.4 million from investors. Complaint ¶ 76.

Alfaro received an executive summary from Jordan Oil Company, Inc. ("Jordan") detailing the terms of the project. The terms were "a third for a quarter," like the terms of the Normanna North project. Pinnacle and Alfaro never disclosed the terms set forth in the executive summary to their investors. Complaint ¶ 77.

A letter agreement dated May 24, 2010, outlined the terms of Alfaro's proposed participation in the Denali project. The letter agreement provided "ALFARO shall not sell, transfer, or assign any of its interest without the prior written consent of Jordan, which will not

be unreasonably withheld." The letter agreement also contained an authorization for expenditure indicating that Alfaro's total well cost was $703,422.05. Despite the fact that it possessed the agreement and authorization for expenditure at least a week before any sale was made, Pinnacle and Alfaro never disclosed that they were not permitted to re-sell the project. Pinnacle and Alfaro also failed to disclose the authorization for expenditure's existence or its terms to their investors. Complaint ¶ 78.

Shortly after the letter agreement was signed, Alfaro's boiler room cold-called a Louisiana investor and pitched the Denali offering on the initial call. The potential investor was familiar with Jordan, and he contacted Jordan to inquire about the Denali offering. Until that time, Jordan was unaware that Pinnacle and Alfaro were re-selling the Denali project. On June 3, 2010, Jordan's counsel sent an e-mail to Alfaro informing him that:

- the sales brochure used by Alfaro and Pinnacle was not authorized by Jordan Oil and contained both inaccurate information and information that they were not allowed to publish;
- Jordan refused to consent to the sale, transfer, or assignment of any interest;
- the offer under the letter agreement was withdrawn; and
- the letter agreement was null and void.

Complaint ¶ 79.

On June 7, 2010, Jordan's counsel sent Alfaro Oil and Gas a letter informing it that Alfaro Oil and Gas failed to make timely payment of $890,422 for the Denali project by June 4, 2010, that it owed $90,000, and was more than 100 days past due on East Moss Lake/LNG – a previous project with Jordan. The letter also admonished Alfaro for the unauthorized resale of the project and false or unauthorized statements contained in sales materials. Complaint ¶ 80.

On June 16, 2010, Jordan's counsel informed Alfaro that: "As of now, there is no contract between Jordan Oil and Alfaro. The deadline has passed without Alfaro Oil timely

paying the agreed-upon price. Moreover, unbeknownst to Jordan Oil, Alfaro's solicitation sales brochure contained misstatements and statements Alfaro was not authorized to make."
Complaint ¶ 81.

Pinnacle and Alfaro never informed any of their investors or potential investors that they owed Jordan significant sums, that Jordan had withdrawn its offer under the letter agreement, and that Jordan claimed that the letter agreement was null and void. Instead, they aggressively offered and sold the Denali offering. In June and July 2010, alone, Pinnacle and Alfaro received more than $1 million from approximately 40 investors located throughout the United States.
Complaint ¶ 82.

Respondents received $1,186,164 from Denali investors. The well was drilled, plugged and abandoned. No money was distributed to investors. CX-146; Tr. 13-14.

### East Moss Lake/LNG

The East Moss Lake/LNG offering was dated April 13, 2009. Pinnacle and Alfaro offered and sold the East Moss Lake/LNG offering from May 7, 2009, to October 16, 2009. According to the East Moss Lake/LNG blotter, Pinnacle and Alfaro received more than $1.8 million from investors. Complaint ¶ 83.

In 2008, Pinnacle and Alfaro received an East Moss Lake prospect summary from the lead geologist for Alfaro Oil and Gas, who recommended that Alfaro not pursue the East Moss Lake project based on a number of concerns. He noted that the location had already made almost 9 BCF from offset wells, and that the location should be depleted by two previous Conoco wells. The lead geologist explained that he would not recommend the project, noting: "Might payout ½ of cost. How much could be left in gas reservoirs after 9 BCF concerns me. Also, how long would it take to get it out economically?" Complaint ¶ 84.

Pinnacle and Alfaro never informed any investor that their lead geologist recommended they not pursue the East Moss Lake project. Pinnacle and Alfaro also failed to inform any investor of the serious concerns raised by Alfaro's lead geologist. Complaint ¶ 85.

Alfaro received an executive summary from Jordan detailing the terms of the project. The terms were "a third for a quarter," like Normanna North. Pinnacle and Alfaro never disclosed the terms of the executive summary to their investors. Complaint ¶ 86.

By January 2011, Alfaro owed Jordan $549,625.81. As of January 17, 2011, Jordan was withholding distribution checks on East Moss Lake/LNG based on Alfaro's failure to pay outstanding balances on the Denali and East Moss Lake/LNG projects. Alfaro agreed to pay the full balance owed by February 10, 2011. However, from January 2011 to the present, Alfaro has only made one $10,000 payment pursuant to the payment plan. Complaint ¶ 87.

Based on Alfaro's failure to make payments, Jordan recently filed suit against Alfaro Oil and Gas and Alfaro, and it is applying revenue to Alfaro's outstanding balance. Jordan is also seeking damages of almost $500,000 and rescission of Alfaro's rights (sold to investors) in the Denali, East Moss Lake, and LNG projects. Complaint ¶ 88.

Respondents collected $1,247,880 from East Moss Lake investors. No money was returned to investors. The well was drilled and producing, but the operator has withheld funds to offset money owed by Alfaro Oil and Gas for the Denali project. CX-150; Tr. 14-15.

- **Pinnacle, Alfaro, and Alfaro's Entities Improperly Used a "Professional Geoscientist" Stamp with Certain Offerings**

In the Victoria Secret, Normanna Deep, Normanna North, Pangaea, French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali offerings, Alfaro affixed a "Professional Geoscientist" seal of a geoscientist whose license had expired, in the executive summary of each of the offerings. The Texas Geoscience Practice Act states that this seal should be used on reports prepared or supervised by a licensed geoscientist. Tex. Occ.

Code Ann. § 1002. However, the well operator from whom Alfaro Oil and Gas purchased minority interests, rather than the individual whose stamp appears on investments offered by Pinnacle and Alfaro, provided the reports. In addition, the geoscientist whose stamp was used in all offerings offered and sold by Pinnacle and Alfaro in 2009 and 2010 was no longer licensed in the State of Texas. Pinnacle, Alfaro, and his related entities used this expired stamp in their 2009 and 2010 offerings. Complaint ¶ 89.

When confronted with the use of his stamp, Alfaro Oil and Gas's "lead geologist" testified under oath that he was unaware that Alfaro and Pinnacle used his stamp without his knowledge, authorization, or consent for many of the private placement offerings prior to the Montague Legacy offering. Complaint ¶ 40.

### D. The Allegations and Evidence Establish that Respondents Violated Section 10(b) of the Exchange Act, SEC Rule 10b-5, NASD Rules 2120 and Rule 2110, and FINRA Rules 2020 and 2010

The Second Amended Complaint, supplemented by the documents in the record, establishes that Respondents made misrepresentations or omissions of material facts; acted with scienter; made such misrepresentations or omissions in connection with the purchase or sale of a security; and used "means or instrumentality of interstate commerce, or of the mails."

### 1. Respondents Made Misrepresentations and Omissions of Material Facts

As set forth above, the Second Amended Complaint alleges numerous misrepresentations and omissions in the sale of the joint venture interests. In many instances, the Second Amended Complaint explicitly states that those misrepresentations and omissions are material. Other misrepresentations and omissions are clearly material.

Whether information is material "depends on the significance the reasonable investor would place on the ... information."[11] "A fact is material if there is a substantial likelihood that a

---

[11] *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).

reasonable investor would have considered the misstated or omitted fact important in making an investment decision, and if disclosure of the misstated or omitted fact would have significantly altered the total mix of information available to the investor."[12]

For each of the joint venture securities, Respondents made misrepresentations and omissions that reasonable investors would clearly consider important in making investment decisions. The misrepresentations and omissions included information that was important to a determination of the likelihood that the investments would be profitable, such as the lack of profitability of previous Alfaro Oil and Gas ventures; the exorbitant fees charged by Silver Star and Alfaro Oil and Gas for each of the joint ventures; the existence of nearby non-producing wells while emphasizing the proximity of producing wells that were often farther away; the cash flows from natural gas production at realistic prices, as opposed to numbers inflated by unrealistic pricing assumptions (using Respondents' inflated estimates of anticipated production); the actual production of nearby wells; production projections by well operators; receipt of a Wells Notice from the SEC; and the insolvency of Alfaro Oil and Gas despite its commitment to entering into a drilling contract for Montague Legacy.

## 2. Respondents Made the Misrepresentations and Omissions with Scienter

Scienter in securities fraud cases is defined as "a mental state embracing intent to deceive, manipulate, or defraud."[13] Scienter may be established by proof of conscious behavior or recklessness on the part of the respondent.[14] Reckless conduct includes "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an

---

[12] *Eric J. Brown*, Exchange Act Rel. No. 66469, slip. op. at 12 (Feb. 27, 2012), citing *Basic, Inc. v. Levinson*, 485 U.S. at 231-32 (1988), and *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[13] *Irfan Mohammed Amanat*, Exchange Act Rel. No. 54708, 2007 SEC LEXIS 2558, at *35 (Nov. 3, 2007), *aff'd*, 269 F. App'x 217 (3d Cir. 2008), citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Kesner*, 2010 FINRA Discip. LEXIS 2, at *30.

[14] *Gebhart v. SEC*, 595 F.3d 1034, 1040-41 (9th Cir. 2010); *Irfan Mohammed Amanat*, 2007 SEC LEXIS 2558, at *35.

extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[15] The scienter of a firm's principals may be attributed to the firm.[16] Proof of scienter may be "a matter of inference from circumstantial evidence."[17] In the case of a material omission, "scienter is satisfied where ... the [respondent] had actual knowledge of the material information."[18]

The allegations of the Second Amended Complaint are sufficient to establish scienter. The allegations strongly support an inference of intentional fraud, but a finding of recklessness is sufficient. Alfaro knew that none of his previous ventures had been profitable for investors; that he had priced the turnkey agreements with Alfaro Oil and Gas far above the drilling costs; that his lead geologist had provided a lower estimate for the natural gas reserves than the estimate provided in the French Town offering documents; that the operator had revised the estimated reserves in the East Wharton well; that he had deleted a key statement from the South Bayou Crook Chene offering documents; and that he had received a Wells notice from the Securities and Exchange Commission. As the promoters, managing venturer, and operators of oil and gas ventures, Alfaro must have known, or was reckless in not knowing, the true market prices of natural gas, and the existence of non-producing wells as well as producing wells in the vicinity of the wells in which they intended to invest.

---

[15] *Gebhart v. SEC*, 2007 U.S. App. LEXIS 27183, at *2 (9th Cir. 2007) (quoting *Hollinger v. Titan*, 914 F.2d at 1569) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)); *Gregory O. Trautman*, Exchange Act Rel. No. 61667A, 2009 SEC LEXIS 4173, at *61 (Dec. 15, 2009) (corrected decision); *see also Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (applying a standard of "severe recklessness," defined as "an extreme departure from the standards of ordinary care.").

[16] *Kirlin Securities, Inc.*, 2009 SEC LEXIS 4168, at *59, n.80.

[17] *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010); *see also*, *Eric J. Brown*, slip op. at 12, n.8.

[18] *Kesner*, 2010 FINRA Discip. LEXIS 2, at *31-32, citing *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004); *Fenstermacher v. Philadelphia Nat'l Bank*, 493 F.2d 333, 340 (3d Cir. 1974); *see also Kenneth R. Ward*, Exchange Act Rel. No. 47535, 2003 SEC LEXIS 687, at *39 (Mar. 19, 2003) (finding scienter established when representative was aware of material information and failed to make appropriate disclosures to customers), *aff'd*, 75 F. App'x 320 (5th Cir. 2003); *Dep't of Mkt. Reg. v. Field*, 2008 FINRA Discip. LEXIS 63, at *33-34 (N.A.C. Sept. 23, 2008) (same).

The Hearing Officer finds that Respondents made their misrepresentations and omissions with scienter.

### 3. The Misrepresentations Were Made in Connection with the Sale of Securities

#### a) The Joint Venture Interests Were Securities

The Second Amended Complaint alleges that the joint venture interests were securities. Complaint ¶ 26. Pursuant to Rule 9269(a)(2), that allegation is deemed admitted. In addition, the facts alleged in the Second Amended Complaint, supported by the evidence in the record, establish that the joint venture interests were securities.

Both the Securities Act and the Exchange Act define "securities" to include "investment contracts."[19] An investment contract is a security if it involves (1) investment of money, (2) in a common enterprise, (3) with profits derived solely from others' efforts.[20] "Solely" is not interpreted strictly. "The Supreme Court has repeatedly emphasized that economic reality is to govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests."[21]

General partnerships and similar investments have been found to be securities in a number of cases.[22] A general partnership is an investment contract, and thus a security, if the general partner retains little ability to control the profitability of the investment. The Fifth

---

[19] 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).

[20] *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

[21] *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. May 20, 1981).

[22] *See*, e.g., *SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007); *SEC v. Novus Technologies, LLC*, 2010 U.S. Dist. LEXIS 111851 (D. Utah Oct. 20, 2010) (joint venture held to be a security); *SEC v. Professional Associates*, 731 F.2d 349, 357 (6th Cir. 1984) (holding that a joint venture was an investment contract, and thus a security, because "at least some of the investors were entirely passive and invested in the joint ventures in reasonable reliance on the expected efforts and expertise of the defendants."); *SEC v. Lowery*, 633 F.Supp.2d 466 (W.D. Mich. 2009) (holding that registered limited liability partnership was a security); *Maximo Justo Guevara*, Exchange Act Rel. No. 42793, 2000 SEC LEXIS 986, at *8-14 (May 18, 2000), *petition denied*, 47 Fed. App'x. 198 (3d Cir. 2002) (table) (general partnership interest was a security).

Circuit has set forth a non-exclusive list of factors that would establish that a general partnership or joint venture interest is a security:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or

> (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or

> (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.[23]

In *Maximo Justo Guevara*,[24] the Securities and Exchange Commission found that investments in a general partnership were securities. The Commission considered a variety of factors in deciding that the general partnership interests were securities, including the lack of sophistication of investors in the partnership's business, naming of the company that had put the partnership together as the initial managing partner, and the terms of a consulting agreement with the managing partner, which provided day-to-day control of the partnership's business to the managing partner.[25] Other factors that have been considered include the fact that investors are

---

[23] *Williamson v. Tucker*, 645 F.2d at 424. Other courts have adopted this analysis. *See*, e.g., *SEC v. Merchant Capital, LLC*, 483 F.3d at 755. The Securities and Exchange Commission has also relied on the analysis in *Williamson v. Tucker*. *See*, *Maximo Justo Guevara*, Exchange Act Rel. No. 42793, 2000 SEC LEXIS 986, at *10. In determining the business experience of the partners, the relevant inquiry is the experience of the partners in the business in which the partnership is engaged. *SEC v. Merchant Capital, LLC*, 483 F.3d at 755, quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982).

[24] Exchange Act Rel. No. 42793, 2000 SEC LEXIS 986, at *8-14 (May 18, 2000), *petition denied*, 47 Fed. Appx. 198 (3d Cir. 2002) (table).

[25] *Maximo Justo Guevara*, 2000 SEC LEXIS 986, at *8-14.

geographically dispersed,[26] the assurance to investors that they were investing in a "turnkey" operation,[27] and the absence of partnership meetings or meaningful partnership votes.[28]

The terms of the offerings establish that the joint venture interests were securities. The terms of the offering documents left "so little power in the hands of the ... venturer that the arrangement in fact distributes power as would a limited partnership."[29] The offering documents named Alfaro Oil and Gas as initial managing venturer. Although the terms of the offering documents provided for the removal of Alfaro Oil and Gas as the managing venturer, the investors' actual power to remove Alfaro Oil and Gas was illusory. For six of the ventures, the offering documents six required a vote of 80% of the partnership interests to remove Alfaro Oil and Gas as managing venturer, and removal was permitted only for a breach of the joint venture agreement or due to a change in control of Alfaro Oil and Gas.[30] Although the other five permitted removal of Alfaro Oil and Gas with a 51% vote,[31] all 11 made it financially unrealistic to remove Alfaro Oil and Gas. The joint venture agreements provided that if Alfaro Oil and Gas were removed as the managing venturer, it would be entitled to receive a share of the venture or a cash payment for the full value of its interest in the venture, as determined by an independent

---

[26] *SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007).

[27] *SEC v. Lowery*, 633 F.Supp.2d 466, 471 (W.D. Mich. 2009) ("Despite the investor ('partner') declarations [that each partner understood that the investment was not a security] in the [partnership] agreements, and the language encouraging or 'expecting' the investors to actually exercise some day-to-day duties of partners and actively guide the partnership, the offering memorandum marketed the RLLPs as passive investments – more nearly the antithesis of the partnership suggested by the agreements themselves. The offering memorandum assured investors. 'This is a completely turnkey business.'").

[28] *SEC v. Lowery*, 633 F.Supp.2d at 471.

[29] *See Williamson v. Tucker, supra*.

[30] CX-43 at 48, 95, 104 (Pangaea); CX-97 at 33, 42, 98 (Normanna North); CX-127 at 39, 52 (French Town); CX-72 at 39, 47, 102 (East Wharton); CX-143 at 38, 101 (Denali); CX-155 at 101 (SW Redfish).

