## CONTRACT OPERATING SERVICES AGREEMENT

This Contract Operating Services Agreement (this "*Agreement*") made and entered into this ____ day of July, 2015 by and between Traton Engineering Associates, L.P. (hereinafter "*Contractor*"), and Primera Energy, L.L.C., (hereinafter "*Owner*"). Owner and Contractor are referred to collectively as the "*Parties*" and individually as a "*Party*".

### WITNESSETH:

WHEREAS, Owner owns undivided working interests in the oil and gas leases (the "*Leases*") located in the counties and states as described in or covered by the Subject JOAs, as defined below, and as same may be amended from time to time (the land described in such Leases is referred to herein as the "*Contract Area*");

WHEREAS, Owner desires to retain the services of Contractor to act as a contract operator for the Leases; and

WHEREAS, Contractor has the capability to and desires to render such services on behalf of Owner.

WHEREAS, Contractor will perform the services as required by the Owner (which is the operator of record at the Texas RRC) under certain joint operating agreements covering the Leases in the Contract Area more particularly described on *Exhibit B,* as same may be amended from time to time (the "*Subject JOAs*");

NOW, THEREFORE, based upon the mutual covenants and considerations contained herein, the sufficiency of which is hereby acknowledged, Contractor and Owner agree as follows:

### ARTICLE I
### DESIGNATION AND RESPONSIBILITIES OF CONTRACTOR

1.1     Subject to the terms of this Agreement, Contractor shall conduct and direct all operations on the Leases as permitted and required by and within the limits of this Agreement (the "*Services*"). Contractor shall perform all services with due diligence and dispatch in accordance with the standards for the Operator under the Subject JOAs and generally accepted oil field practice, conforming to all applicable laws, rules, orders and regulations of any competent governmental body, which are now or may become applicable to the operations contemplated by this Agreement. Owner agrees to assist Contractor by providing Contractor with authorizations necessary for the proper performance of its services. Contractor shall use all possible care and diligence to ensure that the Services rendered pursuant to this Agreement are performed:

    1)     reasonably and prudently;

    2)     in a skillful and workmanlike manner;

3)      in full compliance with all applicable local, municipal, county, state and federal laws and regulations.

Contractor shall perform all work and labor appropriate or necessary for setting, installing, handling, caring for, and maintaining all materials, equipment, and supplies furnished by Owner in connection with the Services.

1.2     Subject to the terms of this Agreement, Contractor shall manage, develop and supervise the Contract Area. Pursuant to such obligations and as required by Owner and as applicable, Contractor shall:

(a)     Supervise contract or Contractor's pumpers, whose services will include but will not be limited to gauging tanks, recording well pressure, preparing gauge reports, treating oil, making minor repairs, and reporting unusual or abnormal occurrences.

(b)     Review well performance and prepare for Owner monthly reports that summarize production in Contractor's standard form on a per well basis for each of the Subject JOAs. Contractor shall also note and evaluate any abnormal changes in production.

(c)     Prepare and furnish to any duly constituted authority having jurisdiction over the Leases any and all reports, statements and information that may be required.

(d)     Use its best efforts to establish and maintain complete and accurate well files containing information on operations performed in connection with each well.

(e)     Review and approve all invoices and charges for all expenses incurred and credits received.

(f)     Keep accurate books of account showing all items of cost or expense incurred in connection with the Leases, and Contract Area with respect to each of the Subject JOAs, and make and pay all charges in accordance with the provisions of this Agreement.

(g)     Prepare and render billings to the Owner and non-operators with respect to each of the Subject JOAs for approved expenses and charges for services as Contractor as agreed herein.

1.3     Upon Owner's request, Contractor shall perform the following services in connection with completing, working-over, or drilling any well in the Contract Area, or reworking, deepening, or plugging back a dry hole:

(a)     Conduct field inspection and inventory equipment

(b)    Locate and contract, on Owner's behalf, contract pumpers or gagues for the Contract Area

(c)    Supervise all routine well service operations and repair and maintenance operations, including onsite supervision of the installation or removal of well equipment, pumping of any treating fluid or substance into a well, and other onsite operations performed under contract by third party or with leased equipment.

(d)    Supervise all drilling and completion operations, workover operations, recompletion operations, and any type of remedial operation, whether or not it would ordinarily be considered a normal well-service operation. This includes contracting with supervisory personnel for onsite supervision as required and maintaining overall supervision of such personnel through day-to-day contact.

(e)    Prepare operating and drilling procedures.

(f)    Prepare operating cost estimates and circulate Authorizations for Expenditures for Owner's approval.

(g)    Obtain all necessary drilling permits and file all necessary and appropriate reports required prior to, during or after completion of operations.

(h)    Conduct overall supervision of drilling supervisor(s) through daily monitoring of drilling, deepening, recompletion or other critical operations.

(i)    Prepare AFEs and procedures and conduct overall supervision through daily monitoring of field personnel, of plugging and abandonment operations of any wells located in the Contract Area in compliance with all federal, state and local regulations and orders.

(j)    Provide emergency response assistance with respect to any accident, spill, upset or similar occurrence requiring immediate action to protect the health, safety and mechanical and environmental integrity of the Contract Area and equipment located thereon.

(k)    Assist Owner in any efforts to market its interest in the Contract Area, including making its records available and making knowledgeable personnel available to accompany potential buyers and respond to questions as they inspect and tour the properties.

(l)    Maintain land and lease documents.

(m)    Market Production.

(n)    Perform any work falling under Contractor's expertise as directed by Owner.

(o)     Unless otherwise agreed by Contractor, all contracts with third parties (excluding contracts with drilling supervisor(s) for onsite supervision), shall be in the name of Owner under master service contracts in form approved by Owner and similar in form and substance to the Master Service Agreement that has previously been established by Owner. Contractor shall have no liability with respect to third-party contracts. Provided, however, Contractor shall initiate no remedial work, repairs, replacement of equipment, etc. with an estimated total cost exceeding $25,000.00 without the prior written approval of Owner.

1.4     All personnel involved in the day-to-day lease operations shall be under the supervision of the Contractor. The selection, hiring, dismissal and work schedule of such contractors and employees of Contractor shall be determined by Contractor.

1.5     Owner shall have access at all reasonable times to the Leases, to all information pertaining to wells drilled, production secured, and oil and gas marketed, and to the books, records, and vouchers relating to the operation of the Leases. Contractor shall, upon Owner's request, furnish Owner with weekly gauge and run tickets. Notwithstanding anything to the contrary herein, all information referenced in this Section 1.6 shall be the property of Owner.

1.6     Owner will grant Contractor access to an account for revenues, operating costs, fees and expenses for each Contract Area under each of the Subject JOAs (the "*Operating Account*"). Prior to the fifteenth (15th) day of each month, Contractor will prepare and deliver to Owner an operating statement for each of the Subject JOAs (the "*Property Operating Statement*"), which Property Operating Statement shall include (a) Contractor's estimate of production volumes; (b) actual revenues received in the prior month; (c) all costs, expenses and charges billed by third parties to Contractor in the prior month, including, without limitation, all sums due under the Leases and other liquidated monetary obligations; and (d) expenditures and fees recorded by Contractor in form satisfactory to Owner. Promptly after delivery of the Property Operating Statement, Contractor shall transfer sufficient funds from the revenue account into the operating account necessary to cover operating costs, fees (including Contractor fees) and expenses set forth on the Property Operating Statement. Contractor shall have the right to withdraw funds from the Operating Account to pay for the services hereunder. The parties hereto acknowledge and agree that from time to time the funds in the Operating Account may be insufficient to cover the operating expenses for such month, in which case Contractor shall immediately notify Owner of the projected shortfall and any interim payments into the account to cover such shortfall will be evaluated by Owner and paid on a case-by-case basis. In no event shall Contractor be required to advance funds on behalf of Owner to conduct the operations or proceed with any operations, unless there are available funds in the account to cover the cost of such operations or Owner has contracted directly for such services.

1.7     At all reasonable times and upon thirty (30) days prior written notice, Contractor shall permit employees and agents of Owner to have access to its offices and work locations to examine, reproduce and retain copies of such documentation and data and to interview Contractor's personnel in connection therewith, as necessary for Owner to verify and monitor (i) the accuracy and propriety of Service fees and reimbursable expenses pursuant to this Agreement, and (ii) Contractor's compliance with the terms of this Agreement. Where Services hereunder, are billed under fixed rates, Owner's auditors shall have sufficient access to those

rates to satisfy themselves that the Services have not also been separately billed on some other basis (e.g., a reimbursable basis). The provisions of this Section 1.7 shall be applicable during the term of this Agreement and for a period of one (1) year thereafter. Any costs associated with Owner's audit requirements or procedures shall be solely for Owner's account. If errors or deficiencies are identified by an audit or otherwise, both Parties shall take prompt corrective action thereof.

## ARTICLE II
## COMPENSATION OF CONTRACTOR

2.1     During the term of this Agreement, Contractor shall be compensated:

(a)     For Services completed under Section 1.2, in accordance with the overhead rate structure set forth on ***Exhibit B*** hereto.

(b)     For Services completed under Section 1.3, in accordance with the hourly rate structure set forth on ***Exhibit C*** hereto.

2.2     The above compensation shall not include any direct costs and third-party costs that are proper charges to the Contractor Account that are incurred by the Contractor in connection with services rendered hereunder. Owner shall reimburse Contractor for any third-party charges incurred by Contractor in accordance with this Agreement within thirty (30) business days of delivery of invoice.

## ARTICLE III
## RESPONSIBILITIES OF OWNER

3.1     Owner shall be the operator of record with respect to the Leases under each of the Subject JOAs.

3.2     Owner shall be duly authorized under all laws, rules, orders and regulations of any competent governmental body, which are now or may become applicable to the operations contemplated by this Agreement and shall obtain and maintain all necessary permits, bonds and sureties as may be required thereunder.

## ARTICLE IV
## HEALTH AND SAFETY OBLIGATIONS

BY EXECUTING THIS AGREEMENT, CONTRACTOR REPRESENTS AND WARRANTS THAT IT IS QUALIFIED TO DO BUSINESS IN EACH OF THE JURISDICTIONS WITHIN THE CONTRACT AREA. CONTRACTOR FURTHER REPRESENTS AND WARRANTS THAT ITS EMPLOYEES ARE QUALIFIED AND COMPETENT AND THAT CONTRACTOR IS, AND WILL BE THROUGHOUT THE DURATION OF THIS AGREEMENT, TRAINED AND COMPLIANT TO THE STANDARDS OF A REASONABLY PRUDENT OPERATOR IN ALL MATTERS RELATED TO HEALTH, SAFETY AND WORK ENVIRONMENT.