[31] CX-38 at 37, 53, 56 (South Bayou Crook Chene); CX-45 at 34, 50-51, 53, 80, 84-85, 89 (Victoria Secret); CX-88 at 36, 52; CX-88 at 53, 55, 88 (Normanna Deep); CX-104 at 36, 50, 63, 96 (Montague Legacy); CX-149 at 29 (East Moss Lake).

engineer selected by Alfaro Oil and Gas.[32] Furthermore, the five agreements that provided for removal only upon a vote of 80% of the interests also provided that if less than 100% of the interests were sold, Alfaro Oil and Gas would receive the unsold interests, without paying for those interests.[33]

The marketing of these investments as "turnkey" projects further establishes that the ventures were securities. The terms of the Turnkey Agreement made it virtually impossible to wrest actual control from Alfaro Oil and Gas.[34] There was no termination provision in the Turnkey Agreement. Furthermore, the amount payable under the Turnkey Agreement was payable to Alfaro Oil and Gas upon entering into the Turnkey Agreement.[35] The upfront payments under the Turnkey Agreement, plus the commissions paid to Pinnacle, resulted in the immediate removal of almost all of the money from the ventures upon formation. The amount to be paid by the joint ventures to Alfaro Oil and Gas pursuant to the Turnkey Agreement ranged from 63% to 85% of the total investments of the venturers.[36] The offering documents disclosed that 15% of the invested funds would be paid to Pinnacle, identified as an affiliated broker-dealer. The payment to Pinnacle was broken down as a 10% commission, a 2% due diligence

---

[32] CX-38 at 93 (South Bayou Crook Chene); CX-43 at 48, 95, 104 (Pangaea); CX-45 at 89-90 (Victoria Secret); CX-88 at 89 (Normanna Deep); CX-97 at 98 (Normanna North); CX-104 at 96 (Montague Legacy); CX-127 at 104 (French Town); CX-72 at 102 (East Wharton); CX-149 at 69-70 (East Moss Lake); CX-143 at 101 (Denali); CX-155 at 101 (SW Redfish).

[33] CX-43 at 52, 95 (Pangaea); CX-97 at 33, 46 (Normanna North); CX-127 at 39, 52 (French Town); CX-72 at 51, 93 (East Wharton).

[34] The control granted to Alfaro Oil and Gas was similar to the control granted by the agreement in *Maximo Justo Guevara, supra.*

[35] CX-38 at 36, 51-52, 55, 87-88, 124-125 (South Bayou Crook Chene); CX-43 at 40, 44-45, 55, 65, 100, 140-141 (Pangaea); CX-45 at 33-34, 49, 52, 55, 84-85, 120 (Victoria Secret); CX-88 at 35, 50, 54, 79, 84, 119 (Normanna Deep); CX-97 at 34, 38, 49, 59, 94, 134 (Normanna North); CX-104 at 117 (Montague Legacy); CX-127 at 26, 38, 40, 44, 55, 65, 100, 141 (French Town); CX-72 at 39, 43, 54, 64, 98; 134 (East Wharton); CX-155 at 134 (SW Redfish); CX-143 at 136 (Denali); CX-149 at 97 (East Moss Lake).

[36] CX-38 at 54 (South Bayou, 63%); CX-43 at 60 (Pangaea, 77%); CX-45 at 51 (Victoria Secret, 66%); CX-88 (Normanna Deep, 66%); CX-97 (Normanna North 80%); CX-127 at 60 (French Town 77%); CX-72 at 59 (East Wharton, 79%); CX-149 at 30 (East Moss Lake, 65%); CX-143 at 59 (77%, Denali); CX-155 at 58 (Redfish, 80%); CX-104 at 52, 57, 112 (Montague Legacy 85%).

fee, and a 3% nonallocable expense fee.[37] Thus, Respondents removed 78% to 100% of the invested funds immediately. If a joint venture were to attempt to replace Alfaro Oil and Gas, it would still be required to have Alfaro Oil and Gas managing their investment under the Turnkey Agreement, and have virtually no money left in the partnership with which to operate.

In addition, the method of recruiting investors by nationwide cold calls all but insured that the investors would not be able to participate in the management of the enterprise.[38] By this marketing method, the investors were certain to be geographically dispersed, and lack expertise in the oil and gas industry.

Based both on the allegations of Paragraph 26 of the Second Amended Complaint, as well as the structure of the investments, the Hearing Officer finds that the joint venture investments were securities.

### b) The Misrepresentations Were Made in Connection with the Sale of the Joint Venture Interests

The "in connection with" requirement is to be construed broadly and flexibly to satisfy its remedial purpose.[39] "It is enough that the scheme to defraud and the sale of securities coincide."[40] Here, the misrepresentations were all made in connection with the sale of the 11 joint venture investments that are the subject of this proceeding. Many of the misrepresentations and omissions were in the offering documents that were provided to investors, and others were made in the cold calls to investors.

---

[37] CX-38 at 25, 38, 48, 54 (South Bayou Crook Chene); CX-43 at 41, 60 (Pangaea); CX-45 at 22, 35, 45; CX-88 at 35, 37, 47, 53 (Normanna Deep); CX-97 at 35, 54 (Normanna North); CX-104 at 22, 34, 57 (Montague Legacy); CX-127 at 41, 60 (French Town); CX-72 at 40, 59 (East Wharton); CX-149 at 24, 30 (East Moss Lake); CX-143 at 32, 136 (Denali); CX-155 at 58 (SW Redfish).

[38] Because the investors were recruited by cold calls, it is also highly unlikely that the typical investor was knowledgeable concerning oil and gas investments. While Respondent purported to qualify the investors as accredited investors, neither the subscription agreements and nor the investor questionnaire requested information about oil and gas experience. *See*, e.g., CX-38 at 106.

[39] *SEC v. Zandford.* 535 U.S. 813, 819 (2002).

[40] *SEC v. Zandford,* 535 U.S. at 822.

### 4.     Respondents Used Means or Instrumentalities of Interstate Commerce

The interstate commerce requirement of Rule 10b-5 is interpreted broadly, consistent with the remedial purpose of the rule. The requirement is satisfied if the respondent has used the mails or telephones in furtherance of the scheme, even if the actual misrepresentations were not made using the mails or telephones.[41]

Respondents marketed their oil and gas investments by making telephone calls to potential investors throughout the United States, and the investments were sold to investors throughout the United States.[42] The allegations of the Complaint are sufficient to establish that Respondents sold the 11 oil and gas ventures by means of interstate commerce.

### 5.     Conclusion: Respondents willfully violated Section 10(b) of the Exchange Act, SEC Rule 10b-5, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020.

As a result of the foregoing conduct, Respondents Pinnacle and Alfaro willfully violated Section 10(b) of the Exchange Act, SEC Rule 10b-5, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020. The conduct occurring between August 2008 and December 14, 2008, violated NASD Rules 2110 and 2120, and the conduct occurring between December 15, 2008, and March 2011 violated FINRA Rules 2010 and 2020.

## V.     Second Cause of Action: Alfaro Misused Customer Funds, in Violation of NASD Rule 2330 and FINRA Rules 2150 and 2010

The Second Cause of Action charges Alfaro with misuse of customer funds. The allegations of the Complaint are sufficient to establish, for purposes of this default decision, that

---

[41] *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, at 865 (stating that the jurisdictional requirements of the federal antifraud provisions are interpreted broadly and are satisfied by intrastate telephone calls and the use of the U.S. mail), *aff'd*, 159 F.3d 1348 (2d Cir. 1998); *Kesner*, 2010 FINRA Discip. LEXIS 2, at *22 n.25; *SEC v. Intelliquis Int'l, Inc.*, 2003 U.S. Dist. LEXIS 27131, at *31-32 (D. Utah Dec. 11, 2003) ("The fraud or misrepresentation itself need not have been communicated through the mails or over the phone so long as the defendant's use of the phone or mails furthers the fraudulent scheme.").

[42] Complaint ¶¶ 1, 26, 82.

Respondent misused customer funds in violation of NASD Rule 2330 and FINRA Rules 2150 and 2010.

## A. Improper Use of Customer Funds is Prohibited by FINRA's Rules

The Second Amended Complaint alleges that Alfaro misused customer funds with respect to the Victoria Secret, Normanna Deep, Normanna North, East Wharton, SW Redfish Reef, and Denali joint venture investments. NASD Conduct Rule 2330(a), and its successor FINRA Rule 2150, provide that "[n]o member or person associated with a member shall make improper use of a customer's securities or funds." Using customer funds improperly is a violation of the fundamental relationship between a registered representative and the customer, and "undermines the integrity of the securities industry."[43] "An associated person makes improper use of customer funds where he or she fails to apply the funds (or uses them for some purpose other than) as directed by the customer." [44]

NASD Rule 2110, and its successor FINRA Rule 2010, requires members and persons associated with members to "observe high standards of commercial honor and just and equitable principles of trade." The misuse of customer funds in violation of NASD Rule 2330 or FINRA Rule 2150 also violates NASD Rule 2110 or FINRA Rule 2010.[45]

## B. Alfaro Misused Customer Funds

### The Victoria Secret Offering

The "investment summary" provided by Pinnacle and Alfaro to investors in the Victoria Secret offering detailed a "payment schedule" with three installments: (1) first installment (subscription); (2) second installment (drilling, testing and pipe); and (3) third installment

---

[43] *Dist. Bus. Conduct Comm. v. Westberry*, No. C07940021, 1995 NASD Discip. LEXIS 225 (N.B.C.C. Aug. 11, 1995).

[44] *Id.*

[45] *Dep't of Enforcement v. Patel*, No. C02990052, 2001 NASD Discip. LEXIS 42, at *24-25 (N.A.C. May 23, 2001) (affirming the decision of a Hearing Panel barring a representative for misuse of customer funds by depositing customer funds into his own account rather than investing them as directed by the customers).

(completion). Alfaro Oil and Gas served as the managing venturer of the joint ventures, and it also served as the joint venture's drilling contractor. Complaint ¶ 93.

The Victoria Secret offering raised approximately $1.5 million; however, the well has never been drilled. Alfaro removed almost $1 million of investor funds for his personal and business use. As of August 16, 2010, 21 investors remained in the Victoria Secret offering, representing more than $973,000 in investor funds. As of July 31, 2010, the bank accounts associated with this offering contained approximately $40,000. Numerous investors provided Pinnacle and Alfaro with their money based on Alfaro's request for their funds for "drilling and testing" the Victoria Secret well. Alfaro never informed investors that their funds were not used for drilling and testing the Victoria Secret well, or that he had spent almost all of their funds for unrelated business and personal purposes. Complaint ¶ 94.

The joint operating agreement for this offering indicated that Alfaro Oil and Gas would be required to pay at least $895,740 to drill this well. Alfaro admitted to FINRA staff that the only way he could meet his financial obligations to drill the Victoria Secret well, and pay for any obligations pursuant to his numerous turnkey agreements with investors, would be to raise additional funds from investors or tap his personal resources. Complaint ¶ 95.

Responding to investors' concerns about delays in the Victoria Secret joint venture, Alfaro represented that he would process refunds. Because he had already extracted funds for his own use and benefit, Alfaro could not promptly process the refunds as had been promised. Following Alfaro's depletion of the Victoria Secret funds, Alfaro Oil and Gas sent a demand letter withdrawing its commitment to the Victoria Secret project. This eliminated the potential drilling obligation for which Alfaro Oil and Gas lacked sufficient funds. In a further effort to avoid refunding investors' funds and to retain Alfaro Oil and Gas's grossly inflated "drilling costs," Alfaro contacted investors and persuaded them to transfer their interests in Victoria

Secret to other projects in lieu of receiving a refund. Alfaro transferred many of the Victoria Secret investors into other fraudulent offerings that were oversubscribed and contained material misrepresentations or omissions. Pinnacle and Alfaro have received investor funds related to these fraudulent offerings. Complaint ¶ 96.

### The Normanna Deep Offering

The Normanna Deep offering was dated February 10, 2009. Like Victoria Secret, the "investment summary" provided by Pinnacle and Alfaro to investors in the Normanna Deep offering detailed a "payment schedule" with three installments: (1) first installment (subscription); (2) second installment (drilling, testing and pipe); and (3) third installment (completion). Alfaro Oil and Gas served as the managing venturer of the joint venture, and it also served as the joint venture's drilling contractor. Complaint ¶ 93.

Pinnacle and Alfaro started receiving funds from Normanna Deep investors in March 2009, and the Normanna Deep escrow account received more than $500,000 in first installment "subscription" funds from investors through May 2009. The well has never been drilled; however, Alfaro removed over $500,000 of investor funds for his personal and business use. Complaint ¶ 97.

The bank statements for the Normanna Deep escrow account reflect the following activity:
- Deposits of $108,930 in March 2009;
- Deposits of $376,125 in April 2009;
- Transfers of $300,000 to the Normanna Deep operating account and $16,339.50 to Pinnacle in April 2009;
- Deposits of $38,880 in May 2009; and
- Transfers of $50,000 to the Normanna Deep operating account and $56,418.75 to Pinnacle in May 2009.

Complaint ¶ 98.

The Normanna Deep escrow account received no deposits in June or July 2009; however, Alfaro transferred another $100,832 from the Normanna Deep escrow account to the Normanna

Deep operating account and Pinnacle during this time. Every investor dollar that Alfaro transferred from the Normanna Deep escrow account to the Normanna Deep operating account was transferred the same month – and often the same day – to Alfaro Oil and Gas's operating account. On July 31, 2009, the ending balance in Normanna Deep's escrow account was $344.75. The balance in the Normanna Deep operating account was never more than one cent from July 2, 2009, until December 31, 2009. Complaint ¶ 99.

Before the end of 2009, Alfaro informed Normanna Deep investors that the operator had determined that the Normanna Deep well would not be drilled. At this time, Alfaro had already spent nearly all of the Normanna Deep investors' funds. Alfaro Oil and Gas's financial situation was precarious as well. On December 28, 2009, the general ledger of Alfaro Oil and Gas reflected that the company's liabilities exceeded its assets. On December 29, 2009, Alfaro's accountant informed him that Alfaro Oil and Gas needed $50,000 to pay for Normanna North expenses, and that it owed approximately $75,000 in commissions to Pinnacle for Normanna North sales. Complaint ¶ 100.

Beginning in late 2009, Alfaro contacted all 26 Normanna Deep investors and convinced them to transfer their interests in Normanna Deep to the Normanna North offering. He also requested that the Normanna Deep investors immediately provide a second installment payment for the purpose of "drilling and testing" pursuant to the Normanna North offering. On December 29, 2009, the Normanna North general ledger reflected that $281,005 was received to record transfers from Normanna Deep investors. The Normanna North general ledger reflects similar entries in 2010. Since Alfaro had already spent the Normanna Deep investors' funds, he used the "drilling and testing" funds he requested and received from them to reimburse their Normanna Deep investments that he had depleted. The highly inflated "drilling costs" charged by Alfaro to

the Normanna Deep investors enabled him to replenish the funds he had dissipated and still have funds remaining to pay for the actual drilling costs. Complaint ¶ 101.

### The Normanna North Offering

As of December 28, 2010, Alfaro had received more than $2.2 million from investors in the Normanna North offering; however, only $751, 216.02 was sent to the well's operator, Abraxas. Complaint ¶ 102.

As of December 28, 2010, Alfaro retained $1,199,184.11, and $250,214.25 was paid to Pinnacle. Alfaro and Pinnacle never disclosed the extent of the mark-up or these retained funds to any of their investors. Despite taking and spending almost $1.45 million from investors, Alfaro's December 2010 accounting showed that he still owed Abraxas $122,370.99 for the work it had already performed. Abraxas permitted Alfaro to enter into a payment plan, and he has failed to make promised payments. Complaint ¶ 103.

From January 2011 to the present, Alfaro never informed Normanna North investors that he had failed to pay Abraxas. Instead, Alfaro sent correspondence to investors requesting additional funds for the Normanna North project for "recompletion." From January 31, 2011, until February 15, 2011, Normanna North blotters provided by Pinnacle and Alfaro indicate that an additional almost $35,000 has been collected from Normanna North investors. Complaint ¶ 104.

The investors who contributed additional funds were not informed that their money was actually used to pay Alfaro's outstanding debts owed to Abraxas, Alfaro's unrelated business expenses, and Alfaro's personal expenses. The operator has indicated that it is currently withholding distribution payments for Normanna North and offsetting them against Alfaro's indebtedness. As a result of Alfaro's conduct and indebtedness, even if the Normanna North well produces hydrocarbons and income, the operator will retain any distributions to offset Alfaro's indebtedness instead of providing them to Alfaro and his investors. Complaint ¶ 105.

### The East Wharton Offering

As of December 28, 2010, Alfaro had received $1,888,318.21 from investors in the East Wharton offering; however, only $742,272 was sent to the well's operator, CICO Oil & Gas Company ("CICO"). Complaint ¶ 106.

As of December 28, 2010, Alfaro retained $1,061,127.51, and the remaining $63,662.89 was paid to Pinnacle. Alfaro and Pinnacle never disclosed the extent of the mark-up or these retained funds to any of their investors. Despite taking and spending over $1 million from investors for unrelated personal and business purposes, Alfaro failed to pay the operator for the work performed and owed CICO at least $148,433.42. Complaint ¶ 107.

From December 2010 to the present, Alfaro never informed East Wharton investors that he had failed to pay CICO. Instead, Alfaro sent investors correspondence requesting additional funds for the East Wharton project to pursue "two other zones up the hole that appear to be productive." From December 17, 2010, until February 17, 2010, East Wharton blotters provided by Pinnacle and Alfaro indicate that an additional almost $100,000 has been collected from East Wharton investors. Complaint ¶ 108.