## ARTICLE V
## INDEPENDENT CONTRACTOR

Contractor undertakes the performance of the provisions of this Agreement as an independent contractor, and neither Contractor nor any of its employees, contractors or agents will be deemed to be an employee, servant, agent or partner of or joint venturer with Owner. Owner shall not, in any respect, be responsible for the hiring, employment or working conditions of the persons employed or retained by Contractor in connection with the performance of Contractor's obligations under the terms of this Agreement.

## ARTICLE VI
## INSURANCE

Owner and Contractor shall each maintain insurance of the type, in the amounts and with the limits set forth on *Exhibit D* hereto. Each party shall be named as an additional insured under each of the other party's policies for the duration hereof and each of such policies shall contain a waiver of subrogation.

## ARTICLE VII
## FORCE MAJEURE

Contractor shall not be liable to Owner for any loss on the Leases caused by war, strikes, tornadoes, floods, governmental priorities on materials or other governmental restrictions, or inability to obtain suitable equipment or labor resulting from any other causes not due to Contractor's failure to exercise reasonable diligence in the performance of Contractor's obligations hereunder. If Contractor is delayed or prevented from performing for any such cause, it shall do all things reasonably possible to remove such cause and shall resume performance hereunder as soon as such cause is removed.

## ARTICLE VIII
## BINDING EFFECT OF AGREEMENT

This Agreement shall be binding upon and inure to the benefit of the parties, their respective successors and permitted assigns. The right of either party to assign this Agreement is subject to the prior written consent of the non-assigning party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the immediately preceding sentence, each party may assign and transfer this Agreement to an affiliate or pursuant to a reorganization or change in control of such party or the person that controls such party without such consent. Any assignment in contravention of this *Article VIII* shall be void.

## ARTICLE IX
## AMENDMENT, TERMINATION AND TURNOVER DATE

9.1     Either party hereto has the right to terminate this Agreement without cause by providing the other party with sixty (60) days prior written notice. In the event of a material breach of this Agreement by either party, including the failure of a party to perform any operation or action proposed hereunder that, the other party may terminate this Agreement by

providing the breaching party with thirty (30) days notice. In the event of termination by Owner, Owner shall pay Contractor in full all amounts due Contractor through the termination date. Upon termination of this Agreement or partial termination as to any Contract Area, Contractor will cooperate with Owner for an orderly transition of operations and will turn over all books and records regarding the Contract Area upon request. Owner shall compensate Contractor for post-termination services requested by Owner and provided in connection with the transition at Contractor's standard hourly rate as set forth on **Exhibit C**.

9.2     Upon termination of this Agreement, the Parties shall not be relieved of any liabilities arising from or incident to Services rendered. The Parties shall not be liable to either Party for any cost or loss in connection with such termination, including but not limited to loss of anticipatory profits. Upon termination of this Agreement, Contractor shall immediately remove all of its and its subcontractors' equipment and materials from Owner's premises that are not necessary for the completion of or the provision of any Service then underway and, notwithstanding anything herein to the contrary, sixty (60) days after the receipt of Contractor of notice of the termination of this Agreement by Owner, Owner shall bear no responsibility for the equipment or materials of Contractor that remain on Owner's premises but which are not necessary for the completion or the provision of any Service then underway.

9.3     If either party (a) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, (b) commences any insolvency proceeding with respect to itself, (c) take any action to effectuate or authorize either (a) or (b), (d) becomes the subject of any involuntary insolvency proceeding, or has any writ, judgment, warrant of attachment, execution or similar process issued or levied against all or a substantial part of its properties, and any such proceeding or petition is not dismissed, or such writ judgment, warrant of attachment, execution or similar process is not released, vacated or fully bonded within sixty (60) days after commencement, filing or levy (e), admits the material allegation of a petition against it in any insolvency proceeding, or an order for relief is issued against it in any insolvency proceeding, or (f) consents to the appointment of a receiver, trustee, custodian, conservator, liquidator, mortgagee in possession (or agent therefore), for itself or a substantial portion of its property or business, then the other party may, by giving written notice to such party, terminate this Agreement as of the date specified in such notice. A termination under this Section shall be deemed a termination for cause,

**ARTICLE X**
**NOTICES**

Until changed by appropriate notice in writing, all notices, reports, and other correspondence required by or made necessary by the terms of this Agreement shall be deemed to have been duly given or served on the date on which personally delivered, or sent by electronic transmission via email or facsimile transmission, with receipt acknowledged, or three (3) Business Days after the same shall have been sent via certified United States Mail. For purposes of this Agreement, the term "**Business Days**" means a day other than a Saturday, Sunday or legal holiday for commercial banks under the laws of the State of Texas or the laws of the United States of America.

## ARTICLE XI
## CONFIDENTIAL INFORMATION
## AND OWNERSHIP OF DOCUMENTS

11.1    Any and all information, in whatever form or format, described or defined by each party as confidential and made available to the other party for the performance of the Agreement shall be and remain the exclusive property of the disclosing party and shall be treated as confidential.

11.2    With respect to such confidential information both parties agree not to disclose or divulge such information to any third party except as may be necessary for the performance of this Agreement.  Both parties shall take reasonable measures to protect and preserve the confidential nature of such information and shall be responsible for any breach hereof committed by its employees, it being understood that the confidentiality obligations of both parties are of a continuing nature and shall continue for one (1) year after the termination date of this agreement

11.3    The foregoing restrictions shall not apply to any such confidential information that is:

>        (a)    Already known by the receiving party at the time of disclosure;

>        (b)    Publicly known or becomes publicly known through no fault of the receiving party;

>        (c)    Received from a third party that is free to disclose the information to the receiving party;

>        (d)    Communicated to a third party with the express prior written consent of the disclosing party; or

>        (e)    Lawfully required to be disclosed to a governmental agency or is otherwise required to be disclosed by law, provided that before making such disclosure the receiving Party shall give the disclosing Party reasonable opportunity to object or insure confidential treatment of the information.

11.4    Both parties acknowledge that the breach of this confidentiality obligation may cause the other party serious economic harm and that the remedies available to the injured party by law may be inadequate.  Therefore, upon any breach hereof by either party, the non-breaching party shall be entitled to seek immediate injunctive relief and/or specific performance, in addition to any other appropriate forms of equitable or legal relief, including but not limited to, monetary damages and reasonable attorney's fees.

11.5    Both Owner and Contractor agree that all tracings, designs, drawings, field notes, requisitions, purchase orders, specifications, computer programs (data files and other software in whatever form), and other documents or records  developed by such party in connection with this Agreement or otherwise shall be the sole property of such party.

## ARTICLE XII
## AMENDMENTS TO THE AGREEMENT
## AND GOVERNING LAWS

THIS AGREEMENT SHALL NOT BE VARIED EXCEPT WITH THE WRITTEN CONSENT OF THE PARTIES. IN THE EVENT ONE OR MORE OF THE PROVISIONS IS HELD INVALID BY ANY COURT OF COMPETENT JURISDICTION, THE SAME SHALL IN NO MANNER AFFECT THE VALIDITY OF ANY OF THE OTHER PROVISIONS. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

## ARTICLE XIII
## INDEMNIFICATION

**13.1 CONTRACTOR SHALL GENERALLY HAVE THE PROTECTIONS, BENEFITS, AND INDEMNIFICATIONS OF OWNER UNDER THE TERMS OF THE A.A.P.L. FORM 610 - 1989 MODEL FORM OPERATING AGREEMENT ("_JOA_") JUST AS IF CONTRACTOR WERE THE DESIGNATED OPERATOR UNDER THE JOA, AND TO THE FULLEST EXTENT POSSIBLE, OWNER HEREBY ASSIGNS AND TRANSFERS ALL OF SUCH PROTECTIONS, BENEFITS AND INDEMNIFICATIONS TO CONTRACTOR DURING THE TERM OF THIS AGREEMENT; PROVIDED, HOWEVER, THAT SUCH ASSIGNMENT SHALL NOT ENTITLE CONTRACTOR (A) TO CLAIM OR ASSERT ANY LIENS OR SECURITY INTERESTS THAT WOULD BE GRANTED TO THE OPERATOR UNDER THE JOA, OR (B) TO SETTLE ANY CLAIMS OR LAWSUITS PERTAINING TO THE CONTRACT AREA.**

**13.2 CONTRACTOR'S RELEASE OF OWNER:**

**CONTRACTOR RELEASES OWNER AND OWNER'S PARENT, SUBSIDIARIES, OFFICERS, DIRECTORS, AND EMPLOYEES ("OWNER PARTIES") OF AND FROM ANY LIABILITY AS TO ALL CLAIMS, PENALTIES, DEMANDS, AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF OR THE NEGLIGENCE (EXCLUDING GROSS NEGLIGENCE AND WILLFUL MISCONDUCT) OF ANY OF THE OWNER PARTIES, ON ACCOUNT OF BODILY INJURY, DEATH AND/OR DAMAGE TO OR LOSS OF PROPERTY OF ANY KIND. CONTRACTOR'S OBLIGATIONS UNDER THIS SECTION SHALL BE PRIMARY AND WITHOUT REGARD TO AND WITHOUT ANY RIGHT TO CONTRIBUTION FROM ANY INSURANCE MAINTAINED OR MADE AVAILABLE TO OWNER. CONTRACTOR AND OWNER HEREBY AGREE THAT CONTRACTOR WILL BE COVERED BY AVAILABLE LIABILITY INSURANCE, UNDER WHICH THE INSURER HAS NO RIGHT OF SUBROGATION AGAINST OWNER OR CONTRACTOR. IT IS AGREED THAT SAID INSURANCE REQUIREMENTS SHALL AUTOMATICALLY BE AMENDED TO CONFORM TO THE MAXIMUM MONETARY LIMITS PERMITTED UNDER APPLICABLE LAW.**

**13.3 OWNER'S RELEASE OF CONTRACTOR:**

OWNER RELEASES CONTRACTOR AND CONTRACTOR'S PARENT, SUBSIDIARIES, OFFICERS, DIRECTORS, AND EMPLOYEES ("CONTRACTOR PARTIES") OF AND FROM ANY LIABILITY AS TO ALL CLAIMS, PENALTIES, DEMANDS, AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF OR THE NEGLIGENCE (EXCLUDING GROSS NEGLIGENCE AND WILLFUL MISCONDUCT) OF ANY OF THE CONTRACTOR PARTIES, ON ACCOUNT OF BODILY INJURY, DEATH AND/OR DAMAGE TO OR LOSS OF PROPERTY OF ANY KIND. OWNER'S OBLIGATIONS UNDER THIS SECTION SHALL BE COVERED BY AVAILABLE LIABILITY INSURANCE, UNDER WHICH THE INSURER HAS NO RIGHT OF SUBROGATION AGAINST OWNER OR CONTRACTOR. IT IS AGREED THAT SAID INSURANCE REQUIREMENTS SHALL AUTOMATICALLY BE AMENDED TO CONFORM TO THE MAXIMUM MONETARY LIMITS PERMITTED UNDER APPLICABLE LAW.