None of the investors who contributed additional funds was informed that their money was actually used to pay Alfaro's outstanding debts owed to CICO, personal expenses, and unrelated business expenses. In addition, Alfaro made the following misrepresentations or omissions to East Wharton investors:

- "He doesn't get a dime of the money" sent in for recompletion (when in fact the recompletion costs are marked up by Alfaro and used to pay his past due obligations to the operator);
- Investors need to send in recompletion money quickly to avoid delays (when the operator is already performing the work prior to payment);
- Failing to inform investors that the recompletion funds they are providing will not be used for recompletion costs (but rather will be used to pay his past due obligations to the operator); and

- Failing to inform investors that any return from the East Wharton offering will be withheld by the operator until Alfaro's past due obligations are fully met and the recompletion costs are paid in full.

Complaint ¶ 109.

On April 26, 2011, Alfaro informed investors that the East Wharton well had failed. As a result, the project was terminated. Alfaro still owes a significant amount to the project's operator. Complaint ¶ 110.

### The SW Redfish Reef Offering

According to the SW Redfish Reef blotter, Pinnacle and Alfaro collected at least $779,027 from investors, including almost $120,000 for drilling and testing and completion costs that were not owed. Despite the January 2011 TCDO and repeated Rule 8210 requests for information, Pinnacle and Alfaro have failed to account for SW Redfish Reef investor funds. During his June 2011 testimony, Alfaro was unable to articulate where these funds were or how much of the funds remained. At least one investor has requested Alfaro return his $155,526 investment, including almost $100,000 in drilling and testing funds. Alfaro has refused. Complaint ¶ 111.

### The Denali Offering

Despite receiving significantly more funds from Denali investors than Jordan billed, Alfaro failed to meet his obligations to the operator. By January 2011, Alfaro owed more than $500,000 to Jordan for the Denali project. Pinnacle and Alfaro failed to inform any of their current or potential investors about this indebtedness. Instead, they sought additional funds from Denali investors for "delay rental payments" on the project. Complaint ¶ 112.

On February 22, 2011, Alfaro wrote all investors requesting additional funds for Denali delay rental payments. He also contacted many Denali investors by telephone requesting additional funds. Alfaro failed to disclose that he owed more than $500,000 to Jordan at the

time, had previously agreed to a payment plan, and had failed to make payments pursuant to the payment plan. Complaint ¶ 113.

### Conclusion: Alfaro Misused Customer Funds

As a result of the foregoing conduct, Respondent Alfaro misused customer funds, thereby violating NASD Rule 2330 and FINRA Rules 2150 and 2010. The conduct occurring between January 2009 and December 14, 2009, violated NASD Rule 2330, and the conduct occurring between December 15, 2009, and March 2011, violated FINRA Rule 2150.

**VI. Third Cause of Action: Respondents Violated Section 5 of the Securities Act, and therefore NASD Conduct Rule 2110, by Unregistered Securities Sales**

Pinnacle and Alfaro engaged in unregistered securities sales with respect to the South Bayou Crook Chene, North Hillje, Victoria Secret, and SW Redfish Reef.

Section 5 of the Securities Act provides that, unless a registration statement is in effect or an exemption applies, it is unlawful to sell a security through the use of any means or instrumentality of transportation or communication in interstate commerce or of the mails.[46] The purpose of the registration requirements is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions."[47] A violation of Section 5 of the Securities Act constitutes a violation of NASD Conduct Rule 2110.[48]

To establish a prima facie case of a violation of Section 5, Enforcement must show that: (1) no registration statement was in effect as to the securities; (2) respondent sold the securities;

---

[46] 15 U.S.C. § 77e(a) and (c); *see also Rodney R. Schoemann*, Exchange Act Rel. No. 9076, 2009 SEC LEXIS 3939, at *20-21 (Oct. 23, 2009); *Jacob Wonsover*, Exchange Act Rel. No. 41123, 1999 SEC LEXIS 430, at *15-16 (Mar. 1, 1999), *aff'd*, 205 F.3d 408 (D.C. Cir. 2000).

[47] *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).

[48] *Alvin W. Gebhart*, Exchange Act Rel. No. 53136, 2006 SEC LEXIS 93, at *54 (Jan. 18, 2006), *rev'd and remanded in part on other grounds*, 2007 U.S. App. LEXIS 27183 (9th Cir. Nov. 21, 2007) ("Further, because we have consistently held that a violation of a Commission or NASD rule or regulation is inconsistent with just and equitable principles of trade, we find that the Gebharts' sale of the unregistered MHP notes also constitutes a violation of NASD Conduct Rule 2110."); *Stephen J. Gluckman*, Exchange Act Rel. No. 41628. 1999 SEC LEXIS 1395 (July 20, 1999); *see William H. Gerhauser*, Exchange Act Rel. No. 40639, 1998 SEC LEXIS 2402 (Nov. 4, 1998).

and (3) interstate transportation or communications were used in connection with the sale.[49]  The prohibitions of Section 5 extend to those who engage in significant steps in the distribution process.  Anyone who is a "necessary participant" or a "substantial factor" in the unlawful transaction, including a registered representative, violates Section 5.[50]

From August 23, 2008, to September 24, 2010, Pinnacle and Alfaro operated a boiler room where approximately ten registered representatives placed thousands of cold calls every week to solicit investments in Alfaro's captive oil and gas joint ventures.  Interests in the joint ventures are securities and were not registered pursuant to the Securities Act.  Specifically, Pinnacle and Alfaro engaged in unregistered offerings with respect to the South Bayou Crook Chene, North Hillje, Victoria Secret, and SW Redfish Reef offerings by discussing the offerings on the initial cold call and sending out offering materials immediately following the initial cold call.  Complaint ¶ 116.[51]

The allegations of the Complaint are sufficient to establish a prima facie violation of Section 5.  The securities were unregistered; Respondents offered and sold the securities; and they were sold using interstate communications, by cold calls throughout the United States.  Accordingly, the Hearing Officer finds that Respondents Pinnacle and Alfaro, by acting in contravention of Section 5 of the Securities Act, violated FINRA Rule 2010 and NASD Rule 2110.  The conduct occurring between August 23, 2008, and December 14, 2008, violated NASD Rule 2110, and the conduct occurring between December 15, 2008, and September 24, 2010, violated FINRA Rule 2010.

---

[49] *Schoemann*, 2009 SEC LEXIS 3939, at *20-21; *Gebhart*, 2006 SEC LEXIS 93, at *53.

[50] *See SEC v. Calvo*, 378 F.3d at 1211, at 1215 (11th Cir. 2004); *SEC v. Murphy*, 626 F.2d 633, 649-52 (9th Cir. 1980); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 Fed. Appx. 70 (2d Cir. 2008) *(per curiam)* (unpublished), *cert. denied*, 129 S. Ct. 2745 (2009); *Owen V. Kane*, Exchange Act Rel. No. 23827, 1986 SEC LEXIS 326, at *11 (Nov. 20, 1986).

[51] The Complaint alleges that "[t]hese offerings are not exempt from registration pursuant to Section 502(c) of Regulation D of the Securities Act because Pinnacle, acting through Alfaro or other representatives employed by the firm, engaged in general solicitations by offering the joint ventures before an existing relationship between the firm and potential investor was established – as early as the initial cold call."

## VII. Fourth Cause of Action: Respondents Violated NASD Rule 2310 and FINRA Rule 2010 by Failure to Document and Determine Suitability

Before recommending a trading strategy, a registered representative must determine whether the strategy is suitable for the specific customer.[52] "A registered representative is obligated to make 'a customer-specific determination of suitability and to tailor his recommendations to the customer's financial profile and investment objectives.'"[53]

Pinnacle and Alfaro failed to document or have a reasonable basis for believing that the investments they sold were suitable for their customers. Pinnacle and Alfaro failed to do any suitability determination for numerous investors, inflated the annual income on the new account form of at least one investor, and failed to evidence the basis for suitability determinations for numerous investors. Complaint ¶ 118.

Alfaro altered financial information on an investor's new account form in an effort to make it appear as if she were an accredited investor. Customer RM completed her suitability questionnaire declaring an annual income of $125,000 and net worth of $700,000. After receiving this paperwork, Alfaro contacted her and explained that her form needed to list an annual income of $250,000 or net worth of $1 million. Customer RM refused to change the form because the information she originally provided was accurate. She explained that the $125,000 detailed on the form came directly from her tax return, and that she did not feel comfortable changing her form to list an inflated annual income. Pinnacle and Alfaro altered her form, listing

---

[52] *Dep't of Enforcement v. Kelly*, No. E9A2004048801, 2008 FINRA Discip. LEXIS 48, at *23 (N.A.C. Dec. 16, 2008).

[53] *Luis Miguel Cespedes*, Exchange Act Rel. No. 59404, 2009 SEC LEXIS 368, at *19 (Feb. 13, 2009); *see Jack H Stein*, Exchange Act Rel. No. 47335, 2003 SEC LEXIS 338, at *8 (Feb. 10, 2003) ("Even in cases in which a customer affirmatively seeks to engage in highly speculative or otherwise aggressive trading, a representative is under a duty to refrain from making recommendations that are incompatible with the customer's financial profile."); *Dane S. Faber*, Exchange Act Rel. No. 49216, 2004 SEC LEXIS 277, at *24 (Feb. 10, 2004) ("A recommendation is not suitable merely because the customer acquiesces in the recommendation. Rather, the recommendation must be consistent with the customer's financial situation and needs."); *Dep't of Enforcement v. Guang Lu*, 2004 NASD Discip. LEXIS 8, at *27-28 (N.A.C. May 13, 2004).

an annual income of $300,000, to make her appear as if she were an accredited investor. Complaint ¶ 119.

Pinnacle and Alfaro also offered and sold their private placement oil and gas offerings to numerous investors with no knowledge or evidence of suitability. For example, Project 888 Oil Partnership, LLC ("Project 888") purchased, further fractionalized, and re-sold offerings sold by Pinnacle and Alfaro. Alfaro communicated directly and indirectly with the sub-investors solicited by Project 888. Many were unaccredited. Pinnacle and Alfaro have confirmed that they never received suitability information related to these sub-investors and do not even know the identity of all of these investors. Complaint ¶ 120.

From August 17, 2009, to March 28, 2010, Pinnacle failed to evidence the basis upon which the suitability determinations were reached for numerous customers. The firm's customer files revealed:

- 14 of 33 customer files did not include the customers' investment objective;
- 28 of 33 customer files did not include the customers' relevant investment experience;
- 27 of 33 customer files did not include the customers' source of funds; and
- 5 of 33 customers listed "income" as their only investment objective, which appears to be inconsistent with this type of investment.

Of the 33 customer files reviewed, none of the files included customer notes to indicate that a suitability review had been conducted by the registered representative or the registered principal who approved the transaction. Complaint ¶ 121.

Pinnacle and Alfaro recommended and effected securities transactions without documenting or having a reasonable basis for believing that they were suitable for their customers. As a result of such conduct, Pinnacle and Alfaro violated NASD Rule 2310 and FINRA Rule 2010.

## VIII. Fifth Cause of Action: Respondents Violated NASD Rule 3070 and FINRA Rule 2010 by Failure to Report, Accurately Report, and Maintain Rule 3070 Filings; and Violated Article V, Section 2 of FINRA By-Laws, and FINRA Rule 2010, by Failure to Update and Timely Update Forms U4

NASD Rule 3070(c) required a member firm to file quarterly reports to FINRA,

providing statistical and summary information regarding customer complaints. The requirement

was intended to protect public investors by helping to identify potential sales practice violations

in a timely manner.[54] Failure to report information promptly and accurately violates NASD

Rules 3070 and 2110, and FINRA Rule 2010.[55]

Between October 2009 and June 2010, Pinnacle and Alfaro failed to properly disclose

and report the following matters related to Pinnacle and Alfaro that relate directly to the

allegations in the Complaint:

- two written customer complaints pursuant to NASD Rule 3070;
- two customer complaints settled for more than $15,000 pursuant to NASD Rule 3070; and
- one settlement related to a customer complaint pursuant to NASD Rule 3070.

Complaint ¶ 125. As a result of the foregoing conduct, Respondents violated NASD Rule 3070

and FINRA Rule 2010.

Article V, Section 2, of FINRA's By-Laws provides that application for registration with

FINRA by any person shall be made by a process established by FINRA and on a prescribed

form signed by the applicant. Section 2(c) provides that every application for registration (Form

U4) filed with FINRA shall be kept current at all times by supplementary amendments that must

be filed within 30 days after learning of the facts or circumstances giving rise to the amendment.

Despite the requirements of Article V, Section 2, Pinnacle and Alfaro failed to amend

their Forms U4 on three separate instances to disclose settlements entered into by Pinnacle and

---

[54] *Richard F. Kresge*, Exchange Act Rel. No. 55988, 2007 SEC LEXIS 1407, at *43-44 (June 29, 2007).

[55] *See Dep't of Enforcement v. Fox & Co.*, No. C3A030017, 2005 NASD Discip. LEXIS 5, at *35 (N.A.C. Feb. 24, 2005).

Alfaro related to customer grievances in excess of $15,000. Complaint ¶ 127. As a result of the foregoing conduct, Respondents violated Article V, Section 2, of FINRA's By-Laws and FINRA Rule 2010.

IX.   **Sixth Cause of Action: Respondents Violated FINRA's Rules with Respect to Supervision, Supervisory Controls, and Books and Records (Section 17 of the Exchange Act, SEC Rule 17a-4, and NASD Rule 3110, against Pinnacle, and NASD Rules 3012, 3010, and 2110, and FINRA Rule 2010, against Pinnacle and Alfaro)**

From August 26, 2008, to March 3, 2011, Pinnacle failed to properly supervise the firm's activities and enforce its Supervisory Control System. Pinnacle failed to have a qualified person adequately supervising the activity of Alfaro, who generated more than 20% of the firm's sales. Victor Hernandez , who was the firm's second principal from January 6, 2011, until the firm was suspended in March 2011, testified that he was unaware what written supervisory procedures were, and that he had "no idea" what FINRA Rule 3010 covered. When questioned about the firm's training manual or guidelines, Hernandez claimed he was aware that there was a book, he was unaware of its title, and he could not tell the staff where the book was located, but that he was sure that it was in his office somewhere. When asked if he supervised Alfaro, Hernandez testified: "Well, I would – like I said, I'd monitor his calls every once in a while. But other than that – I mean, I wasn't like looking over his shoulders or anything like that. I mean, we did go over his e-mails and so forth, you know." Complaint ¶ 129.

Pinnacle failed to adequately supervise Alfaro's e-mail. Specifically, the firm did not enforce its Supervisory Control System as it relates to the review of Alfaro's e-mail. Pinnacle allowed only Alfaro to have direct access to Alfaro's e-mail. Hernandez explained that his review consisted of standing next to Alfaro's desk and reviewing e-mails Alfaro determined were appropriate for him to review. Hernandez was also unaware of how and where Alfaro's e-mails were stored or maintained. Complaint ¶ 130.

Pinnacle also failed to have a qualified person adequately supervise the activity of Bruce Redfield or to place Redfield on heightened supervision. On June 16, 2010, Pinnacle placed Redfield on administrative leave after he was indicted for three federal criminal counts of mail fraud and wire fraud. While he was on administrative leave, Redfield worked for Alfaro Oil and Gas drafting offering documents and working on marketing projects. Complaint ¶ 131. On August 18, 2010, a superseding indictment was issued containing ten counts of mail and wire fraud related to three mortgage fraud and investment schemes. The indictment alleged that "Defendant Bruce Irving Redfield devised a scheme to make money by recruiting 'investors' to take out loans to build high end spec homes and matching them with building contractors in need of financing." The indictment also alleged that Redfield created and managed limited liability companies to promote his investment program. Redfield is currently serving as Alfaro Oil and Gas's Vice President of Business Development. Complaint ¶ 132.

On December 8, 2010, Pinnacle removed Redfield from administrative leave. Hernandez claimed that although he had heard about Redfield's indictment on the radio, he had never taken the time to read the indictment or superseding indictment. He added that he did not see a need to single out Redfield and supervise him more than other Pinnacle representatives. Complaint ¶ 133.

In January 2011, Redfield made a number of misleading statements and omissions to investors related to the Montague Legacy offering. For example, Redfield claimed that the January TCDO: (1) put everything behind the firm (when there was a pending disciplinary proceeding alleging fraud and misuse); (2) led to "a few changes in our paperwork and bookkeeping" (when extensive changes were required); and (3) FINRA would be conducting open book audits every six months (when no such audits were contemplated or scheduled). Complaint ¶ 134.

Redfield cold-called a number of professional football teams from Respondents' boiler room. In January 2011, Redfield contacted potential investors connected with the Dallas Cowboys, Houston Texans, and New Orleans Saints football organizations. During these calls, he made additional misstatements related to the Montague Legacy offering. Specifically, Redfield stated:

- "We've put together an early retirement program in the Barnett Shale."
- "The exciting thing, I think, that it makes so much sense for pro athletes is that you can retire and draw out of it anytime you want."
- "I wanted to try and get a hold of you and send some information on an early retirement program we've put together. The reason it sounds, to me, so exciting for professional athletes is that there's no age qualification before you can begin withdrawing from it, unlike all the other IRA and pension programs out there."

Complaint ¶ 135.

The only project offered by Pinnacle and Alfaro at this time was the Montague Legacy project. Pinnacle never offered an "early retirement program" or "supplemental retirement program" while it was a registered firm, and none of the oil and gas private placement offerings sold by Pinnacle ever permitted investors to make withdrawals. Despite Redfield's ten-count fraud indictment for mortgage and investment-related schemes, Redfield was not under any form of heightened supervision and made fraudulent statements to unsuspecting investors. Complaint ¶ 136.

Hernandez was designated as the firm's financial and operations principal on January 26, 2011. He testified that he had no experience, no training, was unaware of a testing requirement, and failed to perform any duties as Pinnacle's financial and operations principal:

Q. Have you ever had any training as a FINOP?

A. No.

Q. At any point in time?

A. No.

Q. Did you have any work experience as a FINOP prior to January 26, 2011?

A. No.

Q. What is your understanding of what a FINOP was supposed to do at Pinnacle?

A. Very limited knowledge. I was just taking it as a challenge and, you know, figured it was an opportunity to grow.

Q. And I take it since you didn't know that an examination existed to become a FINOP, you didn't ever take the exam?

A. No.

Q. Did you ever do any work with Pinnacle's financials?

A. Never, no.

Complaint ¶ 137.