### 13.4    THIRD PARTY CLAIMS:

For losses, claims, demands, liabilities, or causes of action brought by or on behalf of anyone other than those claimants listed in *Sections 13.2* and *13.3* above, the Parties' respective indemnity obligations shall be as set forth in this *Section 13.4*.

(1) Contractor's Negligence: CONTRACTOR AGREES TO PROTECT, DEFEND (INCLUDING ALL COSTS, EXPENSES, AND REASONABLE ATTORNEYS' FEES), INDEMNIFY, RELEASE AND HOLD THE OWNER INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL LOSSES, CLAIMS, DEMANDS, LIABILITIES, OR CAUSES OF ACTION OF EVERY KIND AND CHARACTER, IN FAVOR OF ANY PERSON OR PARTY, FOR INJURY TO OR ILLNESS OR DEATH OF ANY PERSON, OTHER THAN AS PROVIDED IN *SECTIONS 13.2* AND *13.3* ABOVE, OR DAMAGE TO OR LOSS OF PROPERTY OF ANY SUCH PERSON, AND WHICH SUCH INJURY, ILLNESS, DEATH OR PROPERTY DAMAGE ARISES OUT OF OR IS INCIDENT TO ANY WORK OR SERVICE TO BE PERFORMED UNDER THIS AGREEMENT TO THE EXTENT, AND IN THE PROPORTION THAT, SUCH INJURY, ILLNESS, DEATH OR PROPERTY DAMAGE IS CAUSED OTHER THAN BY THE NEGLIGENCE OF OWNER, ITS EMPLOYEES, AGENTS OR OTHER CONTRACTORS THAT ARE DIRECTLY RESPONSIBLE TO OWNER.

(2) Owner's Negligence: OWNER AGREES TO PROTECT, DEFEND (INCLUDING ALL COSTS, EXPENSES, AND ATTORNEYS' FEES), INDEMNIFY, RELEASE AND HOLD THE CONTRACTOR INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL LOSSES, CLAIMS, DEMANDS, LIABILITIES, OR CAUSES OF ACTION OF EVERY KIND AND CHARACTER, IN FAVOR OF ANY PERSON OR PARTY, FOR INJURY TO OR ILLNESS OR DEATH OF ANY PERSON, OTHER THAN AS PROVIDED IN *SECTIONS 13.2* AND *13.3* ABOVE, OR DAMAGE TO OR LOSS OF PROPERTY OF ANY SUCH PERSON, AND WHICH SUCH INJURY, ILLNESS, DEATH OR PROPERTY DAMAGE ARISES OUT OF OR IS

INCIDENT TO ANY WORK OR SERVICE TO BE PERFORMED UNDER THIS AGREEMENT, TO THE EXTENT, AND ONLY TO THE EXTENT, AND ONLY IN THE PROPORTION THAT, SUCH INJURY, ILLNESS, DEATH OR PROPERTY DAMAGE IS CAUSED BY THE NEGLIGENCE OF OWNER, ITS EMPLOYEES, AGENTS OR OTHER CONTRACTORS THAT ARE DIRECTLY RESPONSIBLE TO OWNER.

13.5   IT IS THE INTENT OF THE PARTIES HERETO THAT ALL OBLIGATIONS, LIABILITIES, AND RISKS ALLOCATED OR ASSUMED BY THE PARTIES UNDER TERMS OF THIS CONTRACT, INCLUDING, WITHOUT LIMITATION, *SECTIONS 13.2* THROUGH *13.4*, BE WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING PREEXISTING CONDITIONS, STRICT LIABILITY, VIOLATIONS OF ANY STATE, OR FEDERAL LAW, BREACH OF CONTRACT, BREACH OF WARRANTY, TRESPASS, CONVERSION, NUISANCE, TORT,  OR THE NEGLIGENCE OF ANY PARTY OR PARTIES, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE OR PASSIVE.  THE RELEASES AND ASSUMPTIONS OF LIABILITY AND ALLOCATIONS OF RISKS EXTENDED BY THE PARTIES HERETO UNDER *SECTIONS 13.2* THROUGH *13.4* SHALL INURE TO THE BENEFIT OF THE PARTIES, THEIR PARENT, HOLDING AND SUBSIDIARIES, AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS AND SERVANTS.  THE TERMS AND PROVISIONS OF SECTIONS 13.2 THROUGH 13.4 SHALL HAVE NO APPLICATION TO CLAIMS OR CAUSES OF ACTION ASSERTED AGAINST OWNER OR CONTRACTOR BY REASON OF ANY AGREEMENT OF INDEMNITY WITH A PERSON OR ENTITY NOT A PARTY HERETO.

13.6   IT IS EXPRESSLY AGREED THAT OWNER  SHALL NOT BE LIABLE TO THE CONTRACTOR PARTIES FOR ANY SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM OR ARISING DIRECTLY OR INDIRECTLY, OUT OR OF IN CONNECTION WITH THE SERVICES OR OPERATIONS HEREUNDER RELATED TO RESERVOIR DAMAGE, LOSS OF RESERVES, OR CRATERING OR BLOWOUT OF THE BOREHOLE, INCLUDING, WITHOUT LIMITATION, LOSS OF USE, LOSS OF DATA, LOSS OF ASSETS, LOSS OF PROFIT, LOSS OF BUSINESS, OR BUSINESS INTERRUPTION UNLESS CAUSED BY THE SOLE NEGLIGENCE (ACTIVE OR PASSIVE) OF OWNER OR ANY OF THE OWNER PARTIES.

13.7   IT IS EXPRESSLY AGREED THAT CONTRACTOR SHALL NOT BE LIABLE TO THE OWNER PARTIES FOR ANY SPECIAL, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM OR ARISING DIRECTLY OR INDIRECTLY, OUT OR OF IN CONNECTION WITH THE SERVICES OR OPERATIONS HEREUNDER RELATED TO RESERVOIR DAMAGE, LOSS OF RESERVES, OR CRATERING OR BLOWOUT OF THE BOREHOLE, INCLUDING, WITHOUT LIMITATION, LOSS OF USE, LOSS OF DATA, LOSS OF ASSETS, LOSS OF PROFIT, LOSS OF BUSINESS, OR BUSINESS INTERRUPTION UNLESS CAUSED BY THE SOLE NEGLIGENCE (ACTIVE OR PASSIVE) OF CONTRACTOR OR ANY OF THE CONTRACTOR PARTIES.

13.8    As a part of the consideration for this Agreement, Contractor hereby agrees that the provisions of the foregoing *Sections 13.2.* through *13.7* inclusive shall extend to and be enforceable by and for the benefit of any non-operating concurrent working interest owners, joint ventures or partners for whom Owner may be performing operations or services.


MISCELLANEOUS

14.1    This Agreement, drawn in counterpart, shall be binding upon the Parties and their respective successors, and assigns.   Notwithstanding the foregoing, this Agreement and the duties and obligations hereunder are not assignable by Contractor without the written consent of Owner.

14.2    In any dispute arising among the Parties to this Agreement, the prevailing party shall be entitled to collect all costs, including attorneys' fees.

14.3    The captions of any articles herein are intended for convenient references only and same shall not be, nor be deemed to be, interpretive of the contents of such sections.

14.4    Harris County, Texas shall be the exclusive venue and jurisdiction for any litigation between the Parties.

14.5    If any provision or part of any provision of this Agreement shall be held invalid, the remainder shall be deemed valid and effective, and the Parties shall endeavor to replace the invalid terms with terms which correspond best to the original economic and general intention of the Parties, it being the intention of the Parties hereto that each provision hereof is being stipulated separately.

14.6    EACH    PARTY    HERETO    KNOWINGLY,    VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY (a) WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS AGREEMENT, OR DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED OR ASSOCIATED THEREWITH, BEFORE OR AFTER TERMINATION; (b) WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY "SPECIAL DAMAGES," AS DEFINED BELOW; (c) CERTIFIES THAT NEITHER IT NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSELORS HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT THE CERTIFYING PARTY WOULD NOT, IN THE EVENT OF LITIGATION,  SEEK  TO  ENFORCE  THE  FOREGOING  WAIVERS;  AND  (d) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.   AS USED IN THIS SECTION, *"SPECIAL DAMAGES"* INCLUDES ALL SPECIAL, CONSEQUENTIAL,    INDIRECT,    EXEMPLARY,    OR    PUNITIVE    DAMAGES

(REGARDLESS OF HOW NAMED), BUT DOES NOT INCLUDE ANY PAYMENTS OR FUNDS WHICH ANY PARTY HAS EXPRESSLY PROMISED TO PAY OR DELIVER TO ANY OTHER PARTY.

14.7    This instrument embodies the whole agreement of the Parties.   There are no promises, terms, conditions, or obligations other than those contained herein.  Should Contractor provide or render any Service, then in the event of a conflict between the terms of performance for such Services or Service, whether made orally or in writing, and the terms of this Agreement, the terms of this Agreement shall prevail except for any activity-specific instructions or directions.   In the event of a conflict between the provisions hereof and the provisions of any printed or other pre-prepared form of work or service order, job, or delivery ticket, or other similar form, submitted to Contractor by Owner in connection with any Services performed hereunder, the provisions of this Agreement shall prevail and be controlling.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the day and year first above written.