The firm also failed to enforce its written supervisory procedures and supervisory control program with respect to the following areas:

- High Pressure Sales Tactics (Section 2.9.2)
- Providing Tax Advice (Section 2.9.3)
- Prohibition Against Guarantees (Section 2.9.8)
- Associated Person Communication are Subject to Review (Section 2.11.2)
- Firm Review of Communications (Section 2.11.3)
- Special Supervision (Section 2.19)
- Reporting of Criminal & Civil Complaints & Arbitration Claims (Section 4.7)
- Guidelines to Ensure that Communications With the Public are Not Misleading (Section 5.2.6)
- Correspondence (Section 5.3)
- Correspondence Review (Section 5.3.6)
- Complaints (Section 5.5)
- Calling Restrictions (Section 5.8)
- Cold Calls (Section 5.10)
- Independently Prepared Reprints (Section 5.13)
- Associated Person Complaint Records (Section 6.1.5)
- Calculation and Reporting of Net Capital (Section 6.3)
- Review of Transactions (Section 9.6)
- Underwriting (Section 13.2).

Complaint ¶ 138.

From August 23, 2008 through March 28, 2010, Pinnacle failed to retain copies of all firm correspondence, and failed to maintain information necessary to access records and indexes stored on the firm's electronic storage media with FINRA. During this time period, Alfaro served as the firm's president and chief compliance officer. Complaint ¶ 139.

From August 23, 2008, to approximately September 2, 2010, Alfaro improperly diverted e-mail to his personal e-mail account and deleted all e-mails related to Pinnacle and offerings sold by Pinnacle and Alfaro. Complaint ¶ 140.

From August 2008 through September 2010, Pinnacle's supervisory system and written procedures were not reasonably designed to ensure compliance with e-mail retention requirements. Among other things, the firm's procedures did not provide for any reasonable follow-up and review to ensure that copies of all e-mail communications were, in fact, being captured and maintained. Complaint ¶ 141.

By engaging in the foregoing conduct, Pinnacle willfully violated Section 17 of the Exchange Act, SEC Rule 17a-4, NASD Rules 3110, 3012, 3010, and 2110, and FINRA Rule 2010. As a result of the foregoing conduct, Alfaro violated NASD Rules 3012, 3010 and 2110 and FINRA Rule 2010. By causing Pinnacle's violations of Section 17 of the Exchange Act, SEC Rule 17a-4, and NASD Rule 3110, Alfaro violated NASD Rule 2110 and FINRA Rule 2010. The conduct occurring between August 23, 2008, and December 14, 2008, violated NASD Rule 2110, and the conduct occurring between December 15, 2008, and March 3, 2011, violated FINRA Rule 2010.

## X.    Sanctions

Enforcement has recommended a bar for Alfaro and expulsion for Pinnacle for their overall egregious conduct, but has not made separate recommendations for each violation. While a bar and expulsion are clearly appropriate, the Hearing Officer imposes separate bars for

Alfaro's securities fraud, misuse of customer funds, and unregistered securities sales; and separate expulsions for Pinnacle's securities fraud and unregistered securities sales.

### A.    Alfaro is Barred and Pinnacle is Expelled for Securities Fraud

The FINRA Sanction Guidelines ("Guidelines") for intentional or reckless misrepresentations or material omissions of fact recommend a fine of $10,000 to $100,000 and a suspension of the individual and the firm for 10 days to two years. In egregious cases, the Guidelines call for consideration of a bar for the individual, and expulsion for the firm.[56]

Respondents' misconduct was egregious. Many of their misrepresentations discussed above were intentional, and the remainder were at least reckless. The number and size of their transactions were substantial.[57] Alfaro and Pinnacle raised more than $10 million from more than 100 investors for offerings that were sold by misrepresenting and omitting material facts. Their conduct had the potential for substantial economic gain, and, in fact, did result in substantial gain.[58] Their fraudulent conduct included 11 separate schemes.[59] Their fraudulent conduct took place over a substantial period of time, from August 2008 until March 2011.[60] They continued to engage in fraudulent conduct after they had agreed to the December TCDO, and further fraudulent conduct after they had agreed to the January TCDO. There was substantial injury to customers, whose losses were virtually assured at the time of their investments.[61] In fact, the Complaint notes that several of the wells were capped, and

---

[56] *FINRA Sanction Guidelines.* 88 (2011).

[57] Principal Consideration No. 18, Guidelines at 6. ("The number, size and character of the transactions at issue.")

[58] Principal Consideration No. 17, Guidelines at 7. ("Whether the respondent's misconduct resulted in the potential for the respondent's monetary or other gain.")

[59] Principal Consideration No. 8, Guidelines at 6. ("Whether the respondent engaged in numerous acts and/or a pattern of misconduct.")

[60] Principal Consideration No. 9, Guidelines at 6. ("Whether the respondent engaged in the misconduct over an extended period of time.").

[61] Principal Consideration No. 11, Guidelines at 6 ("Whether the respondent's misconduct resulted directly or indirectly in injury to [the investing public]").

Enforcement presented evidence that investors have received little or no return from most of the ventures. There are no mitigating factors.

A bar is imposed on Alfaro, and expulsion is imposed on Pinnacle, for their fraudulent conduct, as alleged in the First Cause of Action.

### B.     Alfaro is Barred for Misuse of Customer Funds

The Sanction Guidelines recommend consideration of a bar as the sanction for the improper use of customer funds unless the improper use resulted from a respondent's misunderstanding of his customers' intended use of the funds or other mitigation exists.[62]

From January 2009 to March 2011, Alfaro misused customer funds to: (1) meet obligations for previous offerings; (2) cover Alfaro's personal expenses; and (3) make cash payments to Alfaro personally. Investors entrusted their funds to Alfaro with the belief that the funds would be used for drilling and production in the wells in which their ventures invested. The funds were used for Alfaro's personal expenditures and for business purposes that were not related to the purposes of the customers' investments. When projects failed or were failing, Alfaro concealed his misuse of customers' funds by persuading them to transfer their investment to his other oil and gas ventures.[63] Respondent did not misunderstand the customers' intended use of the funds, and there are no other mitigating factors.

A bar is imposed for Alfaro's misuse of customer funds.

### C.     Alfaro is Barred and Pinnacle is Expelled for Unregistered Securities Sales

For the unregistered sale of securities in violation of NASD Conduct Rule 2110, the Guidelines recommend a fine of $2,500 to $50,000. In egregious cases, the Guidelines recommend consideration of a larger fine, and a suspension in any or all capacities for up to two years, or a bar. The relevant principal considerations set forth in the Guideline are: (1) whether

---

[62] *Guidelines* at 36.

[63] Principal Consideration No. 10, Guidelines at 6.

the respondent attempted to comply with an exemption from registration; (2) the share volume and dollar amount of transactions involved; and (3) whether the respondent disregarded "red flags" suggesting the presence of unregistered distribution.[64]

A bar and expulsion are appropriate. Respondents made no effort to comply with any exemption, but instead attempted to create the false appearance that they were selling joint venture interests rather than securities. The dollar amount of the transactions was substantial. They collected nearly $5 million in sales of the South Bayou Crook Chene, Victoria Secret, and SW Redfish Reef investments. This was not a case of missing red flags, but of issuing and selling the unregistered securities. Respondents were thus aware of every red flag, but chose to ignore them in furtherance of their fraudulent scheme.

Alfaro is barred, and Pinnacle is expelled, for unregistered securities sales.

### D.    Sanctions for Causes Four, Five, and Six

The Fourth Cause of Action charges Respondents with violating NASD Rule 2310 and FINRA Rule 2010 by failing to document and determine suitability. The Fifth Cause of Action charges Respondents with violating NASD Rule 3070 and FINRA Rule 2010 by failing to report, accurately report, and maintain Rule 3070 filings; and with violating Article V, Section 2 of FINRA By-Laws, and FINRA Rule 2010, by failing to update and timely update Forms U4. The Sixth Cause of Action charges Respondents with failure to supervise, failure to maintain supervisory controls, and failure to maintain accurate books and records, in violation of the Exchange Act, SEC Rule 17a-4, and FINRA's Rules.

In light of the bars for Causes One, Two, and Three, no additional sanction is imposed for these causes of action.

---

[64] Guidelines at 26.

## E.  Restitution

Enforcement has requested restitution, and it is an appropriate remedy.  Rescission is an appropriate form of restitution because the investments were sold by numerous misrepresentations of material facts.

"Where appropriate, Adjudicators may order that a respondent offer rescission to an injured party."[65]  Here, rescission is clearly an appropriate remedy.  The sales of the joint venture interests were fraudulent.  Investors received little or no return for their investments.  For some, the investments are already a complete loss, while there is at best a theoretical possibility for some cash flow from others.

Respondents shall offer rescission to every customer of the 11 ventures set forth in the First Cause of Action.  Respondents are ordered to offer rescission within 60 days of the effective date of this Decision.  The offer of rescission shall be in a form acceptable to Enforcement.  Respondents are further ordered to provide Enforcement with proof of the delivery of the offer of rescission to each customer.

To the extent any customer does not request rescission, Respondents shall refund the 15%[66] sales commissions and fees charged to each customer of the 11 fraudulent joint ventures that are the subject of the First Cause of Action.

## XI.  Conclusion

Respondent Pinnacle Partners Financial Corporation is expelled from FINRA membership and Respondent Brian K. Alfaro is barred for making material misrepresentations in connection with the sale of securities, in willful violation of Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5, NASD Rules 2120 and 2110, and FINRA Conduct Rules 2020 and 2010.  Respondent Alfaro is also barred for misuse of customer funds, in

---

[65] General Principles Applicable to All Sanction Determinations, ¶ 5, Guidelines at 4.

[66] As noted above, the offering documents describe the payment to Pinnacle as a 10% commission, a 2% due diligence fee, and a 3% nonallocable expense fee.

violation of NASD Conduct Rules 2330 and 2110, and FINRA Rules 2150 and 2010. Pinnacle is also expelled, and Alfaro is barred, for making unregistered sales of securities, in violation of Section 5 of the Securities Act of 1933, NASD Rule 2110, and FINRA Rule 2010.

Respondents are also ordered to offer rescission to those who purchased interests in the 11 joint ventures that are the subject of the First Cause of Action cause of action. To the extent any customer does not request rescission, Respondents shall refund the 15% sales commission charged to each customer of the 11 fraudulent joint ventures that are the subject of the First Cause of Action.

In light of the bars and expulsions, no additional sanctions are imposed for Respondents' failure to document and determine suitability, in violation of NASD Rule 2310 and FINRA Rule 2010; failure to report, accurately report, and maintain Rule 3070 filings and failure to update and timely update Forms U4, in violation of FINRA's By-Laws, NASD Rule 3070, and FINRA Rule 2010; failure to supervise, establish and maintain supervisory controls, in violation of NASD Rules 3012 and 3010, and FINRA Rule 2010; Pinnacle's willful failure to maintain books and records, in violation of Section 17 of the Securities Act, SEC Rule 17a-4, and FINRA Rule 2010; and Alfaro's causing Pinnacle to fail to maintain books and records, in violation of NASD Rule 2110 and FINRA Rule 2010.

The bars and expulsions will become effective immediately if this Default Decision becomes FINRA's final disciplinary action in this proceeding.

Lawrence B. Bernard
Hearing Officer

Copies to:    Brian K. Alfaro *(via overnight courier and first-class mail)*
              Alan Wolper, Esq. *(via e-mail and first-class mail)*
              Christopher Seps, Esq. *(via e-mail and first-class mail)*
              Patton L. Zárate, Esq. *(via e-mail and first-class mail)*
              Mark P. Dauer, Esq. *(via e-mail and first-class mail)*
              Andrew Favret, Esq. *(via e-mail)*
              Robert Long, Esq. *(via e-mail)*
              David R. Sonnenberg, Esq. *(via e-mail)*

## FINANCIAL INDUSTRY REGULATORY AUTHORITY

## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| Department of Enforcement,<br><br>               Complainant,<br><br>v.<br><br>Pinnacle Partners Financial Corporation<br>(CRD No. 145523),<br><br>and<br><br>Brian K. Alfaro (CRD No. 4049120),<br><br>               Respondents. | DISCIPLINARY PROCEEDING<br>No. 2010021324501 |

## SECOND AMENDED COMPLAINT

The Department of Enforcement alleges:

### Summary

1. This case involves fraudulent sales of unregistered securities in eleven private

   placement offerings perpetrated by Brian K. Alfaro ("Alfaro") and his wholly-owned

   firm Pinnacle Partners Financial Corporation ("Pinnacle"). Alfaro and Pinnacle

   operated a boiler room where numerous registered representatives placed thousands

   of cold calls weekly to solicit investments in Alfaro's captive oil and gas drilling joint

   ventures. The operators of the ventures are entities owned or controlled by Alfaro.

   Alfaro and Pinnacle raised over $10 million from over 100 investors for offerings that

   materially misrepresented or omitted facts. From August 2008 to Respondents'

   March 2011 suspension, Alfaro and Pinnacle offered and sold fraudulent offerings to

investors throughout the United States. These fraudulent sales have caused significant harm to Pinnacle's customers. As a result of the foregoing conduct, Respondents Pinnacle and Alfaro willfully violated Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020.

2. From August 2008 to March 2011, Pinnacle and Alfaro have materially misrepresented or omitted facts related to the South Bayou Crook Chene, Pangaea, Normanna Deep, Normanna North, Victoria Secret, French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali offerings they sold to investors. Pinnacle and Alfaro provided investment summaries to all of the investors in these offerings. The investment summaries included numerous misrepresentations and omissions. Specifically, Alfaro received reports about prospects from operators, and deleted material information that was unfavorable before forwarding information contained in the reports to the investors. Pinnacle and Alfaro never informed investors of Alfaro's alteration of the reports or of the deleted information. Pinnacle and Alfaro also provided investors with maps that omitted numerous dry, plugged, and abandoned wells near their projected drilling sites. In the investment summaries, Pinnacle and Alfaro grossly inflated natural gas prices, projected natural gas reserves, estimated gross returns, and estimated monthly cash flows. In addition, Pinnacle and Alfaro distributed an offering document claiming that a previous offering had distributed $14,287,436.46 when the actual distribution was less than $1.5 million. As a result of the foregoing conduct, Respondents Pinnacle and Alfaro willfully violated Section 10(b) of the Securities Exchange Act

of 1934, Rule 10b-5 thereunder, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020.

3. From January 2009 to March 2011, Alfaro misused customer funds to (1) meet obligations for previous offerings, (2) cover Alfaro's personal expenses, and (3) make cash payments to Alfaro personally. As Alfaro admitted to FINRA staff, the only way Alfaro Oil and Gas could meet its financial obligations to drill the investors' wells and meet obligations to previous investors, after spending investor funds in this fashion, was to raise additional funds from investors or tap Alfaro's personal resources. As a result of the foregoing conduct, Respondent Alfaro violated NASD Rule 2330 and FINRA Rules 2150 and 2010.

4. From August 23, 2008 to September 24, 2010, Pinnacle and Alfaro offered and sold unregistered securities. Pinnacle, acting through Alfaro or other representatives employed by the firm, engaged in general solicitations by offering Alfaro's joint ventures to investors through the boiler room operated by Pinnacle and Alfaro before an existing relationship was established. Specifically, Pinnacle and Alfaro pitched offerings on the initial cold call and sent out offering materials immediately following the initial cold call. As a result of the foregoing conduct, Respondents Pinnacle and Alfaro, by acting in contravention of Section 5 of the Securities Act of 1933, violated FINRA Rule 2010 and NASD Rule 2110.

5. Pinnacle and Alfaro systematically destroyed documents, maintained inaccurate books and records, failed to properly report numerous written investor complaints related to the allegations in this complaint, and failed to properly amend Forms U-4 for settlements related to customer grievances in excess of $15,000. As a result of the

foregoing conduct, Respondents Pinnacle and Alfaro violated Article V, Section 2, of FINRA's By-Laws, NASD Rules 3070 and 2110, and FINRA Rule 2010. Respondent Pinnacle willfully violated Section 17 of the Securities Exchange Act of 1934, Rule 17a-4 thereunder, and NASD Rule 3110. By causing Pinnacle's violations of Section 17 of the Securities Exchange Act of 1934, Rule 17a-4 thereunder, and NASD Rule 3110, Respondent Alfaro violated NASD Rule 2110 and FINRA Rule 2010.

6. From August 2008 through March 2011, Pinnacle's supervisory system and written procedures were not reasonably designed to ensure compliance with e-mail retention requirements. Among other things, the firm's procedures did not provide for any reasonable follow-up and review to ensure that copies of all e-mail communications were captured and maintained. As a result of the foregoing conduct, Respondents Pinnacle and Alfaro violated NASD Rules 3012, 3010, and 2110 and FINRA Rule 2010.

## Procedural History

7. The Department filed its Original Complaint on November 23, 2010. After discovering ongoing investor harm, the Department filed its First Amended Complaint and initiated a Temporary Cease and Desist proceeding on December 3, 2010. Respondents entered into Temporary Cease and Desist Consent Orders on December 10, 2010 (the "December TCDO") and January 21, 2011 (the "January TCDO").

8. On February 10, 2011, the Department filed a Notice of Suspension based on Pinnacle and Alfaro's violations of the January TCDO. Specifically, the Department

4

alleged Respondents had made a number of fraudulent misrepresentations and omissions related to their offering and sale of the Montague Legacy project. Respondents requested a hearing, but they later withdrew the request. As a result, Respondents were suspended from FINRA membership effective March 8, 2011.