**TRATON ENGINEERING ASSOCIATES, L.P.**

By: _____

Printed Name: _____

Title: _____

**PRIMERA ENERGY, L.L.C.**

By: _____

Name: _____

Title: _____

# EXHIBIT A

SUBJECT JOAS

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT
## HORIZONTAL MODIFICATIONS

OPERATING AGREEMENT

DATED

July_____ , __2015__ ,
                    *Year*

**OPERATOR**   Primera Energy, LLC_____

**CONTRACT AREA**   See Exhibit A_____

_____

_____

_____

_____

**COUNTY OR PARISH OF**  Multiple_____ , **STATE OF**  Texas_____

COPYRIGHT 2013 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PROFESSIONAL
LANDMEN, 4100 FOSSIL CREEK BLVD. FORT
WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989 (Horz.)

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 2 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS | 2 |
| IV. | **TITLES** | 3 |
| | A. TITLE EXAMINATION | 3 |
| | B. LOSS OR FAILURE OF TITLE | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 4 |
| | 4. Curing Title | 4 |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR | 5 |
| | 1. Competitive Rates and Use of Affiliates | 5 |
| | 2. Discharge of Joint Account Obligations | 5 |
| | 3. Protection from Liens | 5 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL | 5 |
| | B. SUBSEQUENT OPERATIONS | 6 |
| | 1. Proposed Operations | 6 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | 9. Spudder Rigs | 9 |
| | 10. Multi-Well Pads | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS | 10 |
| | E. ABANDONMENT OF WELLS | 10 |
| | 1. Abandonment of Dry Holes | 10 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS | 11 |
| | G. TAKING PRODUCTION IN KIND | 11 |
| | (Option 1) Gas Balancing Agreement | 11 |
| | (Option 2) No Gas Balancing Agreement | 11 |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 12 |
| | A. LIABILITY OF PARTIES | 12 |
| | B. LIENS AND SECURITY INTERESTS | 12 |
| | C. ADVANCES | 12 |
| | D. DEFAULTS AND REMEDIES | 13 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 13 |
| | F. TAXES | 13 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| | E. WAIVER OF RIGHTS TO PARTITION | 15 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 15 |
| IX. | INTERNAL REVENUE CODE ELECTION | 15 |
| X. | CLAIMS AND LAWSUITS | 15 |
| XI. | FORCE MAJEURE | 16 |
| XII. | NOTICES | 16 |
| XIII. | TERM OF AGREEMENT | 16 |
| XIV. | COMPLIANCE WITH LAWS AND REGULATIONS | 16 |
| | A. LAWS, REGULATIONS AND ORDERS | 16 |
| | B. GOVERNING LAW | 16 |
| | C. REGULATORY AGENCIES | 16 |
| XV. | MISCELLANEOUS | 17 |
| | A. EXECUTION | 17 |
| | B. SUCCESSORS AND ASSIGNS | 17 |
| | C. COUNTERPARTS | 17 |
| | D. SEVERABILITY | 17 |
| XVI. | OTHER PROVISIONS | 18 |
| | A. CONFLICT OF TERMS | 18 |
| | B. OPERATOR'S DUTY | 18 |
| | C. PRIORITY OF OPERATIONS – HORIZONTAL WELLS | 18 |

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Primera Energy, LLC___ ,
hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred
to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land
identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil
and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating
the costs to be incurred in conducting an operation hereunder. An AFE is not a contractual commitment. Rather it is only an estimate, made
in good faith.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas
in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing
conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be
developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are
described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in
which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser. When used in
connection with a Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a Displacement greater than
(i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) to the Displacement to which
the Lateral was drilled pursuant to a previous proposal.

E. The term "Displacement" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction
over the Contract Area, in the absence of which the term shall otherwise mean the length of a Lateral.

F. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any
operation conducted under the provisions of this agreement.

G. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal
body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as
established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

H. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be
located. When used in connection with a Horizontal Well, the term "Drillsite" shall mean (i) the surface hole location, and (ii) the Oil and
Gas Leases or Oil and Gas Interests within the Drilling Unit on or under which the wellbore, including the Lateral, is located.

I. The term "Horizontal Rig Move-On Period" shall mean the number of days after the date of rig release of a Spudder Rig until
the date a rig capable of drilling a Horizontal Well to its Total Measured Depth has moved on to location.

J. The term "Horizontal Well" shall have the same meaning as the term defined by the state regulatory agency having
jurisdiction over the Contract Area, in the absence of which the term shall mean a well containing one or more Laterals which are drilled,
Completed or Recompleted in a manner in which the horizontal component of the Completion interval (1) extends at least one hundred feet
(100') in the objective formation(s) and (2) exceeds the vertical component of the Completion interval in the objective formation(s).

K. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

L. The term "Lateral" shall mean that portion of a wellbore that deviates from approximate vertical orientation to approximate
horizontal orientation and all wellbore beyond such deviation to Total Measured Depth.

M. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in
Article VI.B.2.

N. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed
operation.

O. The terms "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and
other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

P. The terms "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land
lying within the Contract Area which are owned by parties to this agreement.

Q. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts
of land lying within the Contract Area which are owned by the parties to this agreement.

R. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in
a shallower Zone. When used in connection with a Horizontal Well, the term "Plug Back" shall mean an operation to test or Complete the
well at a stratigraphically shallower Zone in which the operation has been or is being Completed and which is not in an existing Lateral.

S. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order
to attempt a Completion in a different Zone within the existing wellbore.

T. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or
improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well
stimulation operations but exclude any routine repair or reworking operations such as cleaning out, Sidetracking, Deepening, Completing,
Recompleting, or Plugging Back of a well.

U. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the
bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties. When used

1    over the Contract Area, in the absence of which the term shall mean the furthest point drilled in the Lateral.

2      X. The term "Total Measured Depth," when used in connection with a Horizontal Well, shall mean the distance from the surface of

3    the ground to the Terminus, as measured along and including the vertical component of the well and Lateral(s). When the proposed

4    operation(s) is the drilling of, or operation on, a Horizontal Well, the terms "depth" or "total depth" wherever used in this agreement shall be

5    deemed to read "Total Measured Depth" insofar as it applies to such well.

6      Y. The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal Well.

7      Z. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas

8    separately producible from any other common accumulation of Oil and Gas.

9      Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes

10    natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

11                         **ARTICLE II.**

12                         **EXHIBITS**

13      The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

14    _X_   A. Exhibit "A," shall include the following information:

15         (1) Description of lands subject to this agreement,

16         ~~(2) Restrictions, if any, as to depths, formations, or substances,~~

17         (3) Parties to agreement with addresses and telephone numbers for notice purposes,

18         ~~(4) Percentages or fractional interests of parties to this agreement,~~

19         (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

20         ~~(6) Burdens on production.~~

21        B. Exhibit "B," Form of Lease.

22    _X_   C. Exhibit "C," Accounting Procedure.

23    _X_   D. Exhibit "D," Insurance.

24        E. Exhibit "E," Gas Balancing Agreement.

25        F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

26        G. Exhibit "G," Tax Partnership.

27    _X_   H. Other:    _Memorandum of Operating Agreement_

28      If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this

29    agreement, the provisions in the body of this agreement shall prevail.

30                         **ARTICLE III.**

31                    **INTERESTS OF PARTIES**

32    **A. Oil and Gas Interests:**

33      ~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement~~

34    ~~and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner~~

35    ~~thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

36    **B. Interests of Parties in Costs and Production:**

37      Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid,

38    and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in

39    Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the

40    payment of royalties and other burdens on production as described hereafter.

41      Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may

42    be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered,

43    all burdens on its share of the production from the Contract Area up to, but not in excess of, _____Mineral Owners royalty_____ and

44    shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement,

45    if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or

46    other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess

47    obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden.

48    However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause

49    to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party

50    has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

51      No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or

52    royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party

53    contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

54      Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in

55    the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be

56    deemed separate leasehold interests for the purposes of this agreement.

57    **C. Subsequently Created Interests:**

58      If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the

59    payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest,

60    assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be

61    deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding

62    royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and

63    such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden

64    causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

65      The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone

66    bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against

## ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request in writing or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party upon request. Costs incurred by Operator in procuring abstracts, run sheets, fees paid outside attorneys and brokers for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and or (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

~~1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,~~

~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure should be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and~~

~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account~~

~~burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an~~

acreage basis, up to the amount of unrecovered costs;

~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. ~~Other~~ Losses: All losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed ~~(other than performance which requires only the payment of money)~~, and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title ~~under Article IV.B.1.~~ or a loss of title ~~under Article IV.B.2.~~ above, any Lease or Interest acquired <u>or re-acquired</u> by any party hereto ~~(other than the party whose interest has failed or was lost)~~ during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the <u>drilling parties</u> ~~party whose interest has failed or was lost~~, and the provisions of Article VIII.B. shall not apply to such acquisition.

## ARTICLE V.
## OPERATOR

**A. Designation and Responsibilities of Operator:**

Primera Energy, LLC _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. **Resignation or Removal of Operator:** Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, ~~no longer owns an interest hereunder in the Contract Area,~~ or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice, ~~or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice.~~ For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement<u> after applicable notice and opportunity to cure</u>.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of <u>thirty (30)</u> ~~ninety (90)~~ days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof <u>as a Non-Operator</u> <u>only if operator owns a working interest in the wells at the time of resignation or removal</u>. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. **Selection of Successor Operator:** Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. **Effect of Bankruptcy:** If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee

hours of labor and the compensation for services performed shall be determined Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled or reworked on the Contract Area shall be drilled or reworked on a competitive contract basis at the usual rates prevailing in the area. If so desires, Operator may employ its own tools and equipment in the drilling or reworking of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Provided Operator has been paid by the Non-Operators for Joint Account Obligations, Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Provided Operator has been paid by the Non-Operators for Joint Account Obligations, Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator that is not in default of its payment obligations upon written request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise Non-Operators participating in such operations and not in default of its payment obligations of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators participating in such operations and not in default of its payment obligations such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall  be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

A. Initial Well:

On or before the _____ day of _____, _____, Operator shall commence the drilling of the initial Well at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)):