9. The December 2010 and January 2011 Temporary Cease and Desist Consent Orders required Pinnacle and Alfaro to provide an accounting and supporting documentation for offerings sold by Respondents. Despite their agreed order and repeated 8210 requests, Respondents have failed to provide the accounting for all offerings sold by Respondents that was required by the January TCDO and numerous 8210 requests.

**Additional Information Discovered After First Amended Complaint**

10. As a result of information obtained after the First Amended Complaint was filed, (1) misconduct related to additional offerings are now being charged (SW Redfish Reef, East Moss Lake/LNG, and Denali), (2) additional facts about the offerings previously charged are being alleged (East Wharton, Normanna North, and Montague Legacy), and (3) additional causes of action are being pursued (Suitability and Supervision). Additional information uncovered by Enforcement after the First Amended Complaint also establishes that Respondents engaged in additional fraud in the offering and sale of securities, and that Respondent Alfaro misused additional customer funds related to the East Wharton, Normanna North, SW Redfish Reef, and Denali offerings.

11. For example, after the well tests were analyzed and an industry partner elected to abandon its interest in the East Wharton project, the operator sent e-mails to Alfaro and all other partners on February 20, 2010. The operator's e-mail to Alfaro and all

5

other partners contained revised reserve estimates for the project of 3 BCF of gas and 200,000 barrels of oil. Alfaro failed to provide the revised reserves estimates to current or potential East Wharton investors. Instead, he continued offering the East Wharton project to new investors and to Victoria Secret transferees until February 2011 *with projected reserves of 20 BCF of gas and 1,000,000 barrels of oil.*

12. In addition, Pinnacle and Alfaro have provided offering materials and made oral representations to hundreds of investors that violate Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5 promulgated thereunder, and FINRA Rule 2020. Specifically, the January 25, 2011 Montague Legacy offering failed to disclose that Respondents and Alfaro Oil and Gas had received a Wells Notice from the Securities and Exchange Commission - citing securities fraud and other violations - in December 2010. Respondents also made written and oral misrepresentations and omissions related to surrounding wells while touting the Montague Legacy investment to investors.

13. The only new private placement offering sold by Pinnacle and Alfaro from late 2010 until they were suspended on March 8, 2011 was the Montague Legacy offering. The Montague Legacy offering was also Pinnacle and Alfaro's primary source of revenue to fund unrelated business expenses and Alfaro's personal expenses. Pinnacle and Alfaro failed to inform Montague Legacy investors that Alfaro Oil and Gas was insolvent. This omission was especially material given that (1) Montague Legacy investors were purchasing a turnkey contract requiring Alfaro Oil and Gas to pay the project's drilling and completion costs, (2) Alfaro Oil and Gas' failure to timely pay the well's operator for drilling and completion costs would result in Montague

6

Legacy investors' distributions being withheld to cover unpaid costs, and (3) Alfaro's failure to pay outstanding debts could lead to rescission of Alfaro's rights (that Alfaro sold to investors).

14. Pinnacle and Alfaro made a number of misrepresentations to investors in order to procure and misuse customer funds. On the East Wharton, Normanna North, and Denali offerings Alfaro failed to disclose that he owed hundreds of thousands of dollars to numerous operators. Alfaro approached investors and informed them that funds were needed for various purposes. None of the investors who contributed additional funds were informed that their money was actually used to pay Alfaro's outstanding debts owed to various operators, Alfaro's unrelated business expenses, and Alfaro's personal expenses. Several operators have indicated that they are currently withholding distributions for their projects and offsetting them against Alfaro's indebtedness. As a result of Alfaro's conduct and indebtedness, even if the wells are successful, the operator will retain any distributions to offset Alfaro's indebtedness instead of providing them to Alfaro and his investors. This is particularly egregious given the fact that Alfaro marked up many of these offerings from 100 to 200%, took millions of dollars for unrelated business and personal purposes from investors' funds, and still failed to pay the operators what he owed.

15. Pinnacle and Alfaro failed to document or have a reasonable basis for believing that the investments they sold were suitable for their customers. Pinnacle and Alfaro failed to do any suitability determination for numerous investors, inflated the annual income on the new account form of at least one investor, and failed to evidence the basis for suitability determinations for numerous investors.

7

16. Pinnacle failed to have a qualified person adequately supervising the activity of Brian Alfaro - who generated more than 20% of the firm's sales. Victor Hernandez , who was the firm's second principal from January 6, 2011 until the firm was suspended in March 2011, testified that he was unaware what WSPs were, and that he had "no idea" what Rule 3010 covered. Pinnacle failed to adequately supervise Alfaro.

17. Pinnacle also failed to have a qualified person adequately supervise the activity of Bruce Redfield. On June 16, 2010, Pinnacle placed Redfield on administrative leave after he was indicted for three federal criminal counts of mail fraud and wire fraud. While he was on administrative leave, Redfield worked for Alfaro Oil and Gas drafting offering documents and working on marketing projects.

18. On August 18, 2010, a superseding indictment was issued containing *ten counts of mail fraud and wire fraud related to three mortgage fraud and investment schemes*. The indictment alleged that "Defendant Bruce Irving Redfield devised a scheme to make money by recruiting 'investors' to take out loans to build high end spec homes and matching them with building contractors in need of financing." The indictment also alleged that Redfield created and managed limited liability companies to promote his investment program. On December 8, 2010, Pinnacle removed Redfield from administrative leave and put him back on the phones. In January 2011, Redfield made a number of misleading statements and omissions to investors related to the Montague Legacy offering. Shortly after Pinnacle was suspended, *Redfield was promoted to Alfaro Oil and Gas' Vice President of Business Development*, and he has been cold-calling investors and pitching a new iteration of the Montague Legacy project.

8

## Respondents and Jurisdiction

19. **Respondent Pinnacle Partners Financial Corporation** was suspended from FINRA membership on March 8, 2011. The firm was a member of FINRA from March 7, 2008 until its BDW became effective on May 24, 2011. The firm's President and Chief Compliance Officer was Alfaro. Pinnacle is 100% owned by Silver Star Resources, LLC, which is wholly-owned by Alfaro. Pinnacle operated pursuant to the (k)(2)(i) exemptive provisions of SEC Rule 15c3-3 and only conducted a securities business selling oil and gas private placements pursuant to SEC Regulation D.

20. Although Pinnacle has not been a FINRA member firm since May 24, 2011, it remains subject to FINRA's jurisdiction for purposes of this proceeding, pursuant to Article V, Section 4 of FINRA's By-Laws, because (1) the Complaint was filed within two years after the date upon which it ceased to be a FINRA member and (2) the Complaint charges it with misconduct committed while it was a FINRA member.

21. **Respondent Brian K. Alfaro** entered the securities industry in October 1999 through registered firm The Champion Group, Inc. ("Champion"). Alfaro was terminated by Champion in June 2006. He was employed by registered firm Pinnacle Partners Financial Corporation until March 3, 2011. Alfaro was subsequently suspended from FINRA membership on March 8, 2011. During his career in the securities industry, Alfaro obtained Series 7, 39, and 63 licenses.

22. Although Respondent has not been associated with a FINRA member firm since March 3, 2011, he remains subject to FINRA's jurisdiction for purposes of this proceeding, pursuant to Article V, Section 4 of FINRA's By-Laws, because (1) the

9

Complaint was filed within two years after the date upon which he ceased to be associated with a FINRA member and (2) the Complaint charges him with misconduct committed while he was associated with a FINRA member.

23. **Non-party Silver Star Resources, LLC** ("Silver Star") is wholly-owned by Alfaro, and it is the sole owner of Pinnacle. Silver Star Resources was utilized by Alfaro to increase the cost to investors for leases originally acquired by Alfaro. Silver Star charged exorbitant fees to investors without providing any identifiable services.

24. **Non-party Alfaro Oil and Gas, LLC** ("Alfaro Oil and Gas") is wholly-owned by Alfaro and acts as the managing venturer for almost all offerings sold by Pinnacle and Alfaro. Alfaro Oil and Gas charged exorbitant additional fees to all investors that are not typically incurred by other interest holders in similar oil and gas drilling projects.

**FIRST CAUSE OF ACTION**
**Fraud in the Offering or Sale of a Security**
**Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder,**
**NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020, against Pinnacle and Alfaro**

25. The Department realleges and incorporates by reference paragraphs 1 through 24 above.

26. Pinnacle and Alfaro offered and sold securities to investors located throughout the United States from their boiler room in San Antonio, Texas. The eleven securities at issue in this First Cause of Action were marketed as joint venture interests for participation in the acquisition of working interests and net revenue interests in oil and gas wells. The eleven offerings were South Bayou Crook Chene, Victoria Secret, Normanna North, Normanna Deep, Pangaea, French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali.

27. Pinnacle and Alfaro failed to disclose to all investors that **none** of the joint ventures offered through Pinnacle and Alfaro had ever been profitable for anyone other than Pinnacle, Alfaro, and entities owned and controlled by Alfaro. Alfaro utilized two non-registered entities which charged fees to investors that made each of the offerings less likely to be profitable. Silver Star is wholly-owned by Alfaro, and it is the sole owner of Pinnacle. Alfaro Oil and Gas is wholly-owned by Alfaro and acts as the managing venturer for almost all offerings sold by Pinnacle and Alfaro. Silver Star and Alfaro Oil and Gas charged exorbitant additional fees to all investors that are not typically incurred by other interest holders in similar oil and gas drilling projects.

28. Silver Star charged all investors for purported lease acquisition costs. Although Silver Star provided no identifiable services to investors, Alfaro, by causing investors to make payments to Silver Star, increased the Victoria Secret lease acquisition cost over 50%. The extent of Silver Star's exorbitant fees was never disclosed to investors.

29. Pinnacle and Alfaro's solicitations created the false impression that Alfaro Oil and Gas was an oil and gas operator. Alfaro Oil and Gas entered into "turnkey agreements" with all investors in the eleven offerings at issue offered and sold by Pinnacle and Alfaro. Turnkey agreements are drilling contracts under which the drilling contractor agrees to perform stated functions for an agreed-upon price. This typically limits the liability exposure for a contractor's actions. The turnkey agreement claimed that Alfaro Oil and Gas would be paid to "...acquire the Prospect and drill and complete the Prospect well, including, but not limited to, the setting of production casing or, if necessary, the plugging and abandoning of a dry hole..." The

11

turnkey agreement also claimed that: "Alfaro shall conduct all of its efforts in a good and workmanlike manner and with reasonable due diligence." Alfaro Oil and Gas has never acted as an operator or actually drilled an oil and gas well. In the offerings sold by Pinnacle and Alfaro, Alfaro Oil and Gas served solely as an interest holder in prospects that were run by actual operators.

30. Despite the limited role of Alfaro Oil and Gas, Pinnacle and Alfaro sold the eleven joint venture interests to all investors at prices that were as much as 100% to 200% more than the cost estimates received from the operators to drill the wells. As a result, investors received minority interests in oil and gas prospects at prices that included substantial additional costs 1) to cover overhead, 2) to compensate the numerous boiler room employees, and 3) to fund Alfaro's lifestyle. Neither Pinnacle nor Alfaro disclosed the drilling cost estimates to investors. Thus, investors were not aware that they paid 100% to 200% more than the drilling cost estimate totals for the interests they acquired.

31. Pinnacle and Alfaro routinely materially misrepresented or omitted facts that were provided to them by the wells' actual operators. As discussed more specifically below, Pinnacle and Alfaro materially misrepresented or omitted facts related to the South Bayou Crook Chene, Victoria Secret, Normanna North, Normanna Deep, Pangaea, French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali offerings.

**The South Bayou Crook Chene Offering**

32. The South Bayou Crook Chene offering was dated July 10, 2008. From at least August 2008 until January 2009, Pinnacle and Alfaro offered and sold the South

12

Bayou Crook Chene offering to investors. Alfaro prepared an investment summary and provided it to all investors with the South Bayou Crook Chene offering materials. The investment summary was copied verbatim from a report Alfaro received from the operator – with the exception of one sentence. The first page of Alfaro's executive summary and the report provided by the operator stated: "Cumulative production. . . has been in excess of 12.5MMBO + 49 BCFG. At least two wells are still producing from this field, the Kerr McGee B-3 and the Hilcorp 4-B. The B-1 may also be producing." However, Alfaro deleted the next sentence stating: *"All currently producing wells are very marginal."* (emphasis added). This would have been material information to investors. Pinnacle and Alfaro never informed investors of Alfaro's alteration of the report or of the deleted information.

### The Pangaea Offering

33. The Pangaea offering was dated March 8, 2010. Pinnacle and Alfaro offered and sold the Pangaea offering to investors from at least March 2010 to September 2010. The Pangaea offering document provided to all investors discusses Alfaro and Alfaro Oil and Gas' management experience. The offering document states: "As of 2006 Mr. Alfaro has served as a corporate officer of Primera Energy Partners, LLC. In that capacity he has had success in the following prior activities: . . ." The offering document then details a number of previous offerings. The first offering listed is South Brushy Creek. Alfaro misrepresented that South Brushy Creek made "cash distribution to partners" of $14,287,436.46. This number is grossly inflated from the actual figure of less than $1.5 million. This material misrepresentation made it

appear as if Alfaro's previous offering had been exponentially more profitable than it really was.

34. The first four offerings detailed in the management section of the Pangaea offering documents were sorted by their "cash distribution to partners." The South Brushy Creek offering was listed as the highest cash distribution to partners, at over $14 million which, as stated previously, was grossly inflated. The second highest cash distribution to partners was less than $450,000, and the third highest was less than $250,000. None of the other offerings listed cash distributions to partners of over $200,000. Alfaro continued the Pangaea offering without correcting this misrepresentation even after this error was brought to his attention.

**The Victoria Secret Offering**

35. The Victoria Secret offering was dated January 5, 2009. Pinnacle and Alfaro offered and sold Victoria Secret to investors from at least January 2009 to July 2009. Each unit offered and sold to investors represented a .41% working interest in the venture. The investment summary included with the offering materials and extensively utilized during sales calls with all investors contained projected natural gas reserves of $630,000,000, estimated gross returns of $1,890,000 to $2,310,000 (for each investor's .41% working interest), and estimated monthly cash flow of $6,300 to $12,600 (for each investor's .41% working interest) based on natural gas prices of $7.00 per MCF. (MCF is the abbreviation for one thousand cubic feet, one of the standard units of measurement for natural gas.) Pinnacle and Alfaro had no basis for predicting that the wellhead price for natural gas was $7.00 per MCF when Victoria Secret was offered by Pinnacle and Alfaro to investors. According to the U.S. Energy

Information Administration, the wellhead price for natural gas was $5.15/MCF in January 2009, $4.19/MCF in February 2009, $3.72/MCF in March 2009, $3.43/MCF in April 2009, $3.45/MCF in May 2009, $3.45/MCF in June 2009, and $3.43/MCF in July 2009. Alfaro inflating the projected natural gas price caused the potential natural gas reserves, estimated gross returns, and estimated monthly cash flow to increase dramatically. The chart below illustrates the magnitude of Pinnacle and Alfaro's misrepresentations:

| Natural Gas Price per MCF | Potential Natural Gas Reserves | Estimated Gross Returns/per .41% working interest | Estimated Monthly Cash Flow/per .41% working interest |
|---|---|---|---|
| $7.00 (Alfaro's number) | $630,000,000 | $1,890,000 to $2,310,000 | $6,300 to $12,600 |
| $5.15 (January actual number) | $463,500,000 | $1,390,500 to $1,699,500 | $4,635 to $9,270 |
| $4.19 (February actual number) | $337,100,000 | $1,131,300 to $1,382,700 | $3,772 to $7,542 |
| $3.45 (May/June actual number) | $310,500,000 | $931,500 to $1,138,500 | $3,105 to $6,210 |

Notwithstanding the fact that natural gas prices may fluctuate, the projected price conveyed by Pinnacle and Alfaro was unreasonable and materially misrepresented projected reserves, estimated gross returns, and estimated monthly cash flow.

36. In June and July 2009, Alfaro sent correspondence to investors claiming that Victoria Secret's operator "required special equipment" and was waiting for a rig. Alfaro also stated that drilling should occur in the next 45 to 60 days. At a time when natural gas prices were below $3.50/MCF, Alfaro continued to make his projections to investors with calculations based on a price of $7.00/MCF: "We are extremely excited about this prospect which is targeting reserves in excess of $630,000,000.00 and should reach a total depth of 15,000'." At the time Alfaro sent this correspondence, targeted reserves were less than $315,000,000.

15

**The SW Redfish Reef Offering**

37. The SW Redfish Reef offering was dated November 16, 2009. Pinnacle and Alfaro offered and sold the SW Redfish Reef offering from December 9, 2009 to March 2, 2010. According to their SW Redfish Reef blotter, Pinnacle and Alfaro collected at least $779, 027 from investors – including almost $120,000 for drilling and testing and completion costs that were not owed.

38. On September 9, 2009 Alfaro Oil and Gas executed a participation agreement and acquired a 10% working interest in the SW Redfish Reef project. Attached to the participation agreement was an authorization for expenditure ("AFE") dated August 4, 2009. Alfaro approved the AFE with his signature on September 22, 2009. The AFE detailed Alfaro's total drilling, completion, and equipment costs as $604,990.10. Despite receiving the authorization for expenditure and signing a contract confirming these amounts prior to the SW Redfish Reef offering, Alfaro and Pinnacle never disclosed these figures to any of their investors.