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66

1
2 ~~The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in~~
3 ~~Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~
4 **B. Subsequent Operations:**
5     1. Proposed Operations: If any party hereto should desire to drill <ins>or complete</ins> any well on the Contract Area other than the Initial
6 Well, ~~or~~
7 any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying
8 paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the
9 party desiring to drill, <ins>complete,</ins> Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed
operation ~~to~~
10 the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the
11 case of a proposal for Sidetracking or Deepening as to a Vertical Well), specifying the work to be performed, the location, proposed depth,
12 objective Zone and the estimated cost of the operation as ~~outlined in an AFE. A proposal for the drilling of or other operations for a~~
13 ~~Horizontal Well shall: (1) state that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans~~
14 ~~specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s),~~
15 ~~(v) utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3)~~
16 ~~include estimated drilling and Completion costs as set forth in an AFE.~~ The parties to whom such a notice is delivered shall have thirty (30)
17 days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the
18 proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be
19 given by telephone and the response period shall be limited to ~~forty-eight (48)~~<ins>twenty four (24)</ins> hours, exclusive of Saturday, Sunday and legal
20 holidays.
21     Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to
22 participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially
23 proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.
24     If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually
25 committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no
26 later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the
27 ~~forty-eight (48)~~<ins>twenty four (24)</ins> hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation
and ~~thereafter~~
28 complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may
29 be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole
30 opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including
31 rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or
32 acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically
33 permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written
34 notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties
35 that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to
36 participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the
37 event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.
38     2. Operations by Less Than All Parties:
39     (a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1.
40 (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or
41 parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the
42 expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the ~~forty-eight (48)~~<ins>twenty four (24)</ins>
four ~~period~~ ~~when~~
43 a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator
44 shall perform all work for the account of the Consenting Parties; ~~provided, however, if no drilling rig or other equipment is on location, and~~
45 ~~if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such~~
46 ~~proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such~~
47 ~~work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party~~
48 ~~designated as Operator for an operation in which the original Operator is a Non-Consenting Party.~~ Consenting Parties, when conducting
49 operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.
50     If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable
51 notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the
52 Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within ~~forty-eight (48)~~<ins>twenty four (24)</ins> hours
(exclusive ~~of~~
53 Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to
54 such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the
55 Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its
56 proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate
57 part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is
58 not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation (other than ~~its~~<ins>the operator</ins>) if such party does
not ~~withdraw~~
59 proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is
60 on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of ~~forty-eight (48)~~<ins>twenty</ins>
four ~~(24)~~ ~~hours~~
61 (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than
62 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on
63 location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing
64 party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall
65
66

that those Non Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying

1     quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned

2     over to Operator (if the Operator did not conduct the operation) and shall be operated by Operator it at the expense and for the account of the

3     Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging

4     Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed

5     to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective

6     interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking,

7     Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-

8     Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate.

9     Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such

10    share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other

11    interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest

12    until it reverts), shall equal the total of the following:

13                 (i) __100____ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the

14    wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each

15    such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such

16    Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-

17    Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party

18    had it participated in the well from the beginning of the operations; and

19                 (ii) __400____ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging

20    Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion

21    of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such

22    Non-Consenting Party if it had participated therein.

23         Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in

24    the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in

25    the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or

26    voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the

27    notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed

28    Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article

29    VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the

30    relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

31         (c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a

32    well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion

33    thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the

34    Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be

35    deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-

36    consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's

37    recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be

38    deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties ____400__ %

39    of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-

40    Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such

41    recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

42         (d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of

43    production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance,

44    excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of

45    production not excepted by Article III.C.

46         In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall

47    be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain

48    unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the

49    Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in

50    value, less cost of salvage.

51         Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the

52    Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an

53    itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the

54    well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed

55    statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the

56    party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs

57    and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the

58    amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity

59    of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or

60    periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such

61    operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned

62    costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as

63    above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

64         If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above,

65    the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on

66    which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the

1  Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting,
2  Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals)
3  shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties
4  responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of
5  all Consenting Parties according to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as
6  part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall
7  be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total
8  interest as shown on Exhibit "A" of all Consenting Parties.

9      In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party
10  may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.4.
11  within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require
12  such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take
13  such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day
14  to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all
15  the electing parties.

16      4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed
17  pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article XVI.A.VI.B.2.
18  shall                                                                                                                                                                              relate
19  only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice
20  under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this
21  Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

22      In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective,
23  such party shall give written notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties).
24  Thereupon, Articles VI.B.1. and XVI.B2. shall apply and all parties receiving such notice shall have the right to participate or not participate
       in                                                                                                                                                                              the
25  Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any
26  Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the
27  case may be) of the following costs and expenses.

28      (a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying
29  quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses
30  incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid
31  had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of
32  participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for
33  testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen
34  beyond the Initial Objective shall be for the sole account of Consenting Parties.

35      (b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing
36  in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse
37  Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the
38  surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties
39  from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well.
40  The Non-Consenting Parties' proportionate part (based on the proportion of such well Non-Consenting Party would have owned had it
41  previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface
42  equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the
43  cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may
44  participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

45      The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior
46  to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

47  This Article VI.B.4 shall not apply to Deepening operations within an existing Lateral of a Horizontal Well.

48      5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an
49  interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate
50  share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

51      (a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs
52  incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

53      (b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of
54  such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the
55  Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the
56  cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in
57  accordance with the provisions of Exhibit "C."

58  This Article VI.B.5, "Sidetracking," shall not apply to operations in an existing Lateral of a Horizontal Well.

59      6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose
60  the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen
61  (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling
62  rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a
63  drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed
64  operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial
65  proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal
66  period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is

shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone absent regulatory governmental approval of an exceptional location.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

9. Spudder Rigs.

(a) Within Approved Horizontal Well proposals (i.e. proposals which include an approved AFE). If an approved Horizontal Well proposal provides that a Spudder Rig shall be utilized, and Operator desires to extend the proposed Horizontal Rig Move-On Period, Operator may obtain one or more extensions, each for a period of time not to exceed _____ days only upon notice and the affirmative vote of not less than _____ % in interest of the Consenting Parties to the drilling of the proposed well.

(b) Not Within Approved Horizontal Well proposals. If an approved Horizontal Well proposal does not provide that a Spudder Rig may be utilized, and Operator subsequently desires to utilize a Spudder Rig, Operator may utilize a Spudder Rig upon notice to the Drilling Parties (which notice shall include a Horizontal Rig Move-On Period) and the affirmative vote of not less than _____ % in interest of the Consenting Parties. Extension(s) of the Horizontal Rig Move-On Period may be requested by Operator in the same manner as provided in Article VI.B.9.(a) immediately above.

(c) Failure to meet Horizontal Rig Move-On Period. If a rig capable of drilling a Horizontal Well to its Total Measured Depth has not commenced operations within the Horizontal Rig Move-On Period, or any approved extension(s) thereof, unless _____ % in interest of the Consenting Parties agree to abandon the operation, Operator shall re-propose the well in the manner provided in Article VI.B of this agreement. Any party who was a Non-Consenting Party to the original drilling proposal shall be entitled to a new election. Costs of the operation, incurred both before and after such re-proposal, shall be borne as follows:

(1) Operator shall promptly reimburse all unused funds previously advanced for the drilling of the well to each party who advanced such unused funds;

(2) If the well's drilling operations are subsequently resumed, all costs, whether incurred before or after the re-proposal, shall be borne by the Consenting Parties to the re-proposed well; and, the Consenting Parties shall proportionately reimburse each party who consented to the original proposal but did not consent to the re-proposal such party's share of costs incurred prior to the re-proposal.

(3) If the well's drilling operations are not subsequently resumed pursuant to a re-proposal as herein provided, all costs incurred prior to the re-proposal, and all costs of abandonment, shall be borne and paid by the original Consenting Parties.

(d) Commencement of Operations. For purposes of Article VI.B., and subject to the provisions of this sub-section 9, the date a Spudder Rig commences actual drilling operations shall be considered the commencement of drilling operations of the proposed well.

10. Multi-well Pads. If multiple Horizontal Wells are drilled or proposed to be drilled from a single pad or location, the costs of such pad or location shall be allocated, and/or reallocated as necessary, to the Consenting Parties of each of the wells thereon.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completion and equipping of the Well, including tankage and/or surface facilities.

✓☐Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of a Vertical Well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties;    provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

Notwithstanding anything to the contrary, including the selection of Option 2 above, or anything else in this agreement, Option

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Twenty Five_____ Dollars ($ __25,000_____ ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of _Twenty Five Thousand _____ _____ Dollars ($__25,000_____ ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least ____70_____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of this proposal.

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties owning an interest in such well. If all parties consent to such _____ abandonment, the _____ well _____ shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing _____70_____% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☐ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion- ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☑ **Option No. 2: No Gas Balancing Agreement:**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or utilized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120)ninety (90) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each party paying may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

within ten (10) fifteen (15) days after such estimate and invoice is received or by first day of the month for which the advance is required, whichever is later. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. _Suspension of Rights:_ Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30)twenty (20) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement shall may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. _Suit for Damages:_ Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. _Deemed Non-Consent:_ The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. _Advance Payment:_ If a default is not cured within ten (10) thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. _Costs and Attorneys' Fees:_ In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall

If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease,

1  and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based
2  in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges
3  to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest.
4  Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

5      If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner
6  prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final
7  determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and
8  any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint
9  account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as
10  provided in Exhibit "C."

11  ~~Operator shall pay, or cause to be paid, on behalf of all parties.~~ Each party shall pay or cause to be paid all production, severance,
12  excise, ~~gathering~~ and ~~other~~ taxes imposed upon or with
13  respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

14                                      **ARTICLE VIII.**
15                      **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**
16  **A. Surrender of Leases:**
17      The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole
18  or in part unless all parties consent thereto.

19      However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written
20  notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of
21  the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such
22  notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all
23  parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its
24  interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production
25  thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest,
26  the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil
27  and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to
28  be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations
29  thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable
30  thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than
31  the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor
32  the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased
33  acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the
34  estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such
35  costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in
36  favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest
37  of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned
38  shall similarly reflect such variances.

39      Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering
40  party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage
41  assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this
42  agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

43  **B. Renewal or Extension of Leases:**
44      If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties
45  shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease,
46  promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery
47  of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands
48  within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of
49  such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each
50  party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein
51  by the acquiring party.

52      If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned
53  by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the
54  Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such
55  renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a
56  readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to
57  participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this
58  agreement.

59      If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in
60  renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

61      The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by
62  the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of
63  its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall
64  be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement
65  Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not
66  be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

    The provisions of this Article shall also be applicable to extensions of Oil and Gas Leases.