39. The November 16, 2009 SW Redfish Reef offering offered 25 joint venture interests for $2,297,000. Alfaro purchased the project for $90,000, representing its share of the prospect development costs. According to the operator, only 29.5% of the SW Redfish prospect has been sold, and the project has very little current interest or value. As a result, the operator has offered to refund participation costs to Alfaro and the other partners upon request. Alfaro has failed to inform investors that the project was never more than 30% sold, and that the operator offered a complete refund for any partner in the project.

### The Normanna Deep Offering

40. The Normanna Deep offering was dated February 10, 2009. Pinnacle and Alfaro
    offered and sold the Normanna Deep offering to investors from at least February
    2009 to May 2009. The investment summary included with the offering materials
    and extensively utilized during sales calls with all investors contained projected
    natural gas reserves of $350,000,000, estimated gross returns of $1,050,000 to
    $2,100,000 (for each investor's .41% working interest), and estimated monthly cash
    flow of $6,300 to $9,450 (for each investor's .41% working interest) based on natural
    gas prices of $7.00 per MCF. Pinnacle and Alfaro had no basis for predicting that the
    wellhead price for natural gas was $7.00 per MCF when Normanna Deep was offered
    by Pinnacle and Alfaro to investors. According to the U.S. Energy Information
    Administration, the wellhead price for natural gas was $4.19/MCF in February 2009,
    $3.72/MCF in March 2009, $3.43/MCF in April 2009, and $3.45/MCF in May 2009.
    The chart below illustrates the magnitude of these misrepresentations:

| Natural Gas Price per MCF | Potential Natural Gas Reserves | Estimated Gross Returns/per .41% working interest | Estimated Monthly Cash Flow/per .41% working interest |
|---|---|---|---|
| $7.00 (Alfaro's number) | $350,000,000 | $1,050,000 to $2,100,000 | $6,300 to $9,450 |
| $4.19 (February actual number) | $209,500,000 | $628,500 to $1,257,000 | $3,771 to $5,656.50 |
| $3.45 (May/June actual number) | $172,500,000 | $517,500 to $1,035,000 | $3,105 to $4,657.50 |

Notwithstanding the fact that natural gas prices may fluctuate, the projected price
conveyed by Pinnacle and Alfaro was unreasonable and materially misrepresented
projected reserves, estimated gross returns, and estimated monthly cash flow.

17

**The Normanna North Offering**

41. The Normanna North offering was dated December 9, 2009. From at least December 2009 until May 2010, Pinnacle and Alfaro offered and sold the Normanna North offering to investors. Although Alfaro utilized a natural gas price of $5.00 per MCF – rather than the inflated $7.00/MCF he had utilized in the Normanna Deep and Victoria Secret offerings, for example – Alfaro prepared an investment summary provided to all investors that contained material misrepresentations and omissions. Specifically, he provided maps to all investors detailing over ten producing wells near the proposed drilling site. The maps highlighted the producing wells and noted their production quantities; however, the maps failed to disclose that there were also over ten wells that were dry, plugged, and abandoned near the proposed drilling site. This information was readily available to Alfaro and was not provided to investors.

42. The Normanna North offering sought to raise $2,302,370. According to their Normanna North blotter, Pinnacle and Alfaro offered and sold Normanna North from December 16, 2009 to April 7, 2010, when an investor was transferred from the Victoria Secret offering.

43. Alfaro entered into a joint operating agreement with Abraxas Petroleum Corporation on April 22, 2009. The terms of the joint operating agreement were "a third for a quarter." This is an industry standard that provides a participant with a 33.33% working interest to casing point, and a 25% working interest (that also provides 25% of revenue) after casing point. Casing point is the point at which a well has been drilled to the desired depth and the owners must decide whether or not to complete and prepare the well for production. A working interest is the rights to mineral

18

interests granted in an oil and gas lease providing the right to work on the leased property to search, develop, and produce oil and gas (and the obligation to pay all costs). Essentially, the terms require a participant to pay 33.33% of all costs to casing point in order to receive 25% of the project's return. Pinnacle and Alfaro never disclosed the terms of the joint operating agreement to their investors.

44. On December 8, 2009, one day before the offering, Abraxas provided Alfaro with an AFE showing $485,500 as Alfaro's 33.33% proportionate share of drilling costs. The AFE also detailed completion costs. Despite receiving the authorization for expenditure and signing a contract confirming these amounts prior to the Normanna North offering, Alfaro and Pinnacle never disclosed these figures to any of their investors.

**The French Town Offering**

45. The offering document for French Town 2-H is dated July 23, 2010. Pinnacle and Alfaro began selling the investment in early August 2010. The participation agreement between Alfaro Oil & Gas and Gulftex/Frenchtown Acres is dated "September __, 2010." According to Alfaro Oil and Gas' website, the French Town 2-H well was drilled to total depth on January 7, 2010. As this well was already drilled over six months before the offering document, there was no need to drill a well; however, the offering document provided by Pinnacle and Alfaro to investors incorrectly stated that their investment would be used to acquire, drill, and complete a well.

19

46. Pinnacle and Alfaro also failed to disclose to French Town investors that only $1.4 million of the $2.1 raised for this project would be sent to the operator, as the costs were already known for this well that had already been drilled.

47. Alfaro and Pinnacle provided every French Town investor with an investment summary. The investment summary included with the offering materials and extensively utilized during sales calls with all investors contained projected estimated gross returns of $787,500 to $967,500 (for each investor's 1.34% working interest), and estimated monthly cash flow of $4,050 to $6,750 (for each investor's 1.34% working interest) based on projected daily gas production of 3,000/MCF to 5,000/MCF. The investment summary contained grossly inflated projected daily gas production numbers. Pinnacle and Alfaro had no basis for predicting that the daily gas production would be 3,000/MCF to 5,000/MCF when French Town was offered by Pinnacle and Alfaro to investors. In fact, Alfaro Oil and Gas' lead geologist for the French Town offering had previously informed Alfaro that he expected initial production of 1,000/MCF to 1,500/MCF per day, dropping to about 500/MCF to 600/MCF per day in six to eight months, and then leveling out at 350/MCF to 450/MCF per day after a year. Pinnacle and Alfaro never provided any French Town investors with the estimates provided by the lead geologist.

48. Despite the fact that his "geophysicist stamp" was included and he was listed as the "lead geologist" in the French Town offering materials, Alfaro Oil and Gas' lead geologist was unaware that Alfaro had unilaterally increased the daily gas production projection for the French Town offering to 3,000/MCF to 5,000/MCF per day. When confronted with the offering materials provided by Pinnacle and Alfaro to investors,

the lead geologist testified under oath that he was previously unaware that these numbers had been provided to investors, and that he was upset that his name was associated with the inflated numbers provided by Alfaro and Pinnacle to investors.

49. The French Town offering materials also included a "senior geologist" for the project. Alfaro Oil and Gas' senior geologist was also unaware that Alfaro had unilaterally increased the daily gas production projection for the French Town offering to 3,000/MCF to 5,000/MCF. The senior geologist had also previously informed Alfaro that he expected initial production of 1,000/MCF to 1,500/MCF per day. When confronted with the offering materials provided by Pinnacle and Alfaro to investors, the senior geologist testified under oath that the daily production numbers provided by Pinnacle and Alfaro to investors were not attainable.

50. Alfaro and Pinnacle provided investors with initial production information for eight similar producing gas wells near the French Town well; however, Alfaro and Pinnacle failed to disclose that the *actual production* for all eight of these wells was substantially less than the projections contained in the French Town investment summary. Alfaro and Pinnacle's projected daily gas production numbers were 3,000/MCF to 5,000/MCF. If any of the eight similar wells ever had actual daily gas production that exceeded 3,000/MCF – that level of production was extremely short-lived. Within ten months, none of the eight similar wells was producing over 1,000/MCF per day, and the daily production from all of these wells continued to decline. The *lowest* daily production value provided by Alfaro and Pinnacle was significantly higher than that of any of the eight similar producing wells. The actual production numbers for the eight similar wells were hundreds of percent less than the

projected production numbers. As a result, Pinnacle and Alfaro materially misrepresented projected daily production, estimated gross returns, and estimated monthly cash flow for the French Town offering.

**The East Wharton Offering**

51. The East Wharton offering was dated October 26, 2009. By December 8, 2009, Alfaro had reached the maximum 15 units and $1,183,200 detailed in the offering; however, Pinnacle and Alfaro continued to add investors and oversell the offering. Alfaro's drilling costs for the well were $658,272 for a 16% working interest. His completion costs were estimated to be $160,000.

52. The East Wharton well was drilled in January 2010, and the operator sent completion ballots out to all industry partners. After a review of the preliminary well tests, one partner elected not to complete the well based on data related to the well's potential production. This required the departing partner to forfeit all of the funds it had paid for drilling and testing costs as well as any future interest in the well. On February 23, 2010, Alfaro elected to not only complete the well, but also to purchase the working interest of the non-consenting partner. This allowed Alfaro to obtain an additional 5% working interest while only paying for the completion costs associated with the interest. Pinnacle and Alfaro never disclosed to any investor that the industry partner had abandoned the project because it did not like the data related to the well's potential production, or that the units being sold were acquired solely by paying completion costs because the industry partner was unwilling to pay completion costs after analyzing data related to the well's potential production.

22

53. After February 23, 2010, Alfaro sold interests in the East Wharton offering to an additional nine investors using the same non-amended private placement memorandum, resulting in a total of 33.0662 units being sold (rather than the 15 unit maximum listed in the offering materials) and a total investment of $1,886,764 (rather than the $1,183,200 listed in the offering materials).

54. There are numerous material misstatements in the offering document, including the location of the well, the well's specifications, and the turnkey cost to investors. When confronted with these facially inaccurate items in the offering materials, Alfaro admitted to the staff that the East Wharton offering materials contained numerous false and inaccurate statements.

55. As recently as September 16, 2010, Alfaro sold additional units in East Wharton to two Victoria Secret investors, as a means to transfer the interests of the Victoria Secret investors from the undrilled project.

56. Alfaro's estimated dry hole drilling costs for the well were $658,272 for a 16% working interest. His completion costs were estimated to be $160,000. Despite receiving the authorization for expenditure and signing a contract confirming these amounts prior to the East Wharton offering, Alfaro and Pinnacle never disclosed these figures to any of their investors.

57. On February 20, 2010, after the well tests were analyzed and the industry partner elected to abandon its interest in the project, the operator sent e-mails to Alfaro and all other partners regarding the "East Wharton non-consent situation." The operator's e-mail to Alfaro and all other partners contained revised reserve estimates for the project of 3 BCF of gas and 200,000 barrels of oil. Alfaro failed to provide the

revised reserves estimates to current or potential East Wharton investors. Instead, he

continued offering the East Wharton project to new investors and to Victoria Secret

transferees until February 2011 *with projected reserves of 20 BCF of gas and*

*1,000,000 barrels of oil*.

58. After February 20, 2010, Pinnacle and Alfaro sold interests in the East Wharton

    offering to numerous additional investors using the same non-amended private

    placement memorandum, and Respondents received a total investment of over $1.8

    million (rather than the $1,183,200 listed in the offering materials). At least three of

    these investors were transferred by Pinnacle and Alfaro from the Victoria Secret

    offering to the East Wharton offering. None of Pinnacle and Alfaro's East Wharton

    investors was provided with the revised reserves estimates sent by the operator or

    information related to the non-consenting partner.

59. On April 26, 2011, Alfaro informed investors that the East Wharton well had failed.

    As a result, the project was terminated.

    **The Montague Legacy Offering**

60. Pinnacle and Alfaro have only offered and sold one new offering in 2011, Montague

    Legacy. The Montague Legacy offering is dated November 1, 2010, and the offering

    documents feature misrepresentations and omissions that are similar to those made in

    previous offerings. It is a turnkey offering to raise $4,943,840. On November 11,

    2010, Pinnacle and Alfaro sold three units ($65,000 initial subscription and $269,000

    total commitment). Between November 11 and November 23, 2010, Alfaro and

    Pinnacle sold an additional 7.75 units to six customers resulting in an additional

    $146,623.50 in payments and a $696,632 total commitment.

24

61. As discussed in the previous paragraph, Alfaro and Pinnacle made their first sale of the Montague Legacy offering on November 11, 2010. On November 12, 2010, the staff discovered a negative balance reflected in Alfaro Oil and Gas' general ledger cash account and discussed it with the accountant shared by Alfaro Oil and Gas, Pinnacle, and Alfaro. According to the accountant, escrow was broken in the Montague Legacy offering and investors' funds were immediately transferred by Alfaro from the offering's account to Alfaro Oil and Gas' bank account. As a result of this transfer, the negative balance in Alfaro Oil and Gas' bank account was covered by utilizing investor funds from the Montague Legacy offering the day after they were received.

62. Alfaro informed the staff that he is selling and intends to keep selling the Montague Legacy offering to investors, and the funds raised from existing and new investors will be forwarded to him, the funds will be placed in the offering's operating account, and Alfaro is then entitled to use these investor funds for any business or personal expense Alfaro deems appropriate.

63. The maps in the Montague Legacy offering materials reference nearby wells producing over 100 BOPD (barrels of oil per day); however, the wells referenced are more than two miles away and some are more than nine miles away. However, nearby wells, not identified in the offering materials, have verifiable production of less than one BOPD, and within a half-mile radius of the proposed well location there are two plugged wells and one dry hole. Despite the fact that information concerning all of these nearby wells was readily available to Alfaro and Pinnacle, this material information was not disclosed to investors in the offering materials.

64. The Montague Legacy offering documents also reference a nearby well that had been drilled but had not reported any verifiable production at the time of the offering; however, the offering materials list the well's initial production as 800 BOPD and averaging 600 BOPD. When the Staff contacted the operator regarding this well, it was informed that the numbers listed in the Montague Legacy offering documents for the well were inflated. This was confirmed by a recent Texas Railroad Commission filing related to the well.

**Alfaro Oil and Gas was Insolvent**

65. The only new private placement offering sold by Pinnacle and Alfaro from late 2010 until they were suspended on March 8, 2011 was the Montague Legacy offering. The Montague Legacy offering was also Pinnacle and Alfaro's primary source of revenue to fund unrelated business expenses and Alfaro's personal expenses. Pinnacle and Alfaro failed to inform Montague Legacy investors that Alfaro Oil and Gas was insolvent. This omission was especially material given that (1) Montague Legacy investors were purchasing a turnkey contract requiring Alfaro Oil and Gas to pay the project's drilling and completion costs, (2) Alfaro Oil and Gas' failure to timely pay the well's operator for drilling and completion costs could result in Montague Legacy investors' distributions being withheld to cover unpaid costs, and (3) Alfaro's failure to pay outstanding debts could lead to rescission of Alfaro's rights (that he sold to investors).

66. Pursuant to the January TCDO, Pinnacle and Alfaro agreed: "Additionally, pursuant to the parties' agreement, the Hearing Panel **ORDERS** Respondents to cause Alfaro to file with FINRA sufficient financials supervised by a certified public accountant,

not unacceptable to FINRA, that demonstrate that Alfaro is solvent and can meet its current obligations." On February 21, 2011, Respondents provided financial statements that (1) were not supervised by a certified public accountant, (2) were replete with inaccuracies, and (3) indicated that Alfaro Oil and Gas was insolvent and incapable of meeting its current obligations.

67. On February 21, 2011, Respondents provided a transmittal letter from a certified public accountant that stated: "Please find enclosed a copy of the current Alfaro Oil and Gas, LLC's unaudited financials which have been prepared by the company in accordance with Generally Accepted Accounting Principles, GAAP. These financials reflect the current financial status of Alfaro Oil and Gas, LLC and the results of their operations." On February 22, 2011, the staff contacted the certified public accountant who stated that he (1) did not supervise the financials, (2) did not have anything to do with preparing the financials, (3) never reviewed the general ledger, and (4) never reviewed any supporting documentation related to the financials.

68. The balance sheet provided to FINRA listed accounts payable of $402,046.35 and checking/savings of $35,135.57. The largest "asset" listed was "Interco Due to From Primera" classified as a contra liability of $2,081,546. *Without this entry alone, Alfaro Oil and Gas had a negative value of more than $1 million.*

69. The certified public accountant who provided the financials informed FINRA that he never saw any supporting documentation related to the "Interco Due to From Primera" entry. Primera is owned entirely by Respondent Alfaro. When confronted with the "Interco Due to From Primera" on August 26, 2010, Respondent Alfaro testified:

27

Q: How much money does Primera have at this point?
A: Last time I looked, not very much. We have moved a lot out of it.

———

Q: You said you've been moving money out of Primera. Where have you been moving that money to?
A: Well, Alfaro assumed a lot of liability of Primera. You know, Primera has been phased out, so to speak. We're not using it. So it didn't have a lot of money to begin with. We haven't been moving money out of it aggressively or anything. We just haven't had any money. We have not raised a deal on Primera since Alfaro and Pinnacle. But it's had expenses obviously, so it's just been --
Q: Does Primera have any way to pay back that $1.9 million?
A: Let me make sure that $1.9 million is accurate. But, no, that can't be accurate.

———

Q: To your knowledge there are not significant assets in Primera's accounts?
A: There's not

———

70. Primera has no meaningful operations, revenues, or ability to pay $2 million. As a result, this entry is improper and Alfaro Oil and Gas is insolvent.

71. The balance sheet provided to FINRA also improperly listed two assets. The first is "Joint Venture Project Deposits" of $951,559. The only information contained in the transaction detail shows that this number was created by a journal entry on December 31, 2008. No other information was provided to substantiate this purported asset. "A/R Other" of $347,820.89 is the second largest asset listed. The transaction detail shows that the accounts receivable are largely related party loans. The firm has failed to provide any supporting documentation that indicates that these assets exist or are collectable. Without these two assets, Alfaro Oil and Gas' own financial statements indicate that it had assets of less than $83,000.