1    governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it
2    may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional
3    rights to earn acreage outside the Contract Area which are in support of well drilled inside the Contract Area.
4       If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such
5    consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

6    **D. Assignment; Maintenance of Uniform Interest:**
7       For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests,
8    wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest
9    in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such
10   disposition covers either:
11       1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or
12       2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment
13   and production in the Contract Area.
14       Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and
15   shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or
16   Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership;
17   provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any
18   purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof
19   in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations
20   previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to
21   pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such
22   assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of
23   any such obligations.
24       If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may
25   require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for
26   and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such
27   party's interest within the scope of the operations embraced in this agreement; however, all such co- owners shall have the right to enter into
28   and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area
29   and they shall have the right to receive, separately, payment of the sale proceeds thereof.

30   **E. Waiver of Rights to Partition:**
31       If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an
32   undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided
33   interest therein.

34   **F. Preferential Right to Purchase:**
35    ☐ (Optional: Check if applicable)
36       Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area,
37   it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the
38   name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description
39   sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of
40   ten (10) days after notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other
41   party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that
42   the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those
43   cases where any party wishes to mortgage its interests, or to transfer title to its interest to its mortgagee in lieu of or pursuant to foreclosure
44   of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its
45   Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to
46   any company in which such party owns a majority of the stock.

47                         **ARTICLE IX.**
48              **INTERNAL REVENUE CODE ELECTION**
49       If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the  parties
50   have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected
51   elects to be excluded from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A," of the Internal Revenue Code
52   of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder.
53   Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by
54   the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of
55   limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each
56   party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence
57   as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any
58   notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in
59   which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K,"
60   Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party
61   hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party
62   states that the income derived by such party from operations hereunder can be adequately determined without the computation of
63   partnership taxable income.

64                         **ARTICLE X.**
65                **CLAIMS AND LAWSUITS**
66       Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure

1  shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

### ARTICLE XI.
### FORCE MAJEURE

4      If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than
5  the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of
6  the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are
7  affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force
8  majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war,
9  blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or
10  inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not
11  reasonably within the control of the party claiming suspension.

12      The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The
13  requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or
14  other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the
15  discretion of the party concerned.

### ARTICLE XII.
### NOTICES

18      All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically
19  provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form
20  of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices
21  permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision
22  hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver
23  any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with
24  respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in
25  accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be
26  deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex,
27  telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48
28  hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the
29  right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available
30  to receive notice orally or by telephone when a party attempts to deliver within 24 or 48 hours, the notice
31  may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for
32  any responsive notice.

### ARTICLE XIII.
### TERM OF AGREEMENT

35      This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for
36  the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to
37  any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

38      ☑ ☐ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are contained in force as to any part
39  of the Contract Area, whether by production, extension, renewal or otherwise

40      ☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this
41  agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this
42  agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____
43  days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are
44  engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a
45  well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production
46  results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or
47  any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the
48  Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Plugging Back, Re- completing, Plugging
49  Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment"
50  for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the
51  elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

52      The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any
53  remedy therefor which has accrued or attached prior to the date of such termination.

54      Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this
55  Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of
56  termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if
57  Operator has satisfied all its financial obligations.

### ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

60  **A. Laws, Regulations and Orders:**
61      This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules,
62  regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws,
63  ordinances, rules, regulations and orders.

64  **B. Governing Law:**
65      This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-
66  performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by

1   or adjacent to the Contract Area.

2       With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries,
3   claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules,
4   rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies
5   to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further
6   agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that
7   Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon
8   owing by Operator as a result of such incorrect interpretation or application.

9                  ARTICLE XV.
10                MISCELLANEOUS

11  **A. Execution:**

12      This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by
13  such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is
14  tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract
15  Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any
16  time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for
17  commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient
18  participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the
19  parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other
20  costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article
21  IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as
22  having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown
23  or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the
24  following:

25      ☐ Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would
26      have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive
27      all revenues which would have been received by each such person under this agreement as if such person had executed the same.

28      ☐ Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each
29      party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery
30      of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or
31      (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all
32      parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided
33      in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons
34      interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing
35      party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an
36      election under (i).

37  **B. Successors and Assigns:**

38      This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal
39  representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the
40  Contract Area.

41  **C. Counterparts:**

42      This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

43  **D. Severability:**

44      For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this
45  agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to
46  comply with all of its financial obligations provided herein shall be a material default.

47
48
49
50
51
52
53
54
55
56
57
58
59
60
61
62
63
64
65
66

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**ARTICLE XVI.**
**OTHER PROVISIONS**

A. Conflict of Terms:

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern.

B. Operator's Duty:

Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.

C. Priority of Operations - Horizontal Wells:

Notwithstanding Article VI.B.6 or anything else in this agreement to the contrary, it is agreed that where a Horizontal Well subject to this agreement has been drilled to the objective Displacement and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal Well, the following elections shall control the order of priority enumerated hereafter:

First:          Testing, coring or logging;

Second:          Complete drilling operations of all proposed Laterals;

Third:          Extend or Deepen a Lateral;

Fourth:          Kick out and drill an additional Lateral in the same Zone;

Fifth:          Plug Back the well to a Zone above the Zone in which a Lateral was drilled, if there is more than one proposal to Plug Back, the proposal to Plug Back to the next deepest prospective Zone shall have priority over a proposal to Plug Back to a shallower prospective Zone;

Sixth:          Sidetrack; and

Seventh:          Plug and abandon as provided for in Article VI.E.

Provided, however, that if, at the time the Consenting Parties are considering any of the above, the hole is in such a condition that a reasonably prudent operator would not conduct the particular contemplated operation involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal Well in the objective Zone, such operation shall be eliminated from the priorities set forth above.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

    IN WITNESS WHEREOF, this agreement shall be effective as of the _____30th___ day of _____July_____, __2015__.

Primera Energy, LLC _____, who has prepared and circulated this form for execution, represents and warrants

that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating

Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made

by strikethrough and/or insertion and that are clearly recognizable as changes in Articles ___II-X, XIII, XIV, XVI_____,

have been made to the form.

**ATTEST OR WITNESS:**

    **OPERATOR**
    Primera Energy, LLC

_____

_____   By Jason Searcy

_____   _____
    Type or print name


    Title  Trustee

    Date  7/30/2015

    Tax ID or S.S. No.  _____


## NON-OPERATORS

_____   _____

_____   By _____

_____   _____
    Type or print name

    Title _____

    Date _____

    Tax ID or S.S. No. _____


_____   _____

_____   By _____

_____   _____
    Type or print name

    Title _____

    Date _____

    Tax ID or S.S. No. _____


_____   _____

_____   By _____

_____   _____
    Type or print name

    Title _____

### ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of _____ )
                             ) ss.
County of _____ )

This instrument was acknowledged before me on

_____ by _____

(Seal, if any)                          _____

                                        Title (and Rank) _____

                                        My commission expires _____

Acknowledgment in representative capacity:

State of _____ )
                             ) ss.
County of _____ )

This instrument was acknowledged before me on

_____ by _____ as

_____ of _____

(Seal, if any)                          _____

                                        Title (and Rank) _____

                                        My commission expires _____

Primera JOA
Exhibit A-2

Attached and made part of the Joint Operating Agreement for Primera Energy, LLC.  Following are the contact information for the parties in the agreement.

Primera Energy, LLC
C/O Jason Searcy, Trustee
PO Box 3929
Longview Texas, 75606

Traton Engineering Associates, LP
Patrick W. Merritt
1415 N Loop W
Suite 1250
Houston, Texas 77008

# EXHIBIT B

## Producing Overhead Rate Structure

| | |
|---|---|
| < 5 Wells | $1,200 / month / well |
| 5-15 Wells | $1,000 / month / well |
| > 15 Wells | $750  / month  / well |
| Shut-In Wells | $125 / month / well |

- Drilling Overhead Rate shall be 10 times Producing Overhead Rate and prorated daily for the number of days of the operation.

- Additional Revenue Distribution:   Traton's overhead rates cover distributions of any royalties, overriding royalties, and working interest payments for up to 50 payees per month per well.  When or if the number of payees increases to more than 50 per month per well on any well, then for each additional 50 payees the fee shall increase by $300 per month per well.

# EXHIBIT C

## Hourly Rate Structure

**Engineering Services:**

| | |
|---|---|
| Senior Engineer | $225.00 / hr |
| Staff Engineer | $195.00 / hr |
| Junior Engineer | $175.00 / hr |
| Tech I | $125.00 / hr |
| Tech II | $110.00 / hr |
| Accounting | $110.00 / hr |
| Clerical | $55.00 / hr |

**Field Consultation Services:**

| | |
|---|---|
| Daylight | $1,300 |
| 24 Hour | $1,700 |

**Additional Expenses to fees above:**

| | |
|---|---|
| Mileage / Trans. Exp. | $1.00 per mile via car or actual travel expense if other transportation taken |
| Lodging | Invoiced at cost |
| Meals | $35.00 per day |
| Phone, Computer | $30.00 per day |
| Insurance | 7% of Field consulting rates |

Exhibit C to
Contract Operator Services Agreement

Page 1

# EXHIBIT D
## Insurance

1. Each Party understands and agrees that each Party will be responsible for its own proportionate interest in the event of any losses, liabilities or expenses arising out of any operation.

2. Each Party hereby waives its rights of recovery against all other Parties to the Agreement, and agrees that all insurance will be suitably endorsed to effectuate this waiver of subrogation.

As to all operations hereunder, Owner shall carry the following insurance and shall name Contractor as co-insured and furnish Contractor with proof of such coverage, to-wit:

**WORKER'S COMPENSATION INSURANCE,** covering Owners employees engaged in operations on the lands subject to this agreement in compliance with the laws of the State in which said lands are situated and EMPLOYER'S LIABILITY INSURANCE of not less than $1,000,000 for injuries or death to any one employee and $1,000,000 for injuries or death of more than one employee resulting from any one accident.

**GENERAL PUBLIC LIABILITY AND PROPERTY DAMAGE INSURANCE** in connection with all operations conducted by Owner hereunder, with bodily injury and death limit of not less than $1,000,000.00 per accident, $2,000,000.00 aggregate. Provided further than such property damage insurance shall not exclude Operator's liability for loss of or damage to property on or above the surface of the earth arising from a blowout or cratering of a gas or oil well; and

**AUTOMOBILE PUBLIC LIABILITY AND PROPERTY DAMAGE INSURANCE** in connection with all operations conducted by Owner hereunder (including coverage on owned and non-owned automotive equipment) with bodily injury or death limit of not less than $1,000,000.00 for injuries to or death of any one person resulting from any one accident, and not less than $500,000 for injuries to or death of more than one person resulting from any one accident, and property damage limit of not less than $25,000 per accident.