72. Pinnacle and Alfaro have also provided offering materials and made oral representations to hundreds of investors that violate Section 10(b) of the Securities

Exchange Act of 1934, SEC Rule 10b-5 promulgated thereunder, and FINRA Rule

2020. Specifically, the January 25, 2011 Montague Legacy offering materials stated:

> With the newest technology, the completion of the Montague
> Legacy is anticipated to be every bit as successful as the offset
> Barnett Shell well due east, drilled and completed by Braden
> Exploration in July 2010, named the Rater "A" Unit #1H. In a
> recent conversation between Giant Resources and Braden
> concerning the well, they reported that the well IP'd over 800
> Bopd and was producing approximately 600 Bopd as of July 11,
> 2010.

However, the offering materials and oral representations to investors failed to disclose

that the November 2010 production numbers for the Braden well showed production

of less than 250 Bopd. These numbers were filed by Braden with the Texas Railroad

Commission and were known by Pinnacle and Alfaro.

73. The Montague Legacy offering materials also failed to disclose that Pinnacle and

Alfaro received a Wells Notice from the Securities and Exchange Commission citing

securities fraud in December 2010. Pinnacle and Alfaro also failed to disclose

information related to the Securities and Exchange Commission's Wells Notice and

the Texas State Securities Board's Cease and Desist Order and upcoming related

hearing when relevant inquiries were posed by investors on tape-recorded

conversations with Alfaro.

74. The Montague Legacy offering materials also state: "EOG reports on their website

that they have many wells that come in making up to 1800 Bopd. With time, a slow

decline is anticipated to a steady production rate average of 200+ Bopd and a slight

increase in gas production of upwards of 1 Mmcfpd has been reported." However,

the offering materials fail to disclose that (a) EOG only lists one well with initial

production of 1800 Bopd; (b) EOG lists the well as "EOG's best well to date in the Barnett Combo"; and (c) that the "slow decline" occurred in a matter of months.

75. Pinnacle and Alfaro have also made oral representations to investors regarding an EOG well ten miles away that had come in making 1800 Bopd; however, the oral representations to investors fail to disclose that the well is actually more than 15 miles away, never produced 1800 Bopd, a rapid decline in production occurred in three months, and that the November 2010 production numbers for the EOG well showed production of less than 250 Bopd. These numbers were filed with the Texas Railroad Commission and were known by Pinnacle and Alfaro. Pinnacle and Alfaro have also engaged in high pressure sales tactics involving false statements regarding the number of units sold and available in the Montague Legacy offering. The misstatements in these recorded conversations directly contradict the firm's purchase and sales blotters and the Montague Legacy offering materials.

**The Denali Offering**

76. The Denali offering was dated May 13, 2010. Pinnacle and Alfaro offered and sold Denali to investors from June 1, 2010 to October 27, 2010, including four Victoria Secret transferees. According to the Denali blotter, Pinnacle and Alfaro received over $1.4 million from investors.

77. Alfaro received an executive summary from Jordan Oil Company, Inc. detailing the terms of the project. The terms were "a third for a quarter." This is an industry standard that provides a participant with a 33.33% working interest to casing point, and a 25% working interest (that also provides 25% of revenue) after casing point. Casing point is the point at which a well has been drilled to the desired depth and the

owners must decide whether or not to complete and prepare the well for production. A working interest is the rights to mineral interests granted in an oil and gas lease granting the right to work on the leased property to search, develop, and produce oil and gas (and the obligation to pay all costs). Essentially, the terms require a participant to pay 33.33% of all costs to casing point in order to receive 25% of the project's return. Pinnacle and Alfaro never disclosed the terms of the executive summary to their investors.

78. A letter agreement dated May 24, 2010 outlined the terms of Alfaro's proposed participation in the Denali project. The letter agreement provided "ALFARO shall not sell, transfer, or assign any of its interest without the prior written consent of Jordan, which will not be unreasonably withheld." The letter agreement also contained an AFE indicating that Alfaro's total well cost was $703,422.05. Despite the fact that it possessed the agreement and AFE at least a week before any sale was made, Pinnacle and Alfaro never disclosed that they were not permitted to re-sell the project. Pinnacle and Alfaro also failed to disclose the AFE's existence or its terms to their investors.

79. Shortly after the letter agreement was signed, Alfaro's boiler room cold-called a Louisiana investor and pitched the Denali offering on the initial call. The potential investor was familiar with Jordan, and he contacted Jordan to inquire about the Denali offering. Until that time, Jordan was unaware that Pinnacle and Alfaro were re-selling the Denali project. On June 3, 2010, Jordan's counsel sent an e-mail to Alfaro informing him that:

- the sales brochure utilized by Alfaro and Pinnacle was not authorized by Jordan Oil and contained both inaccurate information and information that they were not allowed to publish;
- Jordan refused to consent to the sale, transfer, or assignment of any interest;
- the offer under the letter agreement was withdrawn; and
- the letter agreement was null and void.

80. On June 7, 2010, Jordan's counsel sent Alfaro Oil and Gas a letter informing it that Alfaro failed to timely pay the $890,422 for the Denali project by June 4, 2010, and that it owed $90,000 and was over 100 days past due on East Moss Lake/LNG – a previous project with Jordan. The letter also admonished Alfaro for the unauthorized re-sale of the project and false or unauthorized statements contained in sales materials.

81. On June 16, 2010, Jordan's counsel informed Alfaro that: "As of now, there is no contract between Jordan Oil and Alfaro. The deadline has passed without Alfaro Oil timely paying the agreed-upon price. Moreover, unbeknownst to Jordan Oil, Alfaro's solicitation sales brochure contained misstatements and statements Alfaro was not authorized to make."

82. Pinnacle and Alfaro never informed any of their investors or potential investors that they owed Jordan significant sums, that Jordan had withdrawn its offer under the letter agreement, and that Jordan claimed that the letter agreement was null and void. Instead they aggressively offered and sold the Denali offering. In June and July 2010 alone, Pinnacle and Alfaro received over $1 million from approximately 40 investors located throughout the United States.

**East Moss Lake/LNG**

83. The East Moss Lake/LNG offering was dated April 13, 2009. Pinnacle and Alfaro offered and sold the East Moss Lake/LNG offering from May 7, 2009 to October 16,

2009. According to the East Moss Lake/LNG blotter, Pinnacle and Alfaro received over $1.8 million from investors.

84. In 2008, Pinnacle and Alfaro received an East Moss Lake prospect summary from Alfaro's lead geologist. Alfaro's lead geologist recommended that Alfaro not pursue the East Moss Lake project based on a number of concerns. He noted that the location had already made almost 9 BCF from offset wells, and that the location should be depleted by two previous Conoco wells. Alfaro's lead geologist explained that he would not recommend the project, noting: "Might payout ½ of cost. How much could be left in gas reservoirs after 9 BCF concerns me. Also, how long would it take to get it out economically?"

85. Pinnacle and Alfaro never informed any investor that their lead geologist recommended they not pursue the East Moss Lake project. Pinnacle and Alfaro also failed to inform any investor of the serious concerns raised by Alfaro's lead geologist.

86. Alfaro received an executive summary from Jordan detailing the terms of the project. The terms were "a third for a quarter." This is an industry standard that provides a participant with a 33.33% working interest to casing point, and a 25% working interest (that also provides 25% of revenue) after casing point. Casing point is the point at which a well has been drilled to the desired depth and the owners must decide whether or not to complete and prepare the well for production. A working interest is the rights to mineral interests granted in an oil and gas lease granting the right to work on the leased property to search, develop, and produce oil and gas (and the obligation to pay all costs). Essentially, the terms require a participant to pay 33.33% of all

costs to casing point in order to receive 25% of the project's return. Pinnacle and Alfaro never disclosed the terms of the executive summary to their investors.

87. By January 2011, Alfaro owed Jordan $549,625.81. As of January 17, 2011, Jordan was withholding distribution checks on East Moss Lake/LNG based on Alfaro's failure to pay outstanding balances on the Denali and East Moss Lake/LNG projects. Alfaro agreed to pay the full balance owed by February 10, 2011. However, from January 2011 to the present, Alfaro has only made one $10,000 payment pursuant to the payment plan.

88. Based on Alfaro's failure to make payments, Jordan recently filed suit against Alfaro Oil and Gas and Alfaro, and it is applying revenue (belonging to Alfaro's investors) to Alfaro's outstanding balance. Jordan is also seeking almost $500,000 and rescission of Alfaro's rights (sold to investors) in the Denali, East Moss Lake, and LNG projects.

**Pinnacle, Alfaro, and Alfaro's Entities Improperly Utilized a "Professional Geoscientist" Stamp with the Offerings**

89. In the Victoria Secret, Normanna Deep, Normanna North, Pangaea, French Town, East Wharton, Montague Legacy, SW Redfish Reef, East Moss Lake/LNG, and Denali offerings, Alfaro affixed a "Professional Geoscientist" seal of a geoscientist whose license had expired, in the executive summary of each offering that Pinnacle and Alfaro provided to potential investors. The Texas Geoscience Practice Act states that this seal should be used on reports prepared or supervised by a licensed geoscientist. Tex. Occ. Code Ann. § 1002. However, the well operator from whom Alfaro Oil and Gas purchased minority interests, rather than the individual whose stamp appears on investments offered by Pinnacle and Alfaro, provided the reports.

34

In addition, the geoscientist whose stamp was utilized in all offerings offered and sold by Pinnacle and Alfaro in 2009 and 2010 was no longer licensed in the State of Texas. Pinnacle, Alfaro, and his related entities utilized this expired stamp in their 2009 and 2010 offerings.

90. When confronted with the use of his stamp, Alfaro Oil and Gas' "lead geologist" testified under oath that he was unaware that Alfaro and Pinnacle utilized his stamp without his knowledge, authorization, or consent for many of the private placement offerings prior to the Montague Legacy offering.

91. As a result of the foregoing conduct, Respondents Pinnacle and Alfaro willfully violated Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, NASD Rules 2110 and 2120, and FINRA Rules 2010 and 2020. The conduct occurring between August 2008 and December 14, 2008 violated NASD Rules 2110 and 2120, and the conduct occurring between December 15, 2008 and March 2011 violated FINRA Rules 2010 and 2020.

### SECOND CAUSES OF ACTION
### Misuse of Customer Funds
### NASD Conduct Rule 2330 and FINRA Rules 2150 and 2010, against Alfaro

92. The Department realleges and incorporates by reference paragraphs 1 through 91 above.

93. The "investment summary" provided by Pinnacle and Alfaro to investors in the Victoria Secret and Normanna Deep offerings detailed a "payment schedule" with three installments: (1) first installment (subscription), (2) second installment (drilling, testing and pipe), and (3) third installment (completion). Alfaro Oil and Gas

served as the Managing Venturer of the joint ventures, and it also served as the joint ventures' drilling contractor.

**The Victoria Secret Offering**

94. The Victoria Secret offering raised approximately $1.5 million; however, the well has never been drilled. Alfaro removed almost $1 million of investor funds for his personal and business use. As of August 16, 2010, 21 investors remained in the Victoria Secret offering, representing more than $973,000 in investor funds. As of July 31, 2010, the bank accounts associated with this offering contained approximately $40,000. Numerous investors provided Pinnacle and Alfaro with their money based on Alfaro's request for their funds for "drilling and testing" the Victoria Secret well. Alfaro never informed investors that their funds were not utilized for drilling and testing the Victoria Secret well – or that he had spent almost all of their funds for unrelated business and personal purposes.

95. The joint operating agreement for this offering indicated that Alfaro Oil and Gas would be required to pay at least $895,740 to drill this well. Alfaro admitted to FINRA staff that the only way he could meet his financial obligations to drill the Victoria Secret well – and pay for any obligations pursuant to his numerous turnkey agreements with investors – would be to raise additional funds from investors or tap his personal resources.

96. Responding to investors' concerns about delays in the Victoria Secret joint venture, Alfaro represented that he would process refunds. Because he had already extracted funds for his own use and benefit, Alfaro could not promptly process the refunds as had been promised. Following Alfaro's depletion of the Victoria Secret funds, Alfaro

Oil and Gas sent a demand letter withdrawing its commitment to the Victoria Secret project. This eliminated the potential drilling obligation for which Alfaro Oil and Gas lacked sufficient funds. In a further effort to avoid refunding investors' funds and to retain Alfaro Oil and Gas' grossly inflated "drilling costs," Alfaro contacted investors and persuaded them to transfer their interests in Victoria Secret to other projects in lieu of receiving a refund. Alfaro transferred many of the Victoria Secret investors into other fraudulent offerings that were oversubscribed and contained material misrepresentations or omissions. Pinnacle and Alfaro have received investor funds related to these fraudulent offerings. Alfaro contends that he is entitled to dissipate these investor funds for any business or personal purpose.

**The Normanna Deep Offering**

97. The Normanna Deep offering was dated February 10, 2009. Pinnacle and Alfaro started receiving funds from Normanna Deep investors in March 2009, and the Normanna Deep escrow account received more than $500,000 in first installment "subscription" funds from investors through May 2009. The well has never been drilled; however, Alfaro removed over $500,000 of investor funds for his personal and business use.

98. The bank statements for the Normanna Deep escrow account reflect the following activity:

- Deposits of $108,930 in March 2009;
- Deposits of $376,125 in April 2009;
- Transfers of $300,000 to the Normanna Deep operating account and $16,339.50 to Pinnacle in April 2009;
- Deposits of $38,880 in May 2009; and
- Transfers of $50,000 to the Normanna Deep operating account and $56,418.75 to Pinnacle in May 2009.

99. The Normanna Deep escrow account received no deposits in June or July 2009; however, Alfaro transferred another $100,832 from the Normanna Deep escrow account to the Normanna Deep operating account and Pinnacle during this time. Every investor dollar that Alfaro transferred from the Normanna Deep escrow account to the Normanna Deep operating account was transferred the same month – and often the same day – to Alfaro Oil and Gas' operating account. On July 31, 2009, the ending balance in Normanna Deep's escrow account was $344.75. The balance in the Normanna Deep operating account was never more than one cent from July 2, 2009 until December 31, 2009.

100. Before the end of 2009, Alfaro informed Normanna Deep investors that the operator had determined that the Normanna Deep well would not be drilled. At this time, Alfaro had already spent nearly all of the Normanna Deep investors' funds. Alfaro Oil and Gas' financial situation was precarious as well. On December 28, 2009, the general ledger of Alfaro Oil and Gas reflected that the company's liabilities exceeded its assets. On December 29, 2009, Alfaro's accountant informed him that Alfaro Oil and Gas needed $50,000 to pay for Normanna North expenses, and that it owed approximately $75,000 in commissions to Pinnacle for Normanna North sales.

101. Beginning in late 2009, Alfaro contacted all 26 Normanna Deep investors and convinced them to transfer their interests in Normanna Deep to the Normanna North offering. He also requested that the Normanna Deep investors immediately provide a second installment payment for the purpose of "drilling and testing" the Normanna North offering. On December 29, 2009, the Normanna North general ledger reflected that $281,005 was received to record transfers from Normanna Deep investors. The

Normanna North general ledger reflects similar entries in 2010. Since Alfaro had already spent the Normanna Deep investors' funds, he utilized the "drilling and testing" funds he requested and received from them to reimburse their Normanna Deep investments that he had depleted. The highly inflated "drilling costs" charged by Alfaro to the Normanna Deep investors enabled him to replenish the funds he had dissipated and still have funds remaining to pay for the actual drilling costs.

**The Normanna North Offering**

102. As of December 28, 2010, Alfaro had received over $2.2 million from investors in the Normanna North offering; however, only $751,216.02 was sent to the well's operator – Abraxas Petroleum Corporation ("Abraxas").

103. As of December 28, 2010, Alfaro retained $1,199,184.11, and $250,214.25 was paid to Pinnacle. Alfaro and Pinnacle never disclosed the extent of the mark-up or these retained funds to any of their investors. Despite taking and spending almost $1.45 million from investors, Alfaro's December 2010 accounting showed that he still owed Abraxas $122,370.99 for the work it had already performed. Abraxas permitted Alfaro to enter into a payment plan, and he has failed to make promised payments.

104. From January 2011 to the present, Alfaro never informed Normanna North investors that he had failed to pay Abraxas. Instead, Alfaro sent investors correspondence requesting additional funds for the Normanna North project for "recompletion." From January 31, 2011 until February 15, 2011, Normanna North blotters provided by Pinnacle and Alfaro indicate that an additional almost $35,000 has been collected from Normanna North investors.

105.None of the investors who contributed additional funds was informed that their money was actually used to pay Alfaro's outstanding debts owed to Abraxas, Alfaro's unrelated business expenses, and Alfaro's personal expenses. The operator has indicated that it is currently withholding distribution payments for Normanna North and offsetting them against Alfaro's indebtedness. As a result of Alfaro's conduct and indebtedness, even if the Normanna North well produces hydrocarbons and income, the operator will retain any distributions to offset Alfaro's indebtedness instead of providing them to Alfaro and his investors.

**The East Wharton Offering**

106.As of December 28, 2010, Alfaro had received $1,888,318.21 from investors in the East Wharton offering; however, only $742,272 was sent to the well's operator - CICO Oil & Gas Company ("CICO").

107.As of December 28, 2010, Alfaro retained $1,061,127.51, and the remaining $63,662.89 was paid to Pinnacle. Alfaro and Pinnacle never disclosed the extent of the mark-up or these retained funds to any of their investors. Despite taking and spending over $1 million from investors for unrelated personal and business purposes, Alfaro failed to pay the operator for the work performed and owed CICO at least $148,433.42.

108.From December 2010 to the present, Alfaro never informed East Wharton investors that he had failed to pay CICO. Instead, Alfaro sent investors correspondence requesting additional funds for the East Wharton project to pursue "two other zones up the hole that appear to be productive." From December 17, 2010 until February

17, 2010, East Wharton blotters provided by Pinnacle and Alfaro indicate that an

additional almost $100,000 has been collected from East Wharton investors.