**WELL CONTROL INSURANCE** with limits of liability of not less than $3,000,000 for wells with total depth between 0-5000', $5,000,000 for wells with total depth between 5-10000' is $5mm, and $10,000,000 for wells with total depth of 10000' and below for any one occurrence.

As to all operations hereunder, Contractor shall carry the following insurance and shall name Owner as co-insured and furnish Owner with proof of such coverage, to-wit:

**WORKER'S COMPENSATION INSURANCE,** covering Contractors employees engaged in operations on the lands subject to this agreement in compliance with the laws of the State in which said lands are situated and EMPLOYER'S LIABILITY INSURANCE of not less than $1,000,000 for injuries or death to any one employee and $1,000,000 for injuries or death of more than one employee resulting from any one accident.

**GENERAL PUBLIC LIABILITY AND PROPERTY DAMAGE INSURANCE** in connection with all operations conducted by Contractor hereunder, with bodily injury and death limit of not less than $1,000,000.00 per accident, $2,000,000.00 aggregate; and

**AUTOMOBILE PUBLIC LIABILITY AND PROPERTY DAMAGE INSURANCE** in connection with all operations conducted by Contractor hereunder (including coverage on owned and non-owned automotive equipment) with bodily injury or death limit of not less than $1,000,000.00 for injuries to or death of any one person resulting from any one accident, and not less than $500,000 for injuries to or death of more than one person resulting from any one accident, and property damage limit of not less than $25,000 per accident.

Exhibit A-1 Description of Lands

This Exhibit is attached to and made part of the Joint Operating Agreement for Primera Energy, LLC dated July, 2015

The following well list and plats describe the lands that are made a part of this Joint Operating Agreement.

| Primera Energy, LLC | | Operator No. | 677835 | P-5 Expires 4-1-2016 |
|---|---|---|---|---|
| | | | | |
| Well | API | Lease No | Type | County |
| Screaming Eagle A 2H | 311-35222 | 271486 | gas | McMullen |
| Screaming Eagle A 3H | 311-35588 | 273428 | gas | McMullen |
| Screaming Eagle B 4H | 177-33240 | 17965 | oil | Gonzales |
| Screaming Eagle B 6H | 177-33553 | Drill Permit No 800690 | Location only | Gonzales |
| Legacy 1H | 337-34587 | 31974 | oil | Montague |
| Legacy A 2H | 337-34589 | 32042 | oil | Montague |
| Blackhawk 1 | 177-33615 | Drill Permit No 805720 | Location only | Gonzales |



SCALE: 1"= 1000'

0'  250'  500'  1000'  2000'

N

B L O C K  69

B L O C K  57

Legacy
No. 1H
BHL

PANOLA COUNTY SCHOOL LAND

A-587

B L O C K  58

B L O C K  56

SET NAIL

X=1925645
Y=662301

LAT.= 33.486916' N
LONG.= 97.743877' W

330'
335'

B L O C K

SET NAIL

CANAN OPERATING, INC.

B L O C K  55

B L O C K  59

N 44°26'48" W — 4139.29'

LAT.= 33.477922' N
LONG.= 97.733324' W

Legacy
No. 1H
El.= 967

B L O C K

X=1928856
Y=659021

POP #1H
X=1928544
Y=659346

(185 Acres)

SET NAIL

B L O C K  44

B L O C K  54

335'  780'
450'  Legacy
330'  330'

SET NAIL

STATE OF TEXAS
REGISTERED
DEVIN G. SMITH
5849
PROFESSIONAL
LAND SURVEYOR

APPROXIMATELY 2.6 MILES
NORTHEAST OF SUNSET TEXAS

BASIS OF BEARING =
NAD 27 TEXAS NORTH
CENTRAL ZONE (4202)

PLAT FOR LOCATION NO. 1H

SCALE: 1"=1000'

THE ABOVE DESCRIBED LOCATION WAS SURVEYED

MARCH 23, 2011

AND THE DIMENSIONS SHOWN ARE HEREBY CERTIFIED TO BE TRUE AND CORRECT

Devin G. Smith 3/24/11

REGISTERED PROFESSIONAL LAND SURVEYOR

| SURVEY: | PANOLA COUNTY SCHOOL LAND, A-587 BLOCKS 55 & 58 |
| | MONTAGUE COUNTY, TEXAS |
| LEASE DESIGNATION: | LEGACY |
| SURVEY FOR: | CANAN OPERATING, INC. |

CORLETT, PROBST & BOYD, P.L.L.C.
Engineers and Surveyors
4605 Jacksboro Highway, Wichita Falls, Texas 76302
Phone: 940.723.1455 Fax: 940.397.0549 email: cpb@wf.net

PTM





SCREAMING EAGLE A # 2H SURFACE LOCATION (SL), X: 2202434, Y: 225338, Latitude: 28° 27' 05.65", Longitude: 98° 22' 12.20"; PENETRATION POINT (PP), X: 2202554, Y: 225124, Latitude: 28° 27' 03.52", Longitude: 98° 22' 10.87"; FIRST TAKE POINT (FTP), X: 2202428, Y: 225441, Latitude: 28° 27' 06.67", Longitude: 98° 22' 12.26"; LAST TAKE POINT (LTP), X: 2201305, Y: 228721, Latitude: 28° 27' 39.20", Longitude: 98° 22' 24.65"; TERMINUS, X: 2201235, Y: 228882, Latitude: 28° 27' 40.60", Longitude: 98° 22' 25.21".

Surface location is situated 330' from the southeast lease line and 480' from the southwest lease line and 926' from the southeast survey line and 9572' from the southwest survey line; Penetration Point is situated 149' from the southeast lease line and 315' from the southwest lease line and 744' from the southeast survey line and 9408' from the southwest survey line; First Take Point is situated 388' from the southeast lease line and 577' from the southwest lease line; Last Take Point is situated 604' from the northwest lease line and 662' from the northeast lease line; Terminus is situated 544' from the northwest lease line and 513' from the northwest lease line and 3168' from the southeast survey line and 6513' from the northwest survey line, situated approximately 11 miles west from the town of Three Rivers.

There may be existing pipelines not shown on this plat. Use the Texas One Call System to locate pipelines before performing any excavation on this property.

Bearings, distances, and coordinates are based on the Texas State Plane Coordinate System, North American Datum of 1927, South Central Zone.

### PLAT SHOWING AS-DRILLED LOCATION MADE FOR
### PRIMERA ENERGY
### SCREAMING EAGLE A # 2H
### JAMES GARNER SURVEY, ABSTRACT – 5
### McMULLEN COUNTY, TEXAS
### SCALE 1" = 1000'

Eby & Petrus Survey
506 Second Street
P.O. Box 1284
Woodsboro, TX 78393
Phone 361-543-8161
Fax    361-288-8438


**EBY & PETRUS SURVEY**



STATE OF TEXAS
REGISTERED
NATHAN J. EBY
6198
PROFESSIONAL
LAND SURVEYOR

Registered Prof. Land Surveyor
Registration No. 6198

The following is a survey plat drawing with various labels. Below is the transcribed text.

Map labels:
- 6363' to Survey Line
- Lease Line
- TRACT 2
- JAMES GARNER SURVEY A-5
- 289' BHL
- 1378'
- 1336' O.R.
- 43.33 Acre Tract — Harry J. Schulz et al Vol. 73, Pg. 409, D.R.
- 3394'
- H. BORCHERS RANCH SUBD. Vol. 1, Pg. 2, P.R.
- 332' LTP
- 195.7% Y.d 100' O.R.
- 120.06 Acre Tract — U.S.A. 402'
- 172.13 Acre Tract U.S.A. Vol. 402, Pg. 480, D.R.
- TRACT 14
- TRACT 13
- **PRIMERA ENERGY 265.37 ACRES**
- (A)
- (B)
- 1.00 Acre Tract David Gene Wylie, et ux Vol. 404, Pg. 445, D.R.
- 7.00 Acre Tract Lakeview Ranch Land Trust Vol. 432, Pg. 451, D.R.
- STATE HIGHWAY NO. 72
- 620'
- PRIMERA ENERGY SCREAMING EAGLE A # 3H ELEV. 236'
- FTP
- 1093'
- TRACT J
- TRACT 4
- CO. RD. NO. 302
- Survey Line
- 1336'
- SL 462'
- 740'
- 410'
- 263'
- 877'
- A # 3H
- PP
- 141'
- CO. RD. NO. 302
- Lease Line
- MICHAEL HELY SURVEY A-6
- 8858' to Survey Line
- 9233' to Survey Line

Title block:

**PLAT SHOWING LOCATION MADE FOR
PRIMERA ENERGY
SCREAMING EAGLE A # 3H
JAMES GARNER SURVEY, ABSTRACT — 5
McMULLEN COUNTY, TEXAS
SCALE 1" = 1000'**

SCREAMING EAGLE A # 3H SURFACE LOCATION (SL), X: 2202045, Y: 225468, Latitude: 28° 27' 06.96", Longitude: 98° 22' 16.55"; PENETRATION POINT (PP), X: 2202371, Y: 225000, Latitude: 28° 27' 02.31", Longitude: 98° 22' 12.93"; FIRST TAKE POINT (FTP), X: 2201703, Y: 225557, Latitude: 28° 27' 07.86", Longitude: 98° 22' 20.38"; LAST TAKE POINT (LTP), X: 2200826, Y: 228123, Latitude: 28° 27' 33.31", Longitude: 98° 22' 30.05"; BOTTOM HOLE LOCATION (BHL), X: 2201091, Y: 229088, Latitude: 28° 27' 42.85", Longitude: 98° 22' 27.02".

Surface location is situated 740' from the southeast lease line and 483' from the southwest lease line and 1336' from the southeast survey line and 9569' from the southwest survey line; Penetration Point is situated 283' from the southeast lease line and 141' from the southwest lease line and 877' from the southeast survey line and 9233' from the southwest survey line; First Take Point is situated 462' from the southwest lease line and 1093' from the southeast lease line; Last Take Point is situated 332' from the northwest lease line and 1378' from the northeast lease line; Bottom hole location is situated 379' from the northeast lease line and 289' from the northwest lease line and 3394' from the southeast survey line and 6363' from the northwest survey line, situated approximately 11 miles west from the town of Three Rivers.