109. None of the investors who contributed additional funds was informed that their

money was actually used to pay Alfaro's outstanding debts owed to CICO, personal

expenses, and unrelated business expenses. In addition, Alfaro made the following

misrepresentations or omissions to East Wharton investors:

- "He doesn't get a dime of the money" sent in for recompletion (when in fact the recompletion costs are marked-up by Alfaro and used to pay his past due obligations to the operator);
- Investors need to send in recompletion money quickly to avoid delays (when the operator is already performing the work prior to payment);
- Failing to inform investors that the recompletion funds they are providing will not be used for recompletion costs (but rather will be utilized to pay his past due obligations to the operator); and
- Failing to inform investors that any return from the East Wharton offering will be withheld by the operator until Alfaro's past due obligations are fully met and the recompletion costs are paid in full.

110. On April 26, 2011, Alfaro informed investors that the East Wharton well had failed.

As a result, the project was terminated. Alfaro still owes a significant amount to the

project's operator.

**The SW Redfish Reef Offering**

111. According to their SW Redfish Reef blotter, Pinnacle and Alfaro collected at least

$779,027 from investors – including almost $120,000 for drilling and testing and

completion costs that were not owed. Despite the January 2011 TCDO and repeated

8210 requests for information, Pinnacle and Alfaro have failed to account for SW

Redfish Reef investor funds. During his June 2011 testimony, Alfaro was unable to

articulate where these funds were or how much of the funds remained. At least one

investor has requested Alfaro return his $155,526 investment, including almost $100,000 in drilling and testing funds. Alfaro has refused.

**The Denali Offering**

112. Despite receiving significantly more funds from Denali investors than Jordan billed, Alfaro failed to meet his obligations to the operator. By January 2011, Alfaro owed over $500,000 to Jordan for the Denali project. Pinnacle and Alfaro failed to inform any of their current or potential investors about this indebtedness. Instead, they sought additional funds from Denali investors for "delay rental payments" on the project.

113. On February 22, 2011 Alfaro wrote all investors requesting additional funds for Denali delay rental payments. He also contacted many Denali investors by telephone requesting additional funds. Alfaro failed to disclose that he owed over $500,000 to Jordan at the time, had previously agreed to a payment plan, and had failed to make payments pursuant to the payment plan.

114. As a result of the foregoing conduct, Respondent Alfaro violated NASD Rule 2330 and FINRA Rules 2150 and 2010. The conduct occurring between January 2009 and December 14, 2009 violated NASD Rule 2330, and the conduct occurring between December 15, 2009 and March 2011 violated FINRA Rule 2150.

**THIRD CAUSE OF ACTION**
**Unregistered Offerings**
**Section 5 of the Securities Act of 1933, FINRA Rule 2010,**
**and NASD Rule 2110, against Pinnacle and Alfaro**

115. The Department realleges and incorporates by reference paragraphs 1 through 114 above.

116.From August 23, 2008 to September 24, 2010, Pinnacle and Alfaro operated a boiler room where approximately ten registered representatives placed thousands of cold calls every week to solicit investments in Alfaro's captive oil and gas joint ventures. Interests in the joint ventures are securities and were not registered pursuant to the Securities Act of 1933. These offerings are not exempt from registration pursuant to Section 502(c) of Regulation D of the Securities Act of 1933 because Pinnacle, acting through Alfaro or other representatives employed by the firm, engaged in general solicitations by offering the joint ventures before an existing relationship between the firm and potential investor was established – as early as the initial cold call. Specifically, Pinnacle and Alfaro engaged in unregistered offerings with respect to the South Bayou Crook Chene, North Hillje, Victoria Secret, and Southwest Red Fish offerings by discussing the offerings on the initial cold call and sending out offering materials immediately following the initial cold call.

117.As a result of the foregoing conduct, Respondents Pinnacle and Alfaro, by acting in contravention of Section 5 of the Securities Act of 1933, violated FINRA Rule 2010 and NASD Rule 2110. The conduct occurring between August 23, 2008 and December 14, 2008 violated NASD Rule 2110, and the conduct occurring between December 15, 2008 and September 24, 2010 violated FINRA Rule 2010.

### FOURTH CAUSE OF ACTION
### Failure to Document and Determine Suitability
### NASD Rule 2310 and FINRA Rule 2010, against Pinnacle and Alfaro

118.The Department realleges and incorporates by reference paragraphs 1 through 117 above. Pinnacle and Alfaro failed to document or have a reasonable basis for believing that the investments they sold were suitable for their customers. Pinnacle

and Alfaro failed to do any suitability determination for numerous investors, inflated the annual income on the new account form of at least one investor, and failed to evidence the basis for suitability determinations for numerous investors.

119. Alfaro altered financial information on an investor's new account form in an effort to make it appear as if she were an accredited investor. Customer RM completed her suitability questionnaire declaring an annual income of $125,000 and net worth of $700,000. After receiving this paperwork, Alfaro contacted her and explained that her form needed to list an annual income of $250,000 or net worth of $1 million. Customer RM refused to change the form because the information she originally provided was accurate. She explained that the $125,000 detailed on the form came directly from her tax return, and that she did not feel comfortable changing her form to list an inflated annual income. Pinnacle and Alfaro altered her form listing an annual income of $300,000 to make her appear as if she was an accredited investor.

120. Pinnacle and Alfaro also offered and sold their private placement oil and gas offerings to numerous investors with no knowledge or evidence of suitability. For example, Project 888 Oil Partnership, LLC purchased, further fractionalized, and re-sold offerings sold by Pinnacle and Alfaro. Alfaro communicated directly and indirectly with the sub-investors solicited by Project 888 Oil Partnership, LLC – many of whom were unaccredited. Pinnacle and Alfaro have confirmed that they never received suitability information related to these sub-investors and do not even know the identity of all these investors.

121. From August 17, 2009 to March 28, 2010, the firm failed to evidence the basis upon which the suitability determinations were reached for numerous customers. The firm's customer files revealed:

- 14 of 33 customer files did not include the customers' investment objective;
- 28 of 33 customer files did not include the customers' relevant investment experience;
- 27 of 33 customer files did not include the customers' source of funds; and
- 5 of 33 customers listed "income" as their only investment objective, which appears to be inconsistent with this type of investment.

Of the 33 customer files reviewed, none of the files included customer notes to indicate that a suitability review had been conducted by the registered representative or the registered principal that approved the transaction.

122. Pinnacle and Alfaro recommended and effected securities transactions without documenting or having a reasonable basis for believing that they were suitable for their customers. As a result of such conduct, Pinnacle and Alfaro violated NASD Rule 2310 and FINRA Rule 2010.

### FIFTH CAUSE OF ACTION
### Failure to Report, Accurately Report, and Maintain Rule 3070 Filings and Failure to Update and Timely Update Forms U-4 Article V, Section 2 of FINRA By-Laws, NASD Rule 3070, and FINRA Rule 2010, against Pinnacle and Alfaro

123. The Department realleges and incorporates by reference paragraphs 1 through 122 above.

124. NASD Rule 3070 requires member firms to provide FINRA with statistical and summary information regarding customer complaints by the 15th day of the month following the calendar quarter in which customer complaints are received by the firm. This rule assists FINRA in monitoring on a real-time basis the ongoing compliance of member firms and associated persons with applicable securities laws and regulations.

125. Between October 2009 and June 2010, Pinnacle and Alfaro failed to properly disclose and report the following matters related to Pinnacle and Alfaro that relate directly to the allegations in this complaint:

- two written customer complaints pursuant to NASD Rule 3070;
- two customer complaints settled for more than $15,000 pursuant to NASD Rule 3070; and
- one settlement related to a customer complaint pursuant to NASD Rule 3070.

As a result of the foregoing conduct, Respondents Pinnacle and Alfaro violated NASD Rule 3070 and FINRA Rule 2010.

126. Article V, Section 2, of FINRA's By-Laws provides that application for registration with FINRA by any person shall be made by a process established by FINRA and on a prescribed form signed by the applicant. Section 2(c) provides that every application for registration (Form U-4) filed with FINRA shall be kept current at all times by supplementary amendments which must be filed within 30 days after learning of the facts or circumstances giving rise to the amendment.

127. Despite the requirements of Article V, Section 2, Pinnacle and Alfaro failed to amend Forms U-4 for Pinnacle and Alfaro in three separate instances as a result of settlements entered into by Pinnacle and Alfaro related to customer grievances in excess of $15,000. As a result of the foregoing conduct, Respondents Pinnacle and Alfaro violated Article V, Section 2, of FINRA's By-Laws and FINRA Rule 2010.

## SIXTH CAUSE OF ACTION
### Supervision, Supervisory Controls, and Books and Records
### Section 17 of the Securities Exchange Act of 1934,
### Rule 17a-4 thereunder, and NASD Rule 3110, against Pinnacle,
### and NASD Rules 3012, 3010, and 2110, and FINRA Rule 2010,
### against Pinnacle and Alfaro

128. The Department realleges and incorporates by reference paragraphs 1 through 127 above.

129. From August 26, 2008 to March 3, 2011, Pinnacle failed to properly supervise the firm's activities and enforce its Supervisory Control System. Pinnacle failed to have a qualified person adequately supervising the activity of Brian Alfaro - who generated more than 20% of the firm's sales. Victor Hernandez , who was the firm's second principal from January 6, 2011 until the firm was suspended in March 2011, testified that he was unaware what WSPs were, and that he had "no idea" what FINRA Rule 3010 covered. When questioned about the firm's training manual or guidelines, Hernandez claimed he was aware that there was a book, he was unaware of its title, and he could not tell the staff where the book was located, but that he was sure that it was in his office somewhere. When asked if he supervised Alfaro, Hernandez testified: "Well, I would – like I said, I'd monitor his calls every once in a while. But other than that – I mean, I wasn't like looking over his shoulders or anything like that. I mean, we did go over his e-mails and so forth, you know."

130. Pinnacle failed to adequately supervise Alfaro's email. Specifically, the firm did not enforce its Supervisory Control System as it relates to the review of Alfaro's e-mail. Pinnacle only allows Alfaro to have direct access to Alfaro's e-mail. Hernandez explained that his review consisted of standing next to Alfaro's desk and reviewing e-

47

mails Alfaro determined were appropriate for him to review. Hernandez was also unaware of how and where Alfaro's e-mails were stored or maintained.

131. Pinnacle also failed to have a qualified person adequately supervise the activity of Bruce Redfield or to place Redfield on heightened supervision. On June 16, 2010, Pinnacle placed Redfield on administrative leave after he was indicted for three federal criminal counts of mail fraud and wire fraud. While he was on administrative leave, Redfield worked for Alfaro Oil and Gas drafting offering documents and working on marketing projects.

132. On August 18, 2010, a superseding indictment was issued containing *ten counts of mail fraud and wire fraud related to three mortgage fraud and investment schemes*. The indictment alleged that "Defendant Bruce Irving Redfield devised a scheme to make money by recruiting 'investors' to take out loans to build high end spec homes and matching them with building contractors in need of financing." The indictment also alleged that Redfield created and managed limited liability companies to promote his investment program. Redfield is currently serving as Alfaro Oil and Gas' Vice President of Business Development.

133. On December 8, 2010, Pinnacle removed Redfield from administrative leave. Hernandez claimed that although he had heard about Redfield's indictment on the radio, he had never taken the time to read the indictment or superseding indictment. He added that he did not see a need to single out Redfield and supervise him more than other Pinnacle representatives.

134. In January 2011, Redfield made a number of misleading statements and omissions to investors related to the Montague Legacy offering. For example, Redfield claimed

48

that the January TCDO: (1) put everything behind the firm (when there was a pending disciplinary proceeding alleging fraud and misuse), (2) led to "a few changes in our paperwork and bookkeeping" (when extensive changes were required); (3) and that FINRA would be conducting open book audits every six months (when no such audits were contemplated or scheduled).

135. Redfield cold-called a number of professional football teams from Pinnacle and Alfaro's boiler room. In January 2011, Redfield contacted potential investors connected with the Dallas Cowboys, Houston Texans, and New Orleans Saints football organizations. During these calls, he made additional misstatements related to the Montague Legacy offering. Specifically, Redfield stated:

- "We've put together an early retirement program in the Barnett Shale."
- "The exciting thing, I think, that it makes so much sense for pro athletes is that you can retire and draw out of it anytime you want."
- "I wanted to try and get a hold of you and send some information on an early retirement program we've put together. The reason it sounds, to me, so exciting for professional athletes is that there's no age qualification before you can begin withdrawing from it, unlike all the other IRA and pension programs out there."

136. The only project offered by Pinnacle and Alfaro at this time was the Montague Legacy project. Pinnacle never offered an "early retirement program" or "supplemental retirement program" while it was a registered firm, and none of the oil and gas private placement offerings sold by Pinnacle ever permitted investors to make withdrawals. Despite Redfield's ten-count fraud indictment for mortgage and investment-related schemes, Redfield was not under any form of heightened supervision and made fraudulent statements to unsuspecting investors.

49

137. Hernandez was designated as the firm's FINOP on January 26, 2011. He testified

that he had no experience, no training, was unaware of a testing requirement, and

failed to perform any duties as Pinnacle's FINOP:

Q. Have you ever had any training as a FINOP?
A. No.
Q. At any point in time?
A. No.
Q. Did you have any work experience as a FINOP prior to
January 26, 2011?
A. No.
Q. What is your understanding of what a FINOP was supposed to
do at Pinnacle?
A. Very limited knowledge. I was just taking it as a challenge
and, you know, figured it was an opportunity to grow.
Q. And I take it since you didn't know that an examination existed
to become a FINOP, you didn't ever take the exam?
A. No.
Q. Did you ever do any work with Pinnacle's financials?
A. Never, no.

138. The firm also failed to enforce its own Written Supervisory Procedures and

Supervisory Control Program with respect to the following areas:

- High Pressure Sales Tactics (Section 2.9.2)
- Providing Tax Advice (Section 2.9.3)
- Prohibition Against Guarantees (Section 2.9.8)
- Associated Person Communication are Subject to Review (Section 2.11.2)
- Firm Review of Communications (Section 2.11.3)
- Special Supervision (Section 2.19)
- Reporting of Criminal & Civil Complaints & Arbitration Claims (Section 4.7)
- Guidelines to Ensure that Communications With the Public are Not
  Misleading (Section 5.2.6)
- Correspondence (Section 5.3)
- Correspondence Review (Section 5.3.6)
- Complaints (Section 5.5)
- Calling Restrictions (Section 5.8)
- Cold Calls (Section 5.10)
- Independently Prepared Reprints (Section 5.13)
- Associated Person Complaint Records (Section 6.1.5)
- Calculation and Reporting of Net Capital (Section 6.3)
- Review of Transactions (Section 9.6)

- Underwriting (Section 13.2).

139. From August 23, 2008 through March 28, 2010, Pinnacle failed to retain copies of all firm correspondence, and it failed to maintain information necessary to access records and indexes stored on the firm's electronic storage media with FINRA. During this time period, Alfaro served as the firm's President and Chief Compliance Officer.

140. From August 23, 2008 to approximately September 2, 2010, Alfaro improperly diverted e-mail to his personal e-mail account and deleted all e-mails related to Pinnacle and offerings sold by Pinnacle and Alfaro.

141. From August 2008 through September 2010, Pinnacle's supervisory system and written procedures were not reasonably designed to ensure compliance with e-mail retention requirements. Among other things, the firm's procedures did not provide for any reasonable follow up and review to ensure that copies of all e-mail communications were, in fact, being captured and maintained.

142. As a result of the foregoing conduct, Respondent Pinnacle willfully violated Section 17 of the Securities Exchange Act of 1934, Rule 17a-4 thereunder, NASD Rules 3110, 3012, 3010, and 2110, and FINRA Rule 2010. As a result of the foregoing conduct, Respondent Alfaro violated NASD Rules 3012, 3010 and 2110 and FINRA Rule 2010. By causing Pinnacle's violations of Section 17 of the Securities Exchange Act of 1934, Rule 17a-4 thereunder, and NASD Rule 3110, Respondent Alfaro violated NASD Rule 2110 and FINRA Rule 2010. The conduct occurring between August 23, 2008 and December 14, 2008 violated NASD Rule 2110, and the conduct occurring between December 15, 2008 and March 3, 2011 violated FINRA Rule 2010.

## RELIEF REQUESTED

WHEREFORE, the Department respectfully requests that the Panel:

A.    order that one or more of the sanctions provided under FINRA Rule 8310(a) be imposed, including that the Respondents be required to disgorge fully any and all ill-gotten gains and/or make full and complete restitution, together with interest;

B.    order that the Respondents bear such costs of proceeding as are deemed fair and appropriate under the circumstances in accordance with FINRA Rule 8330; and

C.    make specific findings that Respondents Pinnacle Partners Financial Corporation and Brian K. Alfaro willfully violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, and that Respondent Pinnacle Partners Financial Corporation willfully violated Section 17 of the Securities Exchange Act of 1934 and 17a-4 thereunder.

**FINRA DEPARTMENT OF ENFORCEMENT**

June 22, 2011

Patrick K. Craine, Senior Regional Counsel
Andrew Favret, Regional Chief Counsel
FINRA Department of Enforcement
12801 North Central Expressway, Suite 1050
Dallas, Texas 75243
Phone No.: 972.706.7618
Fax No.: 972.716.7646
patrick.craine@finra.org

Mark P. Dauer
Deputy Chief Litigation Counsel
FINRA Department of Enforcement
1100 Poydras Street
Energy Centre, Suite 850
New Orleans, Louisiana 70163
Tel: (504) 412-2405
Fax: (202) 721-6527
mark.dauer@finra.org