There may be existing pipelines not shown on this plat. Use the Texas One Call System to locate pipelines before performing any excavation on this property.

Bearings, distances, and coordinates are based on the Texas State Plane Coordinate System, North American Datum of 1927, South Central Zone.

Eby & Petrus Survey
506 Second Street
P.O. Box 1284
Woodsboro, TX 78393
Phone 361–543–8161
Fax  361–288–8438





STATE OF TEXAS
REGISTERED
NATHAN J. EBY
6198
PROFESSIONAL
LAND SURVEYOR

*Nathan Eby*

Registered Prof. Land Surveyor
Registration No. 6198

*J. GIBSON SURVEY*
*A-23*

JOE FRED CRABB, ET UX
TRACT 3
VOL. 770, PG. 742
D.R.G.C.T.

COUNTY ROAD 415

N09°28'42"E
537.81' KOP
KOP

B NO. 4H BORE PATH
S 87°58'02" W  5289.75' (KOP to BHL)

LEASE LINE

B NO. 4H BHL

8007' TO EAST
SURVEY LINE

WILLIAM & MARY SEGER
190.00 ACRES
VOL. 899, PG. 535
D.R.G.C.T.

EXXON MOBILE PIPELINE CO.

TEPPCO CRUDE PIPELINE, LLC.

558'
PP

DONALD DEAN CLARK
248.00 ACRES

B NO. 6H SHL
ELEV.: 344'

PRIMERA ENERGY
380 ACRES

THOMAS W. BOWERS FAMILY TRUST
190.00 ACRES
VOL. 917, PG. 708
D.R.G.C.T.

LEASE/SURVEY LINE

J. R. BOWERS
210.00 ACRES

PEACH CREEK

GENE HRNCIR
VOL. 1069, PG. 592
D.R.G.C.T.

L. MALLET SURVEY
A-352

-5411' TO WEST SURVEY LINE-

BHL

330'    350'

SCREAMING EAGLE B NO. 6H: SURFACE HOLE LOCATION (SHL), X: 2586267, Y: 674409, Latitude: 29° 40' 34.73", Longitude: 97° 13' 00.02"; KICK OUT POINT (KOP), X: 2586356, Y: 674939, Latitude: 29° 40' 39.97", Longitude: 97° 12' 58.93"; PENETRATION POINT (PP), X: 2586087, Y: 674403, Latitude: 29° 40' 34.70", Longitude: 97° 13' 02.06"; BOTTOM HOLE LOCATION (BHL), X: 2564035, Y: 670299, Latitude: 29° 39' 54.38", Longitude: 97° 13' 26.03".

Surface hole location is located 192' from the southeast lease line and 927' from the north lease line and 8007' from the east survey line and 192' from the southeast survey line; Kick out point is located 861' from the east lease line and 400' from the north lease line; Penetration point is located 380' from the southeast lease line and 927' from the north lease line; Bottom hole location is situated 350' from the southeast lease line and 330' from the southwest lease line and 350' from the southeast survey line and 5411' from the west survey line, situated approximately 5 miles east from the town of Waelder, TX.

There may be existing pipelines not shown on this plat.  Use the Texas One Call System to locate pipelines before performing any excavation on this property.

Bearings, distances, and coordinates are based on the Texas State Plane Coordinate System, North American Datum of 1927, South Central Zone.

Geographic coordinates are based on the North American Datum of 1927.

## PLAT SHOWING LOCATION MADE FOR
## PRIMERA ENERGY
## SCREAMING EAGLE B NO. 6H
## J. GIBSON SURVEY, A-23
## GONZALES COUNTY, TEXAS



1000      0    500  1000

( IN FEET )

This plat meets the requirements for filing a well location plat with the Texas Railroad Commission and is intended solely for that purpose.  This plat is not intended to represent a boundary survey and does not meet the requirements for boundary surveys in the State of Texas, prepared this the 27th day of January, 2014.



EBY
SURVEY

FIRM REG. NO. 10193705
600 Second Street
P.O. Box 1284
Woodsboro, TX 78393
Phone 361-543-8181
Fax    361-288-8438



STATE OF TEXAS
REGISTERED
NATHAN J. EBY
6198
PROFESSIONAL
LAND SURVEYOR

*Nathan Eby*

Registered Professional Land Surveyor
Registration No. 6198



J. GIBSON SURVEY
A-23

JOE FRED CRABB, ET UX
TRACT 'J'
VOL. 770, PG. 742
D.R.G.C.T.

COUNTY ROAD 415

LEASE LINE

6838' TO NORTH SURVEY LINE

5948' TO WEST SURVEY LINE
TERMINUS

PRIMERA ENERGY
WILLIAM & MARY SEGER
190.00 ACRES
VOL. 899, PG. 535
D.R.G.C.T.

EXXON MOBILE PIPELINE CO.

TEPPCO CRUDE PIPELINE, LLC.

B NO. 4H BORE PATH

KOP
PP
FTP

B NO. 4H SHL
ELEV.: 331'

159'
584'

402'
7445' TO EAST
SURVEY LINE

DONALD DEAN CLARK
246.00 ACRES

GENE HRNCIR
VOL. 1069, PG. 592
D.R.G.C.T.

THOMAS W. BOWERS FAMILY TRUST
100.00 ACRES
VOL. 917, PG. 706
D.R.G.C.T.

L. MALLET SURVEY
A-352

**SCREAMING EAGLE B NO. 4H** SURFACE HOLE LOCATION (SHL), X: 2566829, Y: 674446, Latitude: 29° 40' 35.01", Longitude: 97° 12' 53.65"; KICK OUT POINT (KOP), X: 2567061, Y: 675019, Latitude: 29° 40' 40.65", Longitude: 97° 12' 50.91"; PENETRATION POINT (PP), X: 2566604, Y: 674898, Latitude: 29° 40' 39.52", Longitude: 97° 12' 55.11"; FIRST TAKE POINT (FTP), X: 2566631, Y: 674898, Latitude: 29° 40' 39.52", Longitude: 97° 12'55.81"; LAST TAKE POINT (LTP), X: 2564880, Y: 674809, Latitude: 2564880, Longitude: 97° 13' 15.67"; TERMINUS, X: 2564486, Y: 674839, Latitude: 29° 40' 39.26", Longitude: 97° 13' 20.13".

Surface hole location is located 402' from the east lease line and 212' from the southeast lease line and 7445' from the east survey line and 212' from the southwest survey line; Kick out point is located 159' from the east lease line and 345' from the north lease line; Penetration point is located 611' from the east lease line and 450' from the north lease line; First take point is located 584' from the east lease line and 451' from the north lease line; Last take point is located 1610' from the southeast lease line and 478' from the north lease line; Terminus is located 1976' from the southeast lease line and 434' from the north lease line and 5948' from the west survey line and 6838' from the north survey line, situated approximately 6 miles northwest from the town of Moulton, TX.

There may be existing pipelines not shown on this plat. Use the Texas One Call System to locate pipelines before performing any excavation on this property.

Bearings, distances, and coordinates are based on the Texas State Plane Coordinate System, North American Datum of 1927, South Central Zone.

## PLAT SHOWING AS-DRILLED LOCATION MADE FOR
### PRIMERA ENERGY
### SCREAMING EAGLE B NO. 4H
### J. GIBSON SURVEY, A-23
### GONZALES COUNTY, TEXAS

1000      0      500      1000

( IN FEET )

This plat meets the requirements for filing a well location plat with the Texas Railroad Commission and is intended solely for that purpose. This plat is not intended to represent a boundary survey and does not meet the requirements for boundary surveys in the State of Texas, prepared this the 29th day of December, 2014.

**EBY
SURVEY**

FIRM REG. NO. 10193705
600 Second Street
P.O. Box 1284
Woodsboro, TX 78393
Phone 361-543-8161
Fax    361-288-8438



STATE OF TEXAS
REGISTERED
NATHAN J. EBY
6198
PROFESSIONAL
LAND SURVEYOR

*Nathan Eby*

Registered Professional Land Surveyor
Registration No. 6198



J. GIBSON SURVEY
A-23

7406' TO NORTH SURVEY LINE

COUNTY ROAD 415

B No. 4H BORE PATH

LEASE LINE

(1) WILLIAM & MARY SEGER
190.00 ACRES
VOL. 899, PG. 535
D.R.G.C.T.

LEASE LINE

KOP

1429'

PP

B No. 4H SHL

500'

BLACK HAWK No. 1 SHL
ELEV.: 340'

850'

630'

8507' TO EAST SURVEY LINE

LEASE/SURVEY LINE

7046' TO WEST SURVEY LINE

PRIMERA ENERGY
380 ACRES

(2)
THOMAS W. BOWERS FAMILY TRUST
190.00 ACERES
VOL. 917, PG. 708
D.R.G.C.T.

B No. 6V BORE PATH

LEASE/SURVEY LINE

PEACH CREEK

6207' TO WEST SURVEY LINE

BHL

850'

350'

L. MALLET SURVEY
A-352

**PRIMERA ENERGY**

**BLACK HAWK No. 1**
*WELL LOCATION*
**380 ACRE UNIT**
ABSTRACT 23 ~ J. GIBSON SURVEY
GONZALES COUNTY, TEXAS

1000   0   1000 FEET

PRIMERA ENERGY, LLC
21022 GATHERING OAK
SAN ANTONIO, TX 78260
OFFICE (210) 490-8200

N

**Surface Hole Location (SHL):**
7046' FWL & 630' FSEL
Longitude: -97° 13' 05.69"
Latitude: 29° 40' 34.63"
X = 2565767
Y = 674391
Elevation: 340' GL

Bearings, distances, and coordinates are based
on the North American Datum of 1927
Coordinate System, Texas State Plane, South
Central Zone.

Geographic coordinates are based on the North
American Datum of 1927.

KICK OFF POINT (KOP), Longitude: -97° 13' 05.38",
Latitude: 29° 40' 39.86", X: 2565786, Y: 674919

PENETRATION POINT (PP), Longitude: -97° 13'
08.52" Latitude: 29° 40' 34.59", X: 2565518,
Y: 674383

BOTTOM HOLE LOCATION (BHL), Longitude: -97°
13' 28.38", Latitude: 29° 40' 01.18", X: 2563817,
Y: 670982

I HEREBY STATE THIS PLAT TO BE TRUE &
CORRECT TO THE BEST OF MY KNOWLEDGE